ROBERT A. DOTSON
Nevada State Bar No. 5285
DANIEL T. HAYWARD
Nevada State Bar No. 5986
JUSTIN C. VANCE
Nevada State Bar No. 11306
DOTSON, HAYWARD & VANCE, PC
5355 Reno Corporate Drive, Ste 100
Reno, Nevada 89511
Tel:   (775) 501-9400
Email:  rdotson@dhvnv.com
        dhayward@dhvnv.com
        jvance@dhvnv.com

GIBSON, DUNN & CRUTCHER LLP
THOMAS H. DUPREE JR.
*(Pro Hac Vice to be submitted)*
JACOB T. SPENCER
*(Pro Hac Vice to be submitted)*
1700 M Street, N.W.
Washington, DC  20036
Tel:   (202) 955-8500
Email  TDupree@gibsondunn.com
       JSpencer@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
ORIN SNYDER
*(Pro Hac Vice to be submitted)*
MATT BENJAMIN
*(Pro Hac Vice to be submitted)*
200 Park Avenue
New York, NY 10166
Tel:   (212) 351-4000
Email: OSnyder@gibsondunn.com
       MBenjamin@gibsondunn.com

Attorneys for Defendants BLOCKRATIZE INC. d/b/a POLYMARKET; QCX LLC d/b/a POLYMARKET US; ADVENTURE ONE QSS, INC. d/b/a POLYMARKET

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD,<br><br>            Plaintiff,<br><br>     v.<br><br>BLOCKRATIZE INC. d/b/a Polymarket; QCX LLC d/b/a Polymarket US; ADVENTURE ONE QSS INC. d/b/a Polymarket,<br><br>            Defendants. | CASE NO. _____<br><br>[Nev. Dist. Ct. No. 26OC000121B]<br><br>NOTICE OF REMOVAL TO FEDERAL COURT |

1

# NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1331, 1441(a), 1442(a) and 1446, Defendants Blockratize Inc. d/b/a Polymarket ("Blockratize"); QCX LLC d/b/a Polymarket US ("Polymarket US"); and Adventure One QSS Inc. ("Adventure One"), by and through their attorneys, hereby remove the above-captioned action from the First Judicial District Court of Nevada for Carson City, to the United States District Court for the District of Nevada.

This Notice of Removal is not intended and should not be construed as constituting the general appearance or appearance on the merits of Defendants in this matter. By filing this Notice of Removal, Defendants do not waive any defenses they have to this action whether in state or federal court, including, but not limited to, improper service of process and/or lack of personal jurisdiction. Defendants reserve the right to amend or supplement this Notice of Removal.

In support of removal, Defendants state as follows:

## BACKGROUND

1. Prediction markets, exchanges that trade a kind of derivative financial instrument known as event contracts, are a core component of modern, federally regulated financial markets. Hundreds of thousands of U.S. consumers—and millions worldwide—rely on these markets to obtain real-time, accurate information about consequential events in politics, finance, technology, news, and sports. Congress placed these markets squarely within a comprehensive federal regulatory regime and vested exclusive supervisory authority in the Commodity Futures Trading Commission ("CFTC").

2. In the United States, Polymarket US operates a federally licensed designated contract market that offers event contracts. Event contracts are a type of "swap," a financial contract where two parties agree to exchange—swap—payments with each other based on a pre-agreed formula, such as the price of crude oil or interest rates. For event contracts, the "payoff is based on a specified event or occurrence such as the release of a macroeconomic indicator, a corporate earnings announcement, or the dollar value of damages caused by a hurricane." CFTC,

*Futures Glossary: A Guide to the Language of the Futures Industry*.[1] Polymarket US offers event contracts subject to and in full compliance with the CFTC's regulatory oversight and federal law.

3. On January 29, 2026, CFTC Chairman Michael S. Selig publicly reaffirmed that the CFTC "has the expertise and responsibility to defend *its exclusive jurisdiction over commodity derivatives*"—including over event contracts traded on national contract markets. "[P]rediction markets, or event contracts," are "not new," he explained, but "have operated within the CFTC's regulatory perimeter for more than two decades." The Chairman emphasized that "the CFTC supports lawful innovation in these markets," which play an "important role . . . in the broader financial system." Exercising the CFTC's exclusive federal authority, the Chairman directed CFTC Staff "to move forward with drafting an events contracts rulemaking" to "establish[] clear standards" and "provide certainty to market participants." Warning that litigation like this suit—brought by state regulators seeking to displace federal authority—creates "uncertainty" that "has not served our markets well" and undermines "the public interest," the Chairman also "directed CFTC staff to reassess the Commission's participation in matters currently pending before the" courts.[2]

4. Just hours before the Chairman's statement, however, the Nevada state court entered an *ex parte* temporary restraining order prohibiting Defendants from offering *all* federally regulated event contracts in Nevada unless they first obtained a state gaming license. That order directly conflicts with federal law and intrudes upon the CFTC's exclusive and comprehensive authority to regulate exchange-traded derivatives markets nationwide.

5. State efforts to shut down operations of federally regulated derivatives exchanges are unlawful. Those exchanges are subject to exclusive federal oversight, not state regulation. Allowing state regulators to shut down derivates trading by rushing to state courts would fracture

---

[1] https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm.

[2] Remarks of Chairman Michael S. Selig, *The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance* (Jan. 29, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1 (emphasis added).

the uniform national framework Congress designed, subject to the sole federal regulator Congress appointed. This Court has jurisdiction to halt Plaintiff's unlawful intrusion and to prevent a single State from disrupting federally regulated markets that Congress placed exclusively under federal supervision.

6. This Court has jurisdiction under 28 U.S.C. § 1442 because Plaintiff's suit directly targets Polymarket US's "act[ions] under" the CFTC. In operating a designated contract market, Polymarket US acts as a self-regulatory organization exercising delegated authority from the CFTC, under the comprehensive oversight of the CFTC, assisting the CFTC by performing functions the federal agency itself would otherwise carry out. And those functions—certifying event contracts for listing, offering market access, resolving disputes, and promulgating and enforcing rules to promote fair and equitable trading and to protect the market and market participants—are exactly what Plaintiff's suit challenges. Polymarket US is therefore entitled to have its federal preemption defense resolved in federal court.

7. This Court also has jurisdiction under 28 U.S.C. § 1331. Plaintiff's purported state law claims necessarily turn on disputed questions about the meaning and scope of the Commodity Exchange Act ("CEA"). For example, to succeed on its claims, Plaintiff would have to prove that the CEA does not permit Polymarket US to offer event contracts without first obtaining a state license. And Plaintiff's own theory confirms that what Plaintiff calls "wagers" are what the CEA calls "swaps." Again, this Court is the proper forum to resolve those questions of federal law.

## I. Federal Regulatory Authority

8. Defendant Polymarket US operates a federally regulated derivatives exchange on which users nationwide trade event contracts—derivative financial instruments that constitute "swaps" under the CEA. *See* 7 U.S.C. § 1a(47)(A)(ii); Compl. ¶ 2 (Polymarket US is a "financial services company" that "operates a derivatives exchange and prediction market . . . where it offers products referred to as event contracts for sale").

9. On July 9, 2025, the CFTC formally approved Polymarket US as a designated contract market under the CEA—a designation reflecting an extensive federal finding that Polymarket US satisfies stringent requirements that govern derivatives trading on federal exchanges, including with respect to market integrity, access, transparency, financial safeguards, surveillance, and customer protection. *See* 7 U.S.C. §§ 7(a), 7(d), 8(a).

10. When it comes to exchange-traded event contracts, Congress could not have been clearer: the CFTC exercises "exclusive jurisdiction" over transactions involving swaps traded or executed on a designated contract market. 7 U.S.C. § 2(a)(1)(A). That exclusivity leaves no room to target federally regulated derivatives markets with state licensing regimes, enforcement actions, or injunctive relief.

11. Polymarket US operates in full compliance with the CFTC's comprehensive regulatory regime, including the CEA's 23 core principles and all CFTC rules governing market participant access, contract design, surveillance, enforcement, dispute resolution, and customer protection. *See* 7 U.S.C. §§ 7(d), 8(a); 17 C.F.R. §§ 38.3(a), 38.151.

## II. Nevada's Suit Directly Conflicts With Federal Law.

12. Despite this exclusive federal regime, the Nevada Gaming Control Board filed suit under state gaming statutes on January 16, 2026, asserting that federally regulated event contracts constitute unlawful "wagering" unless approved by Nevada regulators and accompanied by state licensure, taxation, and compliance with Nevada gaming procedures. Relying on this state-law theory, Plaintiff sought an *ex parte* temporary restraining order to immediately block Polymarket US from offering all federally regulated event contracts on its federally regulated exchange.

13. The Complaint purports to state a claim against Defendants under Nevada Revised Statutes §§ 463.160, 463.343, 463.346, 463.350, 465.086, and 465.092—*i.e.*, Nevada's gaming statutes—for Polymarket US's offering of *federally regulated* events contracts subject to the CFTC's exclusive jurisdiction. Compl. ¶¶ 36–80.

14. Plaintiff's theory is that contracts for "sports event and other events" constitute "wagering" activity under Nevada law. Compl. ¶¶ 19–20. In Plaintiff's view, offering those

event contacts is unlawful, among other reasons, because Defendants do not have a state license. *Id.* ¶ 25.

15. Plaintiff also asserts that, "[o]n information and belief," Polymarket US "does not employ adequate safeguards to ensure that wagers are not being placed on an event from owners, coaches, players, or officials participating in the event, and does not communicate about potential evidence of match fixing or point shaving with Nevada gaming regulatory authorities." Compl. ¶ 35.

16. Additionally, Plaintiff alleges that Defendants do "not pay taxes on gaming revenue" to "the State of Nevada" and allow "persons under the age of 21 years to place wagers on its market." Compl. ¶ 33.

17. In addition to the Complaint, Plaintiff filed a motion for an *ex parte* temporary restraining order and preliminary injunction. That motion asserts that Polymarket US "does not participate in the State's process," overseen by Plaintiff, "for disputes between a Nevada licensee and its patron," and that a "[p]erson entering a wager through an event contract available on" Polymarket US "has no recourse should there be a dispute over the wager." TRO Mot. 12. For that reason, Plaintiff maintains that Polymarket US "does not provide[] adequate protection to purchasers of event contracts." *Id.* And although Plaintiff has been litigating similar issues against other designated contract markets without an injunction for almost a year, it urged the state court to enter an *ex parte* temporary restraining order "immediately," without even affording Defendants the opportunity to meaningfully respond. *Id.* at 7.

18. Defendants will demonstrate that Plaintiff's Complaint fails as a matter of law. Congress expressly granted the CFTC—not the States—"exclusive jurisdiction" over exchange-traded event contracts. 7 U.S.C. § 2(a)(1)(A). It authorized the CFTC—not the States—to determine whether event contracts involve "gaming" and whether they may be listed or must be prohibited in the public interest. 7 U.S.C. § 7a-2(c)(5)(C). It stripped States of the power to bring most any claim against CFTC-regulated exchanges. *See* 7 U.S.C. § 13a-2. And it did so to ensure that regulation of "market participants" remains "under the oversight of the *Commission*," 7

U.S.C. § 5(b) (emphasis added)—and no "other regulatory agencies," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386 (1982). Even the state-law definition Nevada invokes to characterize event contracts as "wagers" confirms that they are swaps subject to the CFTC's exclusive jurisdiction. *Compare* Nev. Rev. Stat. § 463.01962 ("'Wager' means a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain."), *with* 7 U.S.C. § 1a(47)(A)(ii) (defining "swap" to include any contract providing for payment "that is dependent on the occurrence . . . of an event or contingency associated with a potential financial, economic, or commercial consequence").

19. As the CFTC Chairman made clear just last week in his public statement, "the Commission," not Plaintiff, has "exclusive jurisdiction over commodity derivatives."

20. Nevada's attempt to override and usurp the CFTC's exclusive federal authority through state-law injunctions is not regulation—it is unlawful displacement.

**III. Nevada's Suit Also Targets International Trading That Prohibits U.S. Users.**

21. Throughout the Complaint, Plaintiff conflates the federally regulated Polymarket US exchange—which is a federally regulated designated contract market—with Polymarket.com, a blockchain-based decentralized-finance trading protocol (the "International Protocol"). *See, e.g.*, Compl. ¶¶ 2, 20–23, 32–33.

22. Defendant Adventure One, a Panamanian corporation, provides trading-related services for the International Protocol. Defendant Blockratize, a Delaware corporation, developed the software for the International Protocol.

23. Neither Adventure One nor Blockratize maintains employees, property, or operations in Nevada. And individuals located in the United States are prohibited from trading on the International Protocol.

**FIRST GROUND FOR REMOVAL: FEDERAL OFFICER REMOVAL**

24. The federal officer removal statute guarantees Polymarket US the right to have its federal preemption defense heard by a federal court. As a self-regulatory organization, Polymarket US exercises delegated authority under the supervision of the CFTC to carry out

functions the CFTC itself would otherwise perform. And Plaintiff's suit directly targets the way Polymarket US exercises that delegated authority.

25. The federal officer removal statute authorizes removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). The Supreme Court has emphasized that "the statute must be 'liberally construed'" and that "[t]he words 'acting under' are broad." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007). The Ninth Circuit, likewise, has repeatedly affirmed that "removal rights under section 1442 are much broader than those under" the general removal statute. *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006). Federal officer removal "is an exception to the well-pleaded complaint rule," allowing "suits against federal officers to be removed despite the nonfederal cast of the complaint." *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006). And in assessing federal officer removal, courts credit the *defendant's* "theory of the case for purposes" of the "jurisdictional inquiry." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999).

26. Polymarket US satisfies the three-part test for federal officer removal because "(a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Durham*, 445 F.3d at 1251. And because Polymarket US is "entitled to remove under § 1442, . . . the entire case is remov[able] to the federal court." *Ely Valley Mines, Inc. v. Hartford Acc. & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981).

27. *First*, it is well-established that "corporations" like Polymarket US "are 'person[s]' under § 1442(a)(1)." *Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017) (collecting cases); *see also* 1 U.S.C. § 1 (defining "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals").

28. *Second*, Plaintiff's suit directly targets actions Polymarket US took under the supervision of and exercising authority delegated from the CFTC—including with respect to

8

NOTICE OF REMOVAL TO FEDERAL COURT

Dotson, Hayward
& Vance, PC
5355 Reno Corporate Dr.
Suite #100
Reno, Nevada  89511

market participant access, contract listing, safeguards, dispute resolution, and market integrity—establishing the necessary "causal nexus." *Goncalves*, 865 F.3d at 1244.

29. Polymarket US operates its designated contract market subject to the CFTC's "close direction" and "an unusually close [relationship] involving detailed regulation, monitoring, [and] supervision." *Doe v. Cedars-Sinai Health Sys.*, 106 F.4th 907, 914 (9th Cir. 2024). To operate as a designated contract market, Polymarket US must comply with the CEA's 23 core principles and all CFTC rules governing access, contract design, surveillance, enforcement, dispute resolution, and customer protection. *See* 7 U.S.C. §§ 7(d), 8(a); 17 C.F.R. §§ 38.3(a), 38.151. The CFTC has "sweeping authority" to enforce the CEA and its regulations. *CFTC v. Schor*, 478 U.S. 833, 842 (1986). The CEA expressly authorizes the CFTC to "review and approv[e] . . . event contracts" and thereby permit those contracts to be "listed" for "trading" on federally registered exchanges. 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii). The CFTC may also suspend or revoke the designation of a contract market, *id.* §§ 7b, 8(b), bring administrative enforcement actions, *id.* §§ 9, 13b, and sue in federal court for, among other things, injunctive relief, the rescission of contracts, and the imposition of trading and registration bans, *id.* § 13a-1.

30. In operating a designated contract market, Polymarket US functions as a "[s]elf-regulatory organization." 17 C.F.R. § 1.3. As a self-regulatory organization, Polymarket US "assist[s]" the CFTC, helping it to carry out "governmental tasks" that the CFTC would otherwise have to perform. *Goncalves*, 865 F.3d at 1245 (cleaned up). That includes by "perform[ing] 'a variety of regulatory functions that would, in other circumstances, be performed by a government agency.'" *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 390 F. Supp. 3d 916, 929 (N.D. Ill. 2019). In short, the relationship between Polymarket US and the CFTC goes well beyond that of a highly regulated entity subject to comprehensive supervision.

31. Courts, including the Ninth Circuit, have consistently held that self-regulatory organizations "exercis[e] quasi-governmental powers" and "authority delegated by Congress" or federal agencies. *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1214 (9th Cir. 1998) (self-regulatory organization under Securities Exchange Act of 1934), *abrogated*

*on other grounds*, 578 U.S. 374 (2016); *see also*, *e.g.*, *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) (holding that self-regulatory organization was immune for actions exercising authority "delegated by the SEC"); *DL Cap. Grp., LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 99 (2d Cir. 2005) (similar).

32. In its role as a self-regulatory organization, Polymarket US is specifically charged with a broad array of functions. For example, a designated contract market is required to "establish, monitor, and enforce compliance with the rules of the contract market," including "access requirements," "the terms and conditions of any contracts to be traded on the contract market," and "rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2).

33. A designated contract market also has the "responsibility to prevent manipulation, price distortion, and disruptions . . . through market surveillance, compliance, and enforcement practices and procedures." 7 U.S.C. § 7(d)(4).

34. A designated contract market likewise must "establish and enforce rules" "to protect markets and market participants from abusive practices committed by any party, including abusive practices committed by a party acting as an agent for a participant." 7 U.S.C. § 7(d)(12). To that end, it must also must "maintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information" "to assist in the prevention of customer and market abuses." *Id.* § 7(d)(10).

35. And a designated contract market must "establish and enforce rules regarding, and provide facilities for alternative dispute resolution as appropriate for, market participants and any market intermediaries." 7 U.S.C. § 7(d)(14).

36. To implement or revise a rule, a designated contract market must either submit the rule for CFTC approval or certify that the contract complies with federal law and the Commission's requirements. 7 U.S.C. § 7a-2(c)(1). The CFTC may allow the rule to go into effect, or it may stay the rule's certification pending further review. *Id.* § 7a-2(c)(2)–(3).

37. Similarly, to list new event contracts, the entity must either submit the event contract for CFTC approval or certify that the contract complies with federal law and the Commission's requirements. 7 U.S.C. § 7a-2(c)(1), (4)(A), (5)(C); 17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c). The CFTC retains authority to investigate, stay, or amend the contract after it has been listed. 17 C.F.R. § 40.2(c). If the CFTC determines that a proposed "[e]vent contract" involves certain subjects, including "gaming," it has the discretion to prohibit the listing if the contract would be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C).

38. In all of these respects, a designated contract market exercises authority delegated by the federal government. Because Polymarket US's actions "involve an effort to assist, or to help carry out, the duties or tasks of the federal superior," it "'acts under'" the authority of the CFTC. *Watson*, 551 U.S. at 152 (emphasis omitted).

39. The conduct Nevada challenges—market participant access, contract listing, safeguards, dispute resolution, and market integrity—falls squarely within the actions Polymarket US takes under the authority, supervision, and jurisdiction of the CFTC.

   a. Plaintiff seeks to impose liability on Polymarket US based on event contracts that are allegedly illegal under state law. *See* Compl. ¶¶ 60–80. But Polymarket US offers those event contracts pursuant to its status as a federally designated contract market subject to comprehensive CFTC oversight.

   b. Plaintiff says that Polymarket US improperly allows certain market participants to "create an account and trade on its platform." Compl. § 33. Yet federal law directs Polymarket US to "establish, monitor, and enforce compliance" with "access requirements," 7 U.S.C. § 7(d)(2), and provide "impartial access to its markets and services," 17 C.F.R. § 38.151 (b).

   c. While Plaintiff claims that Polymarket US "does not employ adequate safeguards" to ensure lawful transactions, Compl. ¶ 35, Polymarket US's obligation to "have and enforce rules that are designed to promote fair and equitable trading and to

           protect the market and market participants from abusive practices" is established by federal law, 17 C.F.R. § 38.651.

      d.   Similarly, Plaintiff complains about the adequacy of Polymarket US's dispute-resolution procedures, *see* TRO Mot. 11–12, another function Polymarket US exercises under the express directive and supervision of the federal government, *see* 7 U.S.C. § 7(d)(14); 17 C.F.R. § 38.750.

40.   These allegations easily clear the "low" "hurdle erected by the causal-connection requirement." *Goncalves*, 865 F.3d at 1244 (alterations omitted). The causal nexus is not attenuated; it is direct.

41.   *Third*, Plaintiff's claims are preempted by federal law, which constitutes "a colorable federal defense" for purposes of federal officer removal. *Goncalves*, 865 F.3d at 1249.

42.   Preemption follows from the express language of the CEA, which grants "exclusive jurisdiction" over exchange-traded derivatives to the CFTC, not state regulators. 7 U.S.C. § 2(a)(1)(A). Federal law authorizes the CFTC, not state regulators, to determine whether event contracts involve "gaming" and may be listed on federally regulated exchanges. 7 U.S.C. § 7a-2(c)(5)(C). And Congress ensured that the CFTC—and no "other regulatory agencies"—would establish a uniform, comprehensive regulatory framework to avoid fracturing national derivatives markets. *Merrill Lynch*, 456 U.S. at 386.

43.   "One of the primary purposes of the removal statute . . . was to have [federal officers'] defenses litigated in the federal courts." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). "State-court proceedings may reflect 'local prejudice' against unpopular federal laws and federal officials." *Watson*, 551 U.S. at 150. And private parties likewise may face "a significant risk of state-court 'prejudice.'" *Id.* at 152.

44.   This Court can and should recognize its jurisdiction under § 1442(a)(1) to ensure that Polymarket US's preemption defense is fairly and fully litigated.

## SECOND GROUND FOR REMOVAL: FEDERAL QUESTION JURISDICTION

45.  This case also belongs in federal court because it necessarily turns on disputed and substantial questions of federal law.  See 28 U.S.C. § 1331.

46.  Plaintiff's claims require the adjudication of federal-law issues that are "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable & Sons Metal Prods., Inc. v. Dante Eng'g & Mfg.*, 545 U.S. 308, 313–14 (2005)).

47.  Plaintiff's claims necessarily require proof that the event contracts at issue are illegal gambling—and those claims cannot be adjudicated without deciding disputed and substantial questions of federal law.  Plaintiff concedes that Polymarket US "operates a derivatives exchange" offering "event contracts."  Compl. ¶ 2.  The core question is whether Nevada may nonetheless impose its own licensing and enforcement regime on federally licensed derivatives exchanges.  And that question cannot be answered without interpreting the scope and effect of the CFTC's exclusive jurisdiction under the CEA.

48.  Take, for example, Plaintiff's claim that Polymarket US has violated Nevada Revised Statutes § 465.086.  *See* Compl. ¶¶ 46, 52, 75, 79.  That section states, "*Except as otherwise provided by law*, it is unlawful for a person to receive . . . any percentage or share of the money or property played, for accepting any bet or wager . . . without having first procured, and thereafter maintaining in effect, *all federal*, state, county and municipal gaming *licenses as required by statute*."  Nev. Rev. Stat. § 465.086(1) (emphases added).  Plaintiff's claim under this section raises three issues: (1) whether the "law" "otherwise provides" that Polymarket US need not "procure[]" and "maintain[]" a Nevada license; (2) whether Polymarket US holds the necessary "federal . . . licenses"; and (3) whether any other "licenses" are "required by statute." *Id.*

49.  Each issue necessarily requires Plaintiff to contend with federal law:  (1) By granting the CFTC "exclusive jurisdiction" over Polymarket US's exchange-traded contracts, 7

13

NOTICE OF REMOVAL TO FEDERAL COURT

U.S.C. § 2(a)(1)(A), the "law" "provide[s]" that Polymarket US need only comply with the CEA and CFTC regulations, not the Nevada licensing regime, Nev. Rev. Stat. § 465.086(1); (2) as a CFTC-designated contract market, Polymarket US has "procured" and "maintain[ed]" all the "federal . . . licenses" it needs to offer event contracts, *id.*; and (3) given the CEA's comprehensive scheme and the CFTC's exclusive jurisdiction over Polymarket US's designated contract market, Polymarket US likewise holds all the "licenses" that are "required by statute," *id.*

50. Because Plaintiff's claim will fail unless it can prove otherwise, the claim "necessarily depends on the interpretation and application of the CEA and the scope of the CFTC's exclusive jurisdiction." Order at 8, *Ga. Gambling Recovery LLC v. Kalshi Inc.*, No. 4:25-cv-310 (M.D. Ga. Feb. 2, 2026), Dkt. No. 46 (denying motion to remand suit against designated contract market for violations of state gaming law).

51. Plaintiff's own theory that event contracts constitute "wagers" under Nevada law confirms that they are in fact "swaps" subject to the CFTC's exclusive jurisdiction. The two statutory definitions necessarily overlap: A "wager" under Nevada law is "a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain." Nev. Rev. Stat. § 463.01962. And a "swap" under federal law includes contracts for which payment "is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Likewise, the CEA's "Special Rule" grants the *CFTC* discretion to decide whether "[e]vent contracts" involve "gaming"—and, if so, whether to prohibit their listing as contrary to the "public interest." *Id.* § 7a-2(c)(5)(C). Similarly, the CEA grants the CFTC exclusive jurisdiction to assess whether Polymarket US complied with its regulatory requirements—and, if so, whether to stay listing of any of its event contracts. *Id.* § 7a-2(c)(1).

52. Allowing a state court to adjudicate the legality of—and enjoin the trading of—federally regulated swaps would fracture national derivatives markets and undermine the uniformity Congress deemed essential by granting the CFTC exclusive jurisdiction over these

markets. The CFTC Chairman's clear guidance just last week confirms the supremacy of the federal government in regulating exchange-traded swaps. Upholding federal jurisdiction here does not disrupt the federal-state balance; it enforces it.

## ALL REMOVAL REQUIREMENTS ARE MET

53. Based on the foregoing facts and allegations, this Court has original jurisdiction over this action because Plaintiff's claims are for or relating to actions that Polymarket US took under color of federal office.

54. Based on the foregoing facts and allegations, this Court also has original jurisdiction over this action because the Complaint necessarily raises substantial, disputed federal questions that belong in a federal court.

55. Venue is proper in this Court because this judicial district and division embraces the First Judicial District Court of Nevada, Carson City, in which this case was filed. 28 U.S.C. §§ 1391, 1441(a), 1446(a).

56. Removal is timely because Defendants Blockratize and Polymarket US have agreed to accept service as of January 21, 2026, and the remaining Defendant has not yet been served, and therefore removal is being filed within 30 days of service of Plaintiff's Complaint. 28 U.S.C. § 1446(b)(1) and (2)(B).

57. All Defendants join this Notice of Removal. 28 U.S.C. § 1446(b)(2)(A).

58. Copies of all required process, pleadings, and orders are attached hereto as Exhibits B–D. 28 U.S.C. § 1446(a).

59. Defendants will provide Plaintiff with written notice of this filing, and they will promptly file a true and correct copy of this Notice of Removal with the Clerk of the District Court for Carson City. The Notice of Filing of Notice of Removal to be filed with the District Court for Carson City is attached as Exhibit A. 28 U.S.C. § 1446(d).

60. By filing this Notice of Removal, Defendants do not waive any objections as to notice, service, personal jurisdiction, venue, or any other defenses. Defendants reserve all of their

defenses, and this Notice of Removal is filed subject to full reservation of any rights and all objections, arguments, and defenses to Plaintiff's Complaint.

## CONCLUSION

Defendants hereby remove this action and respectfully request that the Court retain jurisdiction for all further proceedings in this matter.

DATED this 5th day of February 2026.

                            DOTSON, HAYWARD & VANCE, PC

                            */s/ Robert A. Dotson*
                            ROBERT A. DOTSON (NSB No. 5285)
                            DANIEL T. HAYWARD (NSB No. 5986)
                            JUSTIN C. VANCE (NSB No. 11306)
                            5355 Reno Corporate Drive, Ste 100
                            Reno, Nevada 89511
                            (775) 501-9400

                            Orin Snyder*
                            Matt Benjamin*
                            GIBSON, DUNN & CRUTCHER LLP
                            200 Park Avenue
                            New York, NY 10166
                            212.351.4000
                            OSnyder@gibsondunn.com
                            MBenjamin@gibsondunn.com

                            Thomas H. Dupree Jr.*
                            Jacob T. Spencer*
                            GIBSON, DUNN & CRUTCHER LLP
                            1700 M Street, N.W.
                            Washington, D.C. 20036
                            202.955.8500
                            TDupree@gibsondunn.com
                            JSpencer@gibsondunn.com

                            *Attorneys for Defendants BLOCKRATIZE INC. d/b/a POLYMARKET; QCX LLC d/b/a POLYMARKET US; ADVENTURE ONE QSS INC. d/b/a POLYMARKET*

                            **Pro hac vice* forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification to all counsel of record. I also caused a true and correct copy of the foregoing document to be served upon the following parties by First Class Mail and by email:

Jessica E. Whelan
John S. Michela
Sabrena K. Clinton
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
jwhelan@ag.nv.gov
jmichela@ag.nv.gov
sclinton@ag.nv.gov

Respectfully submitted,

By: