# EXHIBIT B

## Complaint

DISTRICT COURT CIVIL COVER SHEET

Carson City County, Nevada

Case No. _____ (Assigned by Clerk's Office)

REC'D & FILED
2026 JAN 16 PM 4: 59
WILLIAM SCOTT HOEN
BY _____ DEPUTY

## I. Party Information (provide both home and mailing addresses if different)

**Plaintiff(s) (name/address/phone):**
State of Nevada ex. rel.
Nevada Gaming Control Board

E-mail address: jwhelan@ag.nv.gov

Attorney (name/address/phone):

Law Firm/Bar # 14781

E-mail address:

**Defendant(s) (name/address/phone):**
Blockratize, Inc., et al.

E-mail address:

Attorney (name/address/phone):

Law Firm/Bar #

E-mail address:

## II. Nature of Controversy (Please Select the Primary Complaint or the One Most Applicable Case Type Below)

### Civil Case Filing Types

| Real Property | | Torts | |
|---|---|---|---|
| **Landlord/Tenant** | **Negligence** | **Other Torts** | |
| ☐ Unlawful Detainer | ☐ Auto | ☐ Product Liability | |
| ☐ Other Landlord/Tenant | ☐ Premises Liability | ☐ Intentional Misconduct | |
| **Title to Property** | ☐ Other Negligence | ☐ Employment Tort | |
| ☐ Judicial Foreclosure | **Malpractice** | ☐ Insurance Tort | |
| ☐ Foreclosure Mediation Assistance | ☐ Medical/Dental | ☐ Other Tort | |
| ☐ Other Title to Property (e.g., Quiet Title) | ☐ Legal | | |
| **Other Real Property** | ☐ Accounting | | |
| ☐ Condemnation/Eminent Domain | ☐ Other Malpractice | | |
| ☐ Other Real Property | | | |

| Probate | Construction Defect & Contract | Judicial Review/Appeal |
|---|---|---|
| **Probate** (select case type and estate value) | **Construction Defect** | **Judicial Review** |
| ☐ Summary Administration | ☐ Chapter 40 | ☐ Petition to Seal Records |
| ☐ General Administration | ☐ Other Construction Defect | ☐ Mental Competency (in Lower Court Proceedings) |
| ☐ Special Administration | **Contract Case** | **Nevada State Agency Appeal** |
| ☐ Set Aside ( ) Surviving Spouse | ☐ Uniform Commercial Code | ☐ Department of Motor Vehicle |
| ☐ Trust/Conservatorship | ☐ Building and Construction | ☐ Worker's Compensation |
| ☐ Other Probate | ☐ Insurance Carrier | ☐ Other Nevada State Agency |
| **Estate Value** | ☐ Commercial Instrument | **Appeal Other** |
| ☐ $300,000 or Greater | ☐ Collection of Accounts | ☐ Appeal from Justice/Municipal Court |
| ☐ $200,000-$299,999 | ☐ Employment Contract | ☐ Other Judicial Review/Appeal |
| ☐ $100,001-$199,999 | ☐ Other Contract | |
| ☐ $25,001-$100,000 | | |
| ☐ $20,001-$25,000 | | |
| ☐ $2,501-20,000 | | |
| ☐ $2,500 or less | | |

| Civil Writ | | Other Civil Filing |
|---|---|---|
| **Civil Writ** | | **Other Civil Filing** |
| ☐ Writ of Habeas Corpus | ☐ Writ of Prohibition | ☐ Compromise of Minor's Claim |
| ☐ Writ of Mandamus | ☐ Other Civil Writ | ☐ Foreign Judgment |
| ☐ Writ of Quo Warrant | | ☒ Other Civil Matters |

*Business Court filings should be filed using the Business Court civil coversheet.*

1/16/26
Date

Signature of initiating party or representative

*See other side for family/juvenile-related case filings.*

1  AARON D. FORD
     Attorney General
2  Jessica E. Whelan (Bar No. 14781)
     Chief Deputy Solicitor General – Litigation
3  John S. Michela (Bar No. 8189)
     Senior Deputy Attorney General
4  Sabrena K. Clinton (Bar No. 6499)
     Senior Deputy Attorney General
5  State of Nevada
   Office of the Attorney General
6  1 State of Nevada Way, Suite 100
   Las Vegas, NV 89119
7  (702) 486-3420 (phone)
   (702) 486-3773 (fax)
8  jwhelan@ag.nv.gov
   jmichela@ag.nv.gov
9  sclinton@ag.nv.gov

10 *Attorneys for Plaintiff*

**FIRST JUDICIAL DISTRICT COURT**

**CARSON CITY, NEVADA**

| | |
|---|---|
| STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD, | Case No.: 26OC00012 1B |
| Plaintiffs, | Dept. No.: I |
| vs. | |
| BLOCKRATIZE, INC. d/b/a POLYMARKET; QCX LLC d/b/a POLYMARKET US; ADVENTURE ONE QSS, INC. d/b/a POLYMARKET, | **COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF** |
| Defendants. | **Hearing Requested** |

Page 1 of 13

COMES NOW, Plaintiff, STATE OF NEVADA, ex rel. NEVADA GAMING CONTROL BOARD, by and through its attorneys, files this Complaint for BLOCKRATIZE, INC., d/b/a POLYMARKET; QCX LLC d/b/a POLYMARKET US; ADVENTURE ONE QSS, INC., d/b/a POLYMARKET's violations of State of Nevada gaming laws and hereby asserts and alleges as follows:

## PARTIES

1. At all times relevant hereto, STATE OF NEVADA, ex rel. NEVADA GAMING CONTROL BOARD ("BOARD") was and is a political subdivision of the State of Nevada established pursuant to NRS 463.030. The BOARD is charged with the responsibility of strictly regulating gaming in the State of Nevada because gaming is vitally important to the State, its economy, and the general welfare of its inhabitants.

2. At all times relevant hereto, BLOCKRATIZE, INC. d/b/a POLYMARKET; QCX LLC d/b/a POLYMARKET US; ADVENTURE ONE QSS, INC. d/b/a POLYMARKET (collectively "POLYMARKET") was and is a financial services company with its principal places of business in New York and Florida. POLYMARKET operates a derivatives exchange and prediction market ("market") where it offers products referred to as event contracts for sale. These products are offered for sale on POLYMARKET's mobile app and are made available to persons located in Nevada.

## GENERAL ALLEGATIONS

**A.  Nevada has a strong interest in regulating gaming in Nevada.**

3. The State of Nevada has a long history of gambling regulation and is the leader in gambling regulation in the United States.

4. In 1931, the Nevada Legislature legalized gambling in the State.

5. The Nevada Gaming Control Act of 1949 shifted gaming licensing from local government to state government.

6. With the passage of the Nevada Gaming Control Act, Nevada became the first State in the Nation to legalize sports betting.

7. "It is established beyond question that gaming is a matter of privilege conferred by the State rather than a matter of right." *State v. Rosenthal*, 93 Nev. 36, 40, 559 P.2d 830, 833 (1977).

8. Nevada's public policy, as expressed by the Legislature, is that "[t]he gaming industry is vitally important to the economy of the State and the general welfare of the inhabitants" and that "[a]ll establishments where gaming is conducted . . . must therefore be licensed, controlled and assisted to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State, to foster the stability and success of gaming and to preserve the competitive economy and policies of free competition of the State of Nevada." NRS 463.0129(1)(a)-(d).

9. The Legislature has conclusively determined that "[p]ublic confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments," NRS 463.0129(1)(c), and that any activity that reflects "discredit upon the State of Nevada or the gaming industry" may be deemed an unsuitable method of operation by the BOARD and the Nevada Gaming Commission ("COMMISSION"), Nev. Gaming Comm'n Reg. 5.011(1).

10. Currently, the State of Nevada has a two-tiered regulatory structure to regulate gaming within the State involving the BOARD and COMMISSION.

11. Nevada law requires that all gaming activity be strictly regulated and licensed, as the gaming industry is "vitally important to the economy of the State and the general welfare of the inhabitants." NRS 463.0129(1)(a).

12. Pursuant to Nevada law, the continued growth and success of gaming in the State of Nevada is "dependent upon public confidence and trust that licensed gaming" is "conducted honestly and competitively." NRS 463.0129(1)(b).

13. Pursuant to Nevada law, "public confidence and trust can only be maintained by <u>strict</u> regulation of all persons, locations, practices, associates, and activities related" to the operation of gaming in Nevada. NRS 463.0129(1)(c) (emphasis added).

14. Pursuant to Nevada law, all entities making gaming available in Nevada must "be licensed, controlled and assisted to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State." NRS 463.0129(1)(d).

15. Lack of enforcement of Nevada gaming laws against entities that make gaming accessible to persons within the State will severely impact Nevada's ability to strictly regulate gaming in Nevada and foster Nevada's gaming industry, which is vitally important to its economy and its citizens.

**B. POLYMARKET's market is a gambling game and/or sports pool and accepts wagers in or from Nevada.**

16. "Gaming" in Nevada is synonymous with "gambling" and includes any regulated game. NRS 463.0153.

17. A "game" subject to regulation in Nevada includes "any game played with . . . equipment or any mechanical or electronic device or machine for money . . . or any representative of value" that is accessible in Nevada. NRS 463.0152.

18. POLYMARKET's products meet the requirements of NRS 463.0152 because a person accesses POLYMARKET's market through POLYMARKET's mobile app and the use of the Internet and enters wagers through POLYMARKET's market with the payment of money. Moreover, POLYMARKET uses electronic devices such as computers and servers to make its wagers available on its mobile app and the Internet. Although POLYMARKET's website states that POLYMARKET is "not available to . . . persons located in the United States," users are able to access POLYMARKET by signing up for an account through its mobile app.

19. A game subject to regulation in Nevada includes a "sports pool." NRS 463.160. A "sports pool" is "the business of accepting wagers on sporting events or other events by any system or method of wagering." NRS 463.0193. A "wager" is "a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain." NRS 463.01962.

20. POLYMARKET's products meet the requirement of NRS 463.160 and NRS 463.0193 because POLYMARKET's market allows users to wager on the outcomes of sporting events and other events for which the outcome is uncertain. These sporting events and other events include, but are not limited to, college basketball games, college and professional football games, and elections. POLYMARKET also has offered wagers related to news events, such as wagers on when arrests would be made in connection with the shootings of Charlie Kirk and at Brown University. *See* POLYMARKET, *New Arrests in Charlie Kirk Shooting by September 30?*, perma.cc/6EQX-JRFP; POLYMARKET, *Brown University Shooter Arrested By . . . ?*, perma.cc/U7PA-6PBK.

21. POLYMARKET's event contracts are wagers: A user spends a sum of a money to buy an event contract on an outcome of an event, and receives a payout if the outcome occurs and not if the outcome does not occur. For example, as of January 16, 2026, a user could buy an event contract for $0.36 that would pay out $1 if the Chicago Bears won their January 18, 2026, NFL playoff game against the Los Angeles Rams—essentially, approximately 3/1 odds. POLYMARKET, *Rams v. Bears*, https://perma.cc/6YNG-F4PN.

22. A "game" subject to regulation in Nevada includes a "percentage game." NRS 463.1052. A "percentage game" exists where the "house" does not directly participate in a wager and its only stake is a commission derived from wagers. *See Hughes Props. v. State*, 100 Nev. 295, 297 (1984).

23. POLYMARKET's products meet this requirement because POLYMARKET takes a commission, or percentage, on the wagers placed through its market. POLYMARKET takes a percentage of money wagered through its market in the form of commissions styled as "trading fees." POLYMARKET, *Fees & Operating Hours*, perma.cc/FWA6-RADG.

24. In taking a percentage of the wagers placed through its market, POLYMARKET accepts wagers on sporting events and other events.

### C. POLYMARKET's offerings that are available in Nevada cause harm to Nevada.

25. Despite making wagers, sports betting, and other gaming activity ("gaming") accessible in the State of Nevada, POLYMARKET is not licensed in Nevada and does not comply with Nevada gaming law.

26. Nevada law requires every entity that makes gaming activities, including wagers, accessible in Nevada to be subject to a rigorous licensing process and an in-depth investigation of all entities and natural persons who directly or indirectly have an ownership interest in the entity offering the wagers.

27. POLYMARKET has not undergone Nevada's rigorous licensing process for its wagering activities.

28. Entities conducting gaming activities in the State of Nevada must pay taxes on gross gaming revenue derived from gaming activities accessible in the State.

29. POLYMARKET does not pay taxes on gross gaming revenue derived from gaming activities, including wagers, accessible in the State of Nevada.

30. Entities accepting wagers from persons in the State of Nevada must have a physical location in Nevada.

31. POLYMARKET does not have a physical location in Nevada for its wagering activity.

32. Entities accepting wagers in the State of Nevada on sporting events may not allow persons under 21 years of age to place wagers.

33. POLYMARKET allows persons under the age of 21 years of age to place wagers on its market. Specifically, it allows anyone over the age of 18 to create an account and trade on its platform. POLYMARKET, *Polymarket.com Terms of Use*, perma.cc/L3Y2-U4YS.

34. Entities accepting wagers in the State of Nevada on sporting events must employ safeguards to ensure that wagers are not being placed on an event by owners,

coaches, players, or officials participating in the event, and must communicate with Nevada gaming regulatory authorities about potential evidence of match fixing or point shaving.

35. On information and belief, POLYMARKET does not employ adequate safeguards to ensure that wagers are not being placed on an event from owners, coaches, players, or officials participating in the event, and does not communicate about potential evidence of match fixing or point shaving with Nevada gaming regulatory authorities.

**D.  POLYMARKET's market violates NRS 463.160.**

36. Pursuant to NRS 463.160, it is unlawful for a person to expose a game or a sports pool for play in Nevada without the required gaming licenses.

37. POLYMARKET's market exposes a percentage game for play in Nevada.

38. POLYMARKET's market exposes a sports pool for play in Nevada.

39. POLYMARKET does not possess a Nevada gaming license.

40. POLYMARKET does not possess a Nevada sports pool approval.

41. POLYMARKET, in making its market available to persons located in Nevada, has violated, and continues to violate, NRS 463.160.

**E.  POLYMARKET's market violates NRS 463.350.**

42. Pursuant to NRS 463.350, a person under the age of 21 may not play, be allowed to play, place wagers at, or collect winnings from any game or sports pool.

43. POLYMARKET's market does not restrict persons under the age of 21 from participating.

44. POLYMARKET's market constitutes a percentage game and/or sports pool.

45. POLYMARKET, in making its market available to persons located in Nevada who are under the age of 21, has violated, and continues to violate, NRS 463.350.

**F.  POLYMARKET's market violates NRS 465.086.**

46. Pursuant to NRS 465.086(1), it is unlawful for any person to directly or indirectly receive any compensation or any percentage or share of the money played for accepting or facilitating any wager upon the result of any sporting event without a gaming license.

47. POLYMARKET is not licensed to accept wagers.

48. POLYMARKET's market accepts wagers.

49. In addition to accepting wagers on the results of sporting events and other events, POLYMARKET's market facilitates wagers on sporting events and other events between individual participants in its market.

50. As set out above, these wagers are on sporting events and other events, including elections.

51. POLYMARKET takes a percentage of money wagered through its market in the form of commissions.

52. POLYMARKET, in making event-based contracts concerning the outcomes, or partial outcomes, of sporting or other events available on its market in Nevada, is a person directly or indirectly receiving compensation or a percentage or share of the money played for accepting or facilitating wagers on the results of sporting events and other events without a gaming license. As a result, it has violated, and continues to violate, NRS 465.086.

**G.   POLYMARKET's market violates NRS 465.092.**

53. Pursuant to NRS 465.092, it is unlawful for a person to knowingly accept a wager from a person inside of Nevada through a medium of communication unless the person accepting the wager is licensed pursuant to Nevada law and otherwise complies with applicable Nevada laws and regulations concerning wagering.

54. POLYMARKET's market accepts wagers on sporting events and other events.

55. POLYMARKET's market accepts wagers from persons inside of Nevada.

56. The Internet is a medium of communication. NRS 465.091.

57. POLYMARKET's market uses the Internet for wagering activities.

58. POLYMARKET is not and has never been licensed to accept wagers in Nevada.

59. POLYMARKET, in making event-based contracts concerning the outcomes, or partial outcomes, of sporting or other events available on its market in Nevada without

a license to accept such wagers, is a person knowingly accepting wagers from persons inside of Nevada through a medium of communication and has violated, and continues to violate, NRS 465.092.

## FIRST CLAIM FOR RELIEF

### (Declaratory and Injunctive Relief - NRS 463.343 and 463.346)

60. The BOARD repeats, realleges, and incorporates each and every paragraph contained in the General Allegations above as though fully set forth herein.

61. Pursuant to NRS 463.343, the BOARD may bring an action for declaratory judgment in this Court to obtain "a judicial determination of any question of construction or validity arising under" NRS chapter 463. NRS 463.343(1).

62. Pursuant to NRS 463.346, the BOARD may institute a civil action in this Court "to restrain a violation" of NRS chapters 463 and 465. NRS 463.346(1).

63. The Court "shall give priority over other civil actions to an action brought pursuant to" NRS 463.346. NRS 463.345.

64. A justiciable controversy exists as to the application of NRS 463.160 and 463.350 to the activities of POLYMARKET as they relate to the State of Nevada.

65. The BOARD's and POLYMARKET's interests are adverse.

66. The BOARD has a strong legal interest in this controversy as it directly impacts the BOARD's ability to carry out its legislative charge to strictly regulate gaming because it is vitally important to Nevada, its economy, and the general welfare of its inhabitants.

67. The issue involved in this controversy is ripe for judicial determination.

68. The Court is required to construe all statutes at issue in this claim for relief in a manner consistent with the declared public policy of Nevada. NRS 463.343(3).

69. The BOARD is entitled to a declaration from this Court that NRS 463.160 prohibits POLYMARKET from making event-based contracts concerning the outcomes, or

...

partial outcomes, of sporting or other events available on its market in Nevada without obtaining the required gaming licenses.

70. The BOARD is entitled to a declaration from this Court that NRS 463.350 prohibits POLYMARKET from making event-based contracts concerning the outcomes, or partial outcomes, of sporting or other events available on its market to persons under the age of 21 in Nevada.

71. The BOARD is entitled to an injunction enjoining POLYMARKET from making event-based contracts concerning the outcomes, or partial outcomes, of sporting or other events available on its market in Nevada unless and until POLYMARKET obtains the appropriate gaming licenses.

72. The BOARD is entitled to an injunction enjoining POLYMARKET from making event-based contracts concerning the outcomes, or partial outcomes, of sporting or other events available on its market to persons under the age of 21 in Nevada.

## SECOND CLAIM FOR RELIEF

### (Declaratory and Injunctive Relief - NRS 30.030)

73. The BOARD repeats, realleges, and incorporates each and every paragraph contained in the General Allegations above as though fully set forth herein.

74. Pursuant to NRS 30.030, this Court has the "power to declare rights, status and other legal relations whether or not further relief is or could be claimed." NRS 30.030. The declaration "may be either affirmative or negative in form and effect" and "shall have the force and effect of a final judgment or decree." *Id.*

75. A justiciable controversy exists as to the application of NRS 465.086 and 465.092 to the activities of POLYMARKET as they relate to Nevada.

76. The BOARD's and POLYMARKET's interests are adverse.

77. The BOARD has a strong legal interest in this controversy as it directly impacts the BOARD's ability to carry out its legislative charge to strictly regulate

...

gaming because it is vitally important to Nevada, its economy, and the general welfare of its inhabitants.

78. The issue involved in this controversy is ripe for judicial determination.

79. The BOARD is entitled to a declaration from this Court that NRS 465.086 and 465.092 prohibit POLYMARKET from making event-based contracts concerning the outcomes, or partial outcomes, of sporting or other events available on its market in Nevada without obtaining the required gaming licenses.

80. The BOARD is entitled to an injunction enjoining POLYMARKET from making event-based contracts concerning the outcomes, or partial outcomes, of sporting or other events available on its market in Nevada unless and until POLYMARKET obtains the appropriate gaming licenses.

## PRAYER FOR RELIEF

WHEREFORE, the BOARD prays for judgment against POLYMARKET as follows:

1. For a declaration that NRS 463.160, 465.086, and 465.092 prohibit POLYMARKET from making event-based contracts concerning the outcomes, or partial outcomes, of sporting or other events available on its market in Nevada without obtaining the required gaming licenses;

2. For a declaration that NRS 463.350 prohibits POLYMARKET from making event-based contracts concerning the outcomes, or partial outcomes, of sporting or other events available on its market to persons under the age of 21 in Nevada;

3. For an injunction enjoining POLYMARKET from making event-based contracts concerning the outcomes, or partial outcomes, of sporting or other events available on its market in Nevada unless and until POLYMARKET obtains the appropriate gaming licenses;

4. For an injunction enjoining POLYMARKET from making event-based contracts concerning the outcomes, or partial outcomes, of sporting or other events available on its market to persons under the age of 21 in Nevada;

...

5. For reasonable attorneys' fees and costs of suit incurred herein; and

6. For such other and further relief as the Court deems just and proper.

## AFFIRMATION

The undersigned does hereby affirm that the proceeding document does not contain the social security number of any person.

DATED this 16th day of January 2026.

AARON D. FORD
Attorney General

By: _____ #11543
Jessica E. Whelan (Bar No. 14781)
Chief Deputy Solicitor General – Litigation
John S. Michela (Bar No. 8189)
  Senior Deputy Attorney General
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
jwhelan@ag.nv.gov
jmichela@ag.nv.gov
sclinton@ag.nv.gov

*Attorneys for Plaintiff*

# CERTIFICATE OF SERVICE

I certify that I am an employee of the Office of the Attorney General, State of Nevada, and that on January 16, 2026, I deposited for mailing in the United States Mail, first-class postage prepaid, at Carson City, Nevada, a true and correct copy of the COMPLAINT for permanent injunction and declaratory relief to the following:

BLOCKRATIZE, INC. d/b/a POLYMARKET
c/o CORPORATION SERVICE COMPANY
251 LITTLE FALLS DRIVE
WILMINGTON, DE 19808

QCX LLC d/b/a POLYMARKET US
c/o CORPORATION SERVICE COMPANY
251 LITTLE FALLS DRIVE
WILMINGTON, DE 19808

ADVENTURE ONE QSS, INC. d/b/a POLYMARKET
1280 LEXINGTON AVE
NEW YORK, NY 10028

_____
Mercedita Garcia
AG Legal Secretary