# EXHIBIT C

## Other State Court Pleadings

1  AARON D. FORD
     Attorney General
2  Jessica E. Whelan (Bar No. 14781)
     Chief Deputy Solicitor General – Litigation
3  Sabrena K. Clinton (Bar No. 6499)
     Senior Deputy Attorney General
4  John S. Michela (Bar No. 8189)
     Senior Deputy Attorney General
5  State of Nevada
   Office of the Attorney General
6  1 State of Nevada Way, Suite 100
   Las Vegas, NV 89119
7  (702) 486-3420 (phone)
   (702) 486-3773 (fax)
8  jwhelan@ag.nv.gov
   sclinton@ag.nv.gov
9  jmichela@ag.nv.gov

10  *Attorneys for Plaintiff*

RECD & FILED

2026 JAN 16  PM 5: 00

WILLIAM SCOTT HOEN
CLERK
BY_____
DEPUTY

11                    **FIRST JUDICIAL DISTRICT COURT**

12                        **CARSON CITY, NEVADA**

| | |
|---|---|
| 13  STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD, | Case No. 26 OC 00012 1B |
| 14 | Dept. No. 1 |
| 15        Plaintiff, | |
| 16  vs. | **Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction** |
| 17  BLOCKRATIZE, INC. d/b/a POLYMARKET; QCX LLC d/b/a POLYMARKET US; ADVENTURE ONE | |
| 18  QSS, INC. d/b/a POLYMARKET | **Hearing Requested** |
| 19        Defendants. | |

20

21        Plaintiff, STATE OF NEVADA, ex rel. NEVADA GAMING CONTROL BOARD

22  ("BOARD"), by and through its attorneys, hereby files this Application for Immediate

23  Temporary Restraining Order and Motion for Preliminary Injunction against

24  BLOCKRATIZE, INC. d/b/a POLYMARKET, QCX LLC d/b/a POLYMARKET US, and

25  ADVENTURE ONE QSS, INC. d/b/a POLYMARKET (collectively, "POLYMARKET"). The

26  BOARD seeks to restrain and enjoin POLYMARKET and any of its agents, employees,

27  officers, or affiliates from operating a derivatives exchange and prediction market

28  ("market") that offers event-based contracts relating to sporting and other events to people

1  within Nevada without obtaining all required Nevada gaming licenses, and from allowing

2  its market to accept wagers from persons under the age of 21 in Nevada.  This Application

3  and Motion are made pursuant to NRCP 65 and are based upon the following Memorandum

4  of Points and Authorities, all papers on file herein, and any oral argument this

5  Court permits.

**MEMORANDUM OF POINTS AND AUTHORITIES**

6  

7  **I.    FACTS**

8      **A.    The State Comprehensively Regulates Gaming in Nevada.**

9      Nevada has a long history of gaming regulation.  Except for a brief period during

10  prohibition, Nevada has allowed some form of legalized gaming for over 150 years.  *See*

11  Becky Harris & Husna Alikhan, *Nevada, Over 60 Years Regulating Gambling—A*

12  *Jurisdictional Overview*, 23 Gaming L. Rev. 645, 648 & n.18 (2019).

13      Nevada's gaming industry is "vitally important to the economy of the State

14  and the general welfare of the inhabitants."  NRS 463.0129(1)(a).  All entities that

15  conduct gaming in Nevada must "be licensed, controlled and assisted to protect the

16  public health, safety, morals, good order and general welfare of the inhabitants of the

17  State."  NRS 463.0129(1)(d).

18      The Nevada Legislature has found that the continued growth and success of gaming

19  "is dependent on public confidence and trust that licensed gaming" is "conducted honestly

20  and competitively."  NRS 463.0129(1)(b).  And the Legislature has made clear that "public

21  confidence and trust can only be maintained by *strict* regulation of all persons, locations,

22  practices, associates, and activities related" to the operation of gaming in Nevada.

23  NRS  463.0129(1)(c)  (emphasis  added).  The  BOARD  is  statutorily  charged  with

24  administering and enforcing Nevada gaming law.  NRS 463.140(1).

25      "Gaming" in Nevada is synonymous with "gambling" and includes any regulated

26  game. NRS 463.0153. A "game" subject to regulation in Nevada includes "any game played

27  with . . . equipment or any mechanical or electronic device or machine for money . . . or any

28  representative of value" that is accessible in Nevada.  NRS 463.0152.  The games subject

1   to regulation in Nevada include "percentage game[s]." NRS 463.0152. A "percentage game"

2   exists where the "house" does not directly participate in a wager and its only stake is a

3   commission derived from the wager. *See Hughes Props. v. State*, 100 Nev. 295, 297 (1984).

4   Gaming includes operating a "sports pool," which is "the business of accepting wagers on

5   sporting events or other events by any system or method of wagering," NRS 463.0193;

6   a "wager" is "a sum of money or representative of value that is risked on an occurrence for

7   which the outcome is uncertain," NRS 463.01962.

8       Nevada law comprehensively regulates entities that conduct gaming activities in the

9   State. Every entity that makes gaming activities accessible in Nevada is subject to a

10  rigorous licensing process. NRS 463.160(1). Entities conducting gaming activities in the

11  State of Nevada must pay taxes on gross gaming revenue derived from gaming activities

12  accessible in the State. NRS 463.373. Licensed entities accepting wagers from persons

13  in the State of Nevada must have a physical location in Nevada. Nev. Gam'g Comm.

14  Reg. 22.060(2). Licensed entities may not accept wagers from those under 21 years of age.

15  NRS 463.350. Further, licensed entities accepting wagers on sporting events must employ

16  safeguards to ensure that wagers are not being placed on an event by owners, coaches,

17  players, or officials participating in the event, and must communicate with Nevada gaming

18  regulatory authorities about potential evidence of match fixing or point shaving. *See* Nev.

19  Gam'g Comm. Reg. 22.1205(2). Failing to enforce these laws would severely weaken the

20  State's ability to strictly regulate gaming and would jeopardize the growth and integrity of

21  Nevada's gaming industry, which is vitally important to its economy and the welfare of

22  its citizens.

23   **B.    POLYMARKET's Market is a Gambling Game and/or Sports Pool and Accepts Wagers from Persons in Nevada.**

24

25       POLYMARKET operates a market that offers event-based contracts relating to

26  sporting and other events. Compl. ¶ 20. These events include, but are not limited to,

27  college basketball games, college and professional football games, and elections. *Id.*

28

POLYMARKET's event contracts are wagers under NRS 463.01962: POLYMARKET's market allows persons located in Nevada to risk money on sporting events and elections, and the outcomes of sporting events and elections are, by their very nature, uncertain. *See, e.g.*, POLYMARKET, *Rams vs Bears*, perma.cc/6YNG-F4PN (allowing a user to spend $0.36 on an event contract that pays out $1.00 if the Bears win their January 18, 2026, playoff game against the Rams). POLYMARKET consequently operates a "sports pool" under Nevada law. NRS 463.0193.

Further, POLYMARKET's market takes a commission, or percentage, on the wagers placed through its market. *See* POLYMARKET, *Fees & Operating Hours*, perma.cc/FWA6-RADG. POLYMARKET accordingly offers a "percentage game"—a type of "gambling game"—under Nevada law. NRS 463.0152.

A person can access POLYMARKET's market through its mobile app. Compl. ¶ 18. POLYMARKET uses computers and servers to make its event-based contracts available on its mobile app. *Id.* A person enters into an event-based contract on POLYMARKET's market with the payment of money. *Id.*

### C.    POLYMARKET's Activities in Nevada Cause Harm to Nevada.

Although POLYMARKET conducts gaming activity in Nevada, including by operating a sports pool, POLYMARKET does not comply with Nevada gaming law. Among other things, POLYMARKET has not undergone Nevada's rigorous licensing process to obtain a gaming license for its wagering activities. Compl. ¶ 27. It accordingly does not possess a Nevada license to conduct gaming activities, including operating a sports pool. *Id.* ¶ 37. Further, POLYMARKET does not pay taxes on gross gaming revenue generated from wagers placed by persons in Nevada. *Id.* ¶ 29. And POLYMARKET does not have a physical location in Nevada. *Id.* ¶ 31.

POLYMARKET also does not comply with the various regulations on gaming that Nevada has imposed to protect Nevada and its citizens. POLYMARKET does not require its patrons to be at least 21 years of age to place a wager in its markets, Compl. ¶ 33; instead, it allows anyone over the age of 18 to create an account and trade on its platform,

*see* POLYMARKET, *Terms of Service* (Aug. 26, 2025), perma.cc/L3Y2-U4YS.  To Plaintiff's knowledge, POLYMARKET does not employ adequate safeguards to ensure that wagers are not being placed on an event by owners, coaches, players, or officials participating in the event, and does not communicate about potential evidence of match fixing or point shaving to Nevada regulatory authorities.  Compl. ¶ 35.

## II.   PROCEDURAL HISTORY

On January 16, 2025, the BOARD filed this action to obtain a declaration from this Court that POLYMARKET is violating Nevada law and an injunction ordering POLYMARKET to cease its violations of Nevada law.  *See* Compl. 11.  In this Application for Temporary Restraining Order and Motion for Preliminary Injunction, the BOARD seeks a temporary restraining order and preliminary injunction prohibiting POLYMARKET and any of its agents, employees, officers, or affiliates from operating a market that offers event-based contracts relating to sporting and other events to people within Nevada without obtaining the required Nevada gaming licenses, and prohibiting POLYMARKET from allowing its market to accept wagers from persons under the age of 21 in Nevada.

## III.   LEGAL STANDARD

A court should grant preliminary injunctive relief when it "appear[s] by the complaint that the plaintiff is entitled to the relief demanded, and such relief or any part thereof consists in restraining the commission or continuance of the act complained of," NRS 33.010(1), and when "the commission or continuance of some act, during the litigation, would produce great or irreparable injury to the plaintiff," NRS 33.010(2).  The plaintiff must demonstrate two elements:  (1) there is a reasonable likelihood that the plaintiff will prevail in the underlying case and (2) absent a preliminary injunction, the plaintiff will suffer irreparable harm for which compensatory damages are not sufficient.  *Elk Point Country Club Homeowners' Ass'n, Inc. v. K.J. Brown, LLC,* 138 Nev. 640, 642, 515 P.3d 837, 839 (2022); *Posner v. U.S. Bank Nat'l Ass'n,* 140 Nev. Adv. Op. 22, 545 P.3d 1150, 1152 (Nev. 2024).  The court may also consider the balance of hardships and the public interest.

*See Univ. & Cmty. Coll. Sys. of Nev. v. Nevadans for Sound Gov't,* 120 Nev. 712, 721, 100 P.3d 179, 187 (2004).

Nevada Rule of Civil Procedure 65(b) authorizes a court to issue an ex parte temporary restraining order.    Courts often apply similar standards for temporary restraining orders and preliminary injunctions, as both are forms of injunctive relief aimed at preventing harm before a final resolution of the case.  *See, e.g., LIT Ventures, LLC v. Carranza,* 457 F. Supp. 3d 906, 908 (D. Nev. 2020).  The key question is whether the Plaintiff has shown that it will suffer "immediate and irreparable injury."  NRCP 65(b); *see State ex rel. Friedman v. Eighth Jud. Dist. Ct. In & For Clark Cnty.,* 81 Nev. 131, 134, 399 P.2d 632, 633 (1965).

The requirements for both a preliminary injunction and for a temporary restraining order are met here.  In particular, the BOARD is suffering serious, ongoing, irreparable harm every day that POLYMARKET operates its market in violation of Nevada law, and so the Court should immediately issue a temporary restraining order.

## IV.    ARGUMENT

POLYMARKET has been willfully circumventing Nevada law requiring all gaming activity in the State to be strictly regulated and licensed.  POLYMARKET operates a "sports pool" and/or "gambling game" under Nevada law.  Yet POLYMARKET does not possess a Nevada license to operate a sports pool or conduct other gaming activity in Nevada.  POLYMARKET also does not follow many of the restrictions on licensed gaming in the State.  In particular, POLYMARKET allows persons under 21 years of age to wager on its market.  Accordingly, the BOARD is entitled to a temporary restraining order and preliminary injunction prohibiting POLYMARKET from operating an unlicensed sports pool in Nevada and prohibiting POLYMARKET from accepting wagers from persons under the age of 21.

### A.    Plaintiff is likely to succeed on the merits of its claims.

The BOARD is likely to succeed in showing that POLYMARKET violates, at a minimum, NRS 463.160, 463.350, 465.086, and 465.092.

POLYMARKET violates NRS 463.160.  Pursuant to NRS 463.160, it is unlawful for a person to expose a game or a sports pool for play in Nevada without the required gaming licenses.  POLYMARKET's market exposes a percentage game and/or sports pool for play in Nevada.  Compl. ¶¶ 18–24.  POLYMARKET does not possess a Nevada gaming license either to offer a percentage game or to operate a sports pool in Nevada.  *Id.* ¶ 39.  Accordingly, POLYMARKET, in making its market available to persons located in Nevada, has violated and continues to violate NRS 463.160.

POLYMARKET violates NRS 463.350.  Pursuant to NRS 463.350, a person under the age of 21 may not play, be allowed to play, place wagers at, or collect winnings from any game or sports pool.  POLYMARKET's market constitutes a percentage game and/or sports pool.  Compl. ¶¶ 18–24.  Yet POLYMARKET's market does not restrict persons under the age of 21 from participating.  *Id.* ¶ 43.  Accordingly, POLYMARKET, in making its market available to persons located in Nevada who are under the age of 21, has violated and continues to violate NRS 463.350.

POLYMARKET violates NRS 465.086.  Pursuant to NRS 465.086(1), it is unlawful for any person to directly or indirectly receive any compensation or any percentage or share of the money played for accepting or facilitating any wager upon the result of any sporting event without a gaming license.  POLYMARKET is not licensed to accept wagers in Nevada.  Compl. ¶ 47.  POLYMARKET's market accepts wagers in Nevada.  *Id.* ¶ 48.  In addition to accepting wagers on the results of sporting events and other events, POLYMARKET's market facilitates wagers on sporting events and other events between individual participants in its market.  *Id.* ¶ 49.  POLYMARKET takes a percentage of money wagered through its market in the form of commissions styled as "trading fees."  POLYMARKET, *Fees & Operating Hours*, perma.cc/FWA6-RADG.  Accordingly, POLYMARKET, in operating its market, has violated and continues to violate NRS 465.086.

POLYMARKET violates NRS 465.092.  Pursuant to NRS 465.092, it is unlawful for a person to knowingly accept a wager from a person inside of Nevada through a medium of

communication unless the person accepting the wager is licensed pursuant to Nevada law and otherwise complies with applicable Nevada laws and regulations concerning wagering. POLYMARKET's market accepts wagers on sporting events and other events. Compl. ¶ 54. POLYMARKET's market accepts wagers from persons inside of Nevada. *Id.* ¶ 55. The Internet is a medium of communication. NRS 465.091. POLYMARKET's market uses the Internet for wagering activities. Compl. ¶ 57. Accordingly, in operating its market, POLYMARKET is a person knowingly accepting wagers from persons inside of Nevada through a medium of communication, and has violated and continues to violate NRS 465.092.

For at least these reasons, POLYMARKET is violating Nevada gaming law. Yet POLYMARKET has made clear that it will not voluntarily obtain a gaming license or otherwise comply with Nevada gaming law. The BOARD therefore is likely to succeed on the merits of its claims and obtain a permanent injunction from this Court enjoining POLYMARKET from operating its market without complying with Nevada gaming law.

**B.    Plaintiff is suffering and will continue to suffer immediate and irreparable harm absent relief.**

Plaintiff suffers serious and irreparable harm every day that POLYMARKET operates its market in violation of Nevada law. The Nevada Legislature has enacted a "comprehensive regulatory structure, coupled with strict licensing standards" to ensure the integrity of gaming in the State. NRS 463.745. Plaintiff is statutorily charged with enforcing Nevada gaming law and overseeing Nevada's gaming industry, to protect the reputation of the State of Nevada, to protect the reputation of gaming in Nevada, and to protect the public health, safety, morals, good order, and general welfare of the inhabitants of Nevada. NRS 463.140(1).

POLYMARKET's failure to comply with Nevada gaming law impairs the BOARD from carrying out its statutory functions. For example, in order to ensure that wagering is fair, Nevada gaming regulations prohibit accepting wagers on sporting events from owners, coaches, players, officials, or other participants in the event and require licensees to take

reasonable steps to avoid circumvention of this regulation.    Nev. Gam'g Comm. Reg. 22.1205(2).  Licensed sports books also must:  (1) obtain certain identification information from patrons who place wagers of a certain size; (2) prevent multiple wagers designed to circumvent the identification requirements for wagers of a certain size; and (3) prevent wagers structured to circumvent the identification requirements.  Nev. Gam'g Comm. Reg. 22.061, 22.062, and 22.063.  Further, licensed sports books must communicate with the BOARD about potential evidence of match fixing or point shaving.  *See* Nev. Gam'g Comm. Reg. 22.121.    To Plaintiff's knowledge, POLYMARKET does not adhere to these requirements, which harms the BOARD by preventing it from ensuring the integrity of gaming in the State.

POLYMARKET's failure to comply with Nevada gaming law gives it a massive and unfair competitive advantage over its competitors, which greatly disrupts the gaming industry.  That advantage is both pecuniary, in that POLYMARKET does not need to spend the money its competitors need to spend on licensing fees, taxes, and compliance (including maintaining a physical location in Nevada), as well as strategic, in that POLYMARKET's products are not subject to the same requirements as its competitors.  Plaintiff, which is charged with ensuring that gaming in Nevada is fair, suffers irreparable harm when POLYMARKET is able to distort the playing field and disrupt the industry in this manner.  *See Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1509 (9th Cir. 1993).

The harm only increases the longer POLYMARKET is allowed to operate unfettered.  POLYMARKET's ability to profit from unlicensed gaming will incentivize others to enter into prediction markets instead of becoming (or remaining) licensed by the State.  Indeed, that already has started to happen: DraftKings and FanDuel have decided to forgo licensing in Nevada so that they can enter the prediction-markets business in other States.  *See KalshiEX LLC v. Hendrick*, 2025 WL 3286282, at *14 (D. Nev. Nov. 24, 2025), *appeal pending*, No 25-7516 (9th Cir. filed Nov. 25, 2025).  Other sportsbooks could follow suit, "unleashing even more unregulated gambling." *Id.*

Thus, the harms caused by POLYMARKET are on-going, serious, and irreparable. The BOARD seeks to stop the myriad of harms caused by POLYMARKET.

### C. The balance of hardships and the public interest weigh heavily in favor of granting a temporary restraining order and preliminary injunction.

Compared to the ongoing, severe, irreparable harm that POLYMARKET's market causes to the BOARD and to the State, any harms that POLYMARKET claims to suffer from an injunction are insignificant. Indeed, the BOARD seeks only for POLYMARKET to follow Nevada gaming law, and following the law is not a harm. *See Goldman v. Newage Lake Las Vegas, LLC*, 2019 WL 13254890, at *1 (D. Nev. Oct. 23, 2019).

POLYMARKET may contend that federal law preempts Nevada gaming law, and that it is harmed by being required to follow preempted law. But a federal district court evaluating this argument brought by POLYMARKET's competitor concluded that the competitor is not likely to prevail on the argument. *KalshiEX*, 2025 WL 3286282, at *6–12. In any event, as the federal court explained, any claimed harms from being required to stop operating are "largely monetary"—"essentially that [the company] will not be able to profit from [its] trades"—and pale in comparison to the harms to the BOARD. *Id* at *12. Notably, the federal agency POLYMARKET may claim to regulate it expressly told POLYMARKET to "account[] for" "State regulatory actions and pending and potential litigation, including enforcement actions," and that it should have "contingency plans," including "liquidation or close-out policies and procedures" in the event it cannot operate in a State. U.S. Commodity Futures Trading Comm'n, CFTC Letter No. 25-36, at 2 (Sept. 30, 2025), perma.cc/B26G-SBH5. The balance of harms thus weighs in the BOARD's favor. *KalshiEX*, 2025 WL 3286282, at *13.

The public interest similarly weighs in favor of enjoining POLYMARKET from violating Nevada gaming law. The Legislature has determined that "[p]ublic confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments." NRS 463.0129(1)(c). "All establishments where gaming is conducted . . . must therefore be

licensed, controlled and assisted to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State." NRS 463.0129(1)(d). The Legislature thus has determined that the public interest requires *all* gaming operators to be licensed and to follow Nevada gaming law. Any gaming business, including POLYMARKET, that does not comply with Nevada gaming law poses a threat to this vital industry.

In particular, POLYMARKET does not adhere to the consumer-protection requirements in Nevada law. To start, POLYMARKET's operations harm some of Nevada's most vulnerable residents. Nevada law prohibits persons under 21 from placing sports wagers, NRS 463.350(1)(a), but POLYMARKET does not require its participants to be 21 years of age. Nevada law also protects those suffering from problem gaming by requiring, among other measures, that gaming licensees letting patrons set deposit limits, "conspicuously display" information about responsible-gaming resources, train employees to identify signs of problem gaming, and refrain from marketing to customers who have excluded themselves. Nev. Gam'g Comm. Reg. 5.225(18)(a)-(b). To Plaintiff's knowledge, POLYMARKET does not adhere to these requirements to the extent required by Nevada law.

POLYMARKET's operations further harm the gaming public because POLYMARKET does not participate in the State's process to resolve patron disputes. *See* NRS 463.362 *et seq.* Patrons of licensed gaming establishments may utilize a process with the BOARD to resolve disputes related to wagering activities. But this structure is in place only for disputes between a Nevada licensee and its patron. NRS 463.362. A person entering a wager through an event contract available on POLYMARKET's market is not a patron of a Nevada licensee and, thus, pursuant to the applicable statutes, has no recourse should there be a dispute over the wager. POLYMARKET's market thus harms the public interest because it does not provides adequate protection to purchasers of event contracts.

POLYMARKET also harms the State's economy and the public fisc. Licensed gaming is "vitally important to the economy of the State and the general welfare of the inhabitants." NRS 463.0129(1)(a). All licensed gaming operators must pay taxes, *see*

1  NRS 463.370—revenues that finance "indispensable" State functions, from schools to

2  highways. *Sacco v. State*, 105 Nev. 844, 847 (1989). POLYMARKET's unlicensed gaming

3  operations threatens that revenue, by evading taxes and diverting business from licensed

4  sports books that pay taxes, and thus "represents a serious threat to the state's economic

5  base." *Id.* Allowing POLYMARKET to offer unlawful gaming activities risks "devastating

6  the Nevada economy and related tax revenues." *KalshiEX*, 2025 WL 3286282, at *14. The

7  public interest thus weighs decisively in favor of enjoining POLYMARKET.

## CONCLUSION

9      The Court should grant this application for temporary restraining order and

10  preliminary injunction, and enter an order prohibiting POLYMARKET and any of its

11  agents, employees, officers, or affiliates from operating a market that offers event-based

12  contracts relating to sporting and other events to people in Nevada without obtaining all

13  required Nevada gaming licenses, and prohibiting POLYMARKET from allowing its

14  market to accept wagers from persons under the age of 21 in Nevada.

15      Dated: January 16, 2026.

16      AARON D. FORD
       Attorney General

18      By: _____ #11543

19      Jessica E. Whelan (Bar No. 14781)
         Chief Deputy Solicitor General - Litigation
20      Sabrena K. Clinton (Bar No. 6499)
         Senior Deputy Attorney General
21      John S. Michela (Bar No. 8189)
         Senior Deputy Attorney General
22      State of Nevada
       Office of the Attorney General
23      jwhelan@ag.nv.gov
       sclinton@ag.nv.gov
24      jmichela@ag.nv.gov

25      *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that I am an employee of the Office of the Attorney General, State of Nevada, and that on January 16, 2026, I deposited for mailing in the United States Mail, first-class postage prepaid, at Carson City, Nevada, a true and correct copy of the foregoing to the following:

BLOCKRATIZE, INC. d/b/a POLYMARKET
c/o CORPORATION SERVICE COMPANY
251 LITTLE FALLS DRIVE
WILMINGTON, DE 19808

QCX LLC d/b/a POLYMARKET US
c/o CORPORATION SERVICE COMPANY
251 LITTLE FALLS DRIVE
WILMINGTON, DE 19808

ADVENTURE ONE QSS, INC. d/b/a POLYMARKET
1280 LEXINGTON AVE
NEW YORK, NY 10028

_____
Mercedita Garcia
AG Legal Secretary

1  AARON D. FORD
     Attorney General
2  Jessica E. Whelan (Bar No. 14781)
     Chief Deputy Solicitor General – Litigation
3  Sabrena K. Clinton (Bar No. 6499)
     Senior Deputy Attorney General
4  John S. Michela (Bar No. 8189)
     Senior Deputy Attorney General
5  State of Nevada
   Office of the Attorney General
6  1 State of Nevada Way, Suite 100
   Las Vegas, NV 89119
7  (702) 486-3420 (phone)
   (702) 486-3773 (fax)
8  jwhelan@ag.nv.gov
   sclinton@ag.nv.gov
9  jmichela@ag.nv.gov

10  *Attorneys for Plaintiff*

11          **FIRST JUDICIAL DISTRICT COURT OF NEVADA**

12                      **CARSON CITY**

13  STATE OF NEVADA ex rel. NEVADA          Case No. 26 0C 00012 1B
    GAMING CONTROL BOARD,
14
                        Plaintiff,
15          vs.

16  BLOCKRATIZE, INC. d/b/a
    POLYMARKET; QCX LLC d/b/a
17  POLYMARKET US; ADVENTURE ONE
    QSS, INC. d/b/a POLYMARKET            **HEARING REQUESTED**
18
                        Defendants.
19

20  **ERRATA TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING
         ORDER AND MOTION FOR PRELIMINARY INJUNCTION**
21

22          Plaintiff, STATE OF NEVADA, *ex rel.* NEVADA GAMING CONTROL BOARD, by

23  and through its attorneys, hereby files this Errata to Plaintiffs' Complaint against

24  BLOCKRATIZE, INC. d/b/a POLYMARKET; QCX LLC d/b/a POLYMARKET US;

25  ADVENTURE ONE QSS, INC. d/b/a POLYMARKET.

26          This Errata comprises two updates to the previously filed Motion for Temporary

27  Restraining Order: a Declaration from Chief Deputy Attorney General Jessica E. Whelan,

28  and a proposed Temporary Restraining Order. Due to the expedited nature of these

proceedings, these attachments were inadvertently excluded from the filing of the initial motion. These attachments do not expand the scope of relief Plaintiffs seek in any way. Plaintiffs hereby request that the Court consider the attached documents in its consideration of the Complaint and Motion.

Dated: January 21, 2026.

AARON D. FORD
Attorney General

By: _____ #10950

Jessica E. Whelan (Bar No. 14781)
  Chief Deputy Solicitor General - Litigation
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
John S. Michela (Bar No. 8189)
  Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
jwhelan@ag.nv.gov
sclinton@ag.nv.gov
jmichela@ag.nv.gov

*Attorneys for Plaintiff*

### DECLARATION OF JESSICA E. WHELAN

I, Jessica E. Whelan, declare as follows:

I am the Chief Deputy Solicitor General—Litigation in the Nevada Attorney General's Office, and I make this declaration in support of Plaintiff's application for an *ex parte* temporary restraining order under NRS 463.346 and NRCP 65(b).

On October 15, 2025, the Nevada Gaming Control Board ("BOARD") issued public guidance explaining that "it considers offering sports event contracts, or certain other events contracts, as constituting wagering activity under NRS 463.0193 and 463.01962," regardless of whether "the contract is listed on an exchange regulated by the Commodity Futures Trading Commission (CFTC) or elsewhere." Nev. Gaming Control Bd., *Notice to Licensees No. 2025-77: Sports Event Contracts Are Wagers* 1 (Oct. 15, 2025), perma.cc/ 7XEH-BZLV.  The BOARD further explained that "[e]xamples of event contracts that the Board specifically considers to be wagering subject to its jurisdiction include event contracts based on the outcome or partial outcome of any sporting or athletic event, or other selected events such as the World Series of Poker, the Oscars, Esports, and political elections." *Id.*

The BOARD also explained that "[o]fferings for Sports and Other Events Contracts may be conducted in Nevada only if the offering entity possesses a nonrestricted gaming license with sports pool approval in Nevada and meets the other requirements for sports wagering including, without limitation, wagering accounts and sports book systems." *Id.*

Accordingly, as of October 15, 2025, the Board had provided public notice to all entities that allow for the purchase or sale of event contracts based on the outcome of sporting and certain other events in Nevada without possessing a gaming license with sports pool approval that such conduct violates Nevada law.

Defendants BLOCKRATIZE, INC. d/b/a POLYMARKET, QCX LLC d/b/a POLYMARKET US, and ADVENTURE ONE QSS, INC. d/b/a POLYMARKET (collectively, "POLYMARKET") operate a market that offers event-based contracts relating to sporting and other events.  Compl. ¶ 20.  These events include, but are not limited to, college

1  basketball games, college and professional football games, and elections. *Id.* Although

2  POLYMARKET's website states that POLYMARKET is "not available to . . . persons

3  located in the United States," users in Nevada are able to access POLYMARKET by signing

4  up for an account through its mobile app. *Id.* ¶ 18.

5      POLYMARKET's activities meet the definition of a "game" subject to regulation in

6  Nevada—specifically, it operates a "sports pool" under Nevada law. *See* Compl. ¶¶ 18-23.

7  But despite conducting gaming accessible in the State of Nevada, POLYMARKET is not

8  licensed in Nevada and does not comply with Nevada gaming law. *Id.* ¶ 25. It has not

9  undergone Nevada's rigorous licensing process for its gaming activities, nor has does it

10  comply with the restrictions and requirements of Nevada law for operators of sports pools.

11  *See id.* ¶¶ 26, 35.

12      Because POLYMARKET is an unlicensed entity, the BOARD does not have contact

13  information to provide POLYMARKET notice of this application.

14      An *ex parte* temporary restraining order is appropriate because POLYMARKET's

15  activities in Nevada are causing immediate and irreparable injury to Plaintiff and the State

16  of Nevada, and will continue to do so before POLYMARKET can be heard in opposition to

17  Plaintiff's application.

18      The BOARD enforces Nevada gaming law and oversees the State's gaming industry

19  to protect the integrity and reputation of gaming in Nevada and to safeguard the public.

20  POLYMARKET's failure to comply with Nevada gaming law harms the public. For

21  example, Nevada law prohibit persons under the age 21 from engaging in gaming, yet

22  POLYMARKET allows those as young as 18 to wager on its platform. Nevada law also

23  prohibits wagers by owners, coaches, players, officials, or other participants in sporting

24  events and require licensees to take reasonable steps to prevent circumvention of that rule.

25  To the undersigned counsel's knowledge, POLYMARKET does not comply with these

26  requirements.

27      POLYMARKET's failure to comply with Nevada gaming law also gives it a massive

28  and unfair competitive advantage over its competitors, which upends the gaming industry.

1  That advantage is both pecuniary, in that POLYMARKET does not need to spend the
2  money its competitors need to spend on licensing fees, taxes, and compliance (including
3  maintaining a physical location in Nevada), as well as strategic, in that POLYMARKET's
4  products are not subject to the same requirements as its competitors.  The BOARD suffers
5  irreparable harm when POLYMARKET is able to distort the playing field and disrupt the
6  industry in this manner.

7       The harm only increases the longer POLYMARKET is allowed to operate unfettered.
8  POLYMARKET's ability to profit from unlicensed gaming will incentivize others to enter
9  into prediction markets rather than becoming (or remaining) licensed by the State.

10       Plaintiff and the State of Nevada are currently suffering the serious, ongoing, and
11  irreparable harms outlined above every day that POLYMARKET operates its market in
12  violation of Nevada law.  These harms justify issuance of the temporary restraining order
13  on an *ex parte* basis without notice to POLYMARKET or an opportunity for it to respond.

14       Dated this 20th day of January, 2026.

16       By: /s/
17            JESSICA E. WHELAN

Page **5** of 8

**TEMPORARY RESTRAINING ORDER**

Upon review of the Application for Temporary Restraining Order and the accompanying declaration of Jessica E. Whelan, this Court determines that Plaintiff has satisfied the requirements of NRCP 65(b)(1).

Plaintiff has shown that it is likely to succeed on the merits. Plaintiff also has shown irreparable harm resulting from Defendants' efforts to circumvent Nevada law requiring all gaming activity in the State to be strictly regulated and licensed. Specifically, Plaintiff has shown that it will suffer serious and irreparable harm every day that Defendants operate their market in violation of Nevada law, because Defendants' conduct impairs Plaintiff's ability to carry out its statutory functions. Further, Defendants' failure to comply with Nevada gaming law gives them a massive and unfair competitive advantage over their competitors, thereby disrupting the gaming industry Plaintiff is charged with overseeing and regulating.

The public interest will also be harmed absent a temporary restraining order, as Defendants do not adhere to the consumer-protection requirements set forth in Nevada's comprehensive gaming regime, and Defendants' shirking of their regulatory obligations will harm the State's economy and the public fisc.

In contrast, Defendants will not suffer significant and irreparable harm from a temporary restraining order. Finally, the serious, ongoing, and irreparable harms Plaintiff is incurring and will continue to incur as a result of continued delay in waiting for Defendants to respond to the application supports issuance of an *ex parte* temporary restraining order without giving Defendants notice or an opportunity to respond.

/ / /

/ / /

/ / /

Based on the foregoing, and good cause appearing, IT IS HEREBY ORDERED that Defendants and any of their principals, employees, or agents are hereby enjoined from operating a market that offers event-based contracts relating to sporting and other events to people in Nevada without obtaining all required Nevada gaming licenses and enjoined from allowing their market to accept wagers from persons under the age of 21 in Nevada.

This order is effective for 14 days unless further ordered by the Court.

Signed this ___ day of _____, 2026, at __:___ am/pm

_____
DISTRICT COURT JUDGE

1

**CERTIFICATE OF SERVICE**

2

I certify that I am an employee of the Office of the Attorney General, State of Nevada,

3

and that on January 21, 2026, I deposited for mailing in the United States Mail, first-class

4

postage prepaid, at Carson City, Nevada, a true and correct copy of the foregoing

5

to the following:

6

Jacob T. Spencer, Esq.
Gibson. Dunn & Crutcher, LLP

7

1700 M. Street, N.W.
Washington, D.C. 20036-4504

8

9

*Attorneys for Blockratize, Inc. d/b/a
Polymarket; QCX LLC d/b/a Polymarket
US; Adventure One QSS, Inc. d/b/a
Polymarket*

10

11

An employee of the Office of the
Nevada Attorney General

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  ROBERT A. DOTSON
   Nevada State Bar No. 5285
2  DANIEL T. HAYWARD
   Nevada State Bar No. 5986
3  JUSTIN C. VANCE
   Nevada State Bar No. 11306
4  DOTSON, HAYWARD & VANCE, PC
5  5355 Reno Corporate Drive, Ste 100
   Reno, Nevada 89511
6  Tel:    (775) 501-9400
7  Email:  rdotson@dhvnv.com
           dhayward@dhvnv.com
8          jvance@dhvnv.com

9  ORIN SNYDER (*Pro Hac Vice Forthcoming*)
   GIBSON, DUNN & CRUTCHER LLP
10 200 Park Avenue
11 New York, NY 10166
   Tel:    (212) 351-4000
12 Email: OSnyder@gibsondunn.com

13 *Attorneys for Defendants BLOCKRATIZE, INC.*
14 *d/b/a POLYMARKET; QCX LLC d/b/a*
   *POLYMARKET US*

15
16          **IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**
            **IN AND FOR CARSON CITY**

17  STATE OF NEVADA ex rel. NEVADA        Case No.:  26-OC-00012-1B
18  GAMING CONTROL BOARD,
                                          Dept. No.: 1
19              Plaintiff,

20          v.

21  BLOCKRATIZE, INC. d/b/a
22  POLYMARKET; QCX, LLC d/b/a
    POLYMARKET US; ADVENTURE ONE
23  QSS, INC. d/b/a POLYMARKET,

24              Defendants.

25

26  **DEFENDANTS' PRELIMINARY RESPONSE AND REQUEST FOR OPPORTUNITY TO**
    **FILE FULL OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY**
27  **RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION AND TO**
    **ATTEND HEARING AND BE HEARD THEREON**

28

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

Defendants, BLOCKRATIZE, INC., d/b/a POLYMARKET and QCX LLC, d/b/a POLYMARKET US ("Defendants"), by and through their counsel, GIBSON DUNN and DOTSON, HAYWARD & VANCE, PC, hereby provide the following preliminary response[1]:

## INTRODUCTION

This case presents a textbook example of the improper use of *ex parte* emergency relief to gain leverage, rather than to address any genuine emergency. On the eve of a holiday weekend, the Nevada Gaming Control Board (the "Board") sought to shut down a federally regulated national prediction market—without notice, without the certification required by Nevada law, and without the evidentiary materials necessary to justify extraordinary relief.

Defendant QCX LLC operates Polymarket US, a nationwide prediction market regulated by the Commodity Futures Trading Commission ("CFTC"). Prediction markets allow participants to trade contracts tied to the outcome of future events—such as elections, economic indicators, technological developments, and sports—producing real-time price signals that reflect collective expectations about matters of public importance. Hundreds of thousands of consumers in the United States, and millions worldwide, rely on these markets for timely, accurate information. Federal law places such national contract markets under the "exclusive jurisdiction" of the CFTC, 7 U.S.C. § 2(a)(1)(A), precisely because they cannot function if subjected to a patchwork of inconsistent state regulation.

Despite this comprehensive federal framework, the Board sought to halt Polymarket US's lawful operations in Nevada through an *ex parte* temporary restraining order, depriving Defendants of any meaningful opportunity to be heard. Worse still, it now appears clear that after Defendants' counsel had already contacted the Board, after the parties were actively discussing an orderly briefing schedule, and after a meet-and-confer had been scheduled, the Board, through counsel, filed a sworn declaration asserting that it lacked contact information for Defendants—without disclosing to the Court that those statements were no longer true and yet it included an address for Gibson, Dunn & Crutcher LLP in the service page.

---

[1] Adventure One QSS, Inc. is not a U.S. corporation and does no business in Nevada. To the extend necessary this should be considered a special appearance.

2

1   The Board then withheld notice of its *ex parte* filing from Defendants while simultaneously
2   using the threat of immediate injunctive relief as leverage to demand that Defendants cease lawful
3   operations in Nevada. No purported emergency could justify this conduct. Fundamental due process
4   requires that Defendants be afforded a meaningful opportunity to respond before the Court considers
5   extraordinary relief of this magnitude. The Court should deny the Board's request for an *ex parte*
6   temporary restraining order, permit Defendants to file an opposition on February 13, 2026, and set a
7   hearing no fewer than fourteen days thereafter. Once heard, the Court will also see that the Board's
8   request fails on the merits.

9   **REQUEST FOR RELIEF**

10   Defendants respectfully request the opportunity to file an opposition to Plaintiff's Application
11   for a Temporary Restraining Order and Motion for Preliminary Injunction on February 13, 2026, and
12   that the Court schedule a hearing on Plaintiff's application no less than fourteen days thereafter.
13   Defendants do not waive—and expressly reserve—all defenses available to them, including, without
14   limitation, improper service of process and lack of personal jurisdiction.

15   The Board's attempt to obtain an *ex parte* temporary restraining order shutting down
16   Polymarket US's operations in Nevada is procedurally improper, substantively meritless, and violates
17   fundamental principles of due process. This Court should grant Defendants a meaningful opportunity
18   to be heard before the Court considers extraordinary, immediate injunctive relief.

19   **A.    The Board Failed to Comply with Basic Procedural Requirements for *Ex Parte***
20   **Relief.**

21   The Board made no effort to comply with the procedural rules governing *ex parte* relief. On
22   the eve of a holiday weekend, it filed this lawsuit and sought emergency relief without written
23   certification of any efforts to give notice or an explanation of why notice should not be required, as
24   Nevada procedural rules expressly require. *See* N.R.C.P. 65(b) (*ex parte* temporary restraining orders
25   require that "the movant's attorney certifies in writing any efforts made to give notice and the reasons
26   why it should not be required").

27   That omission appears to have been no accident. The Board made no effort whatsoever to
28   provide notice. It did not contact Defendants, did not send courtesy copies of its filings, and did not

provide any information about the nature of its claims or the relief it intended to seek.  In fact, Defendants' counsel obtained a copy of the Complaint and Application only by retrieving it from the clerk's office after the filing was processed on Tuesday, January 20. And even then, the Application included no declaration, affidavit, or proposed order, leaving Defendants unable to determine whether the Board intended to seek *ex parte* relief or instead proceed by noticed motion.

Late Tuesday night, counsel for the Board emailed a copy of the Complaint—along with requests to waive service—to Defendant QCX's Chief Compliance Officer.  That email apparently did not attach, reference, or even mention the Application, let alone disclose that the Board was seeking an *ex parte* temporary restraining order.

**B.**    **The Board Concealed Its *Ex Parte* Strategy While Engaging in Parallel Communications.**

On Wednesday morning, before 7:00 a.m. Pacific Time, Defendants' counsel emailed counsel for the Board requesting a meet-and-confer "about proposing an orderly briefing schedule and agreed-upon hearing date" for the Board's Application.  Shortly thereafter, the Board's counsel agreed and proposed a meet-and-confer for 9:00 a.m. the following day (Thursday)—again without any mention that the Board was pursuing *ex parte* relief.

Yet more than five hours later, the Board filed a purported Errata to its Application, attaching for the first time a Declaration from Chief Deputy Attorney General Jessica E. Whalen and a proposed Temporary Restraining Order—documents the Board claimed were "inadvertently excluded from the filing of the initial motion" and that purportedly did "not expand the scope of relief" sought.  The Declaration asserted that "the BOARD does not have contact information to provide POLYMARKET notice of this application."  That assertion was inaccurate at the time it was submitted.[2]  By then, the Board had already communicated directly with Defendants' counsel and had scheduled a meet-and-confer to discuss briefing and hearing logistics.

Critically, the Board failed to disclose to the Court that:

- Defendants' counsel had contacted the Board;

---

[2] *See* Nevada Rule of Professional Conduct 3.3 generally and 3.3(d) particularly ("In an *ex parte* proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse.").

4

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

- The parties were actively discussing an orderly briefing and hearing schedule; or

- A meet-and-confer had already been scheduled.

Nor did the Board promptly notify Defendants or their counsel that it had filed the Errata seeking *ex parte* relief. Defendants learned of the filing only during the meet-and-confer, when Board counsel revealed—after the fact—that the documents had already been submitted.[3]

During that same meeting, Board counsel stated that the Board would withdraw its *ex parte* request and agree to a briefing schedule only if Defendants ceased operations in Nevada. If Defendants instead chose to oppose the TRO, Board counsel asserted that they lacked authority to agree to any briefing schedule at all.

**C.     The Board's *Ex Parte* Request Is Tainted by Material Omissions and Tactical Abuse.**

No purported emergency could justify this conduct. Even if the Board initially lacked contact information when the Complaint was filed, that was no longer true when the Declaration was submitted. By that time, the Board knew the identities of Defendants' counsel, had communicated with them, and had scheduled a meet-and-confer to discuss an orderly process.

The Board has offered no explanation for withholding notice of its *ex parte* filing from opposing counsel or for presenting the Court with a materially incomplete account of the parties' communications. These facts demonstrate that the Board's *ex parte* filing was not the product of necessity, but of tactical choice—one that deprived the Court of a complete factual record and deprived Defendants of the process the law requires.

*Ex parte* relief is reserved for the rarest circumstances and demands the utmost candor. The Board's conduct falls well short of that standard.

**D.     The Board's Request Also Fails on the Merits.**

Once afforded a fair opportunity to respond, Defendants will also establish that the Board's request for injunctive relief fails on the merits.

---

[3] *See* Nevada Rule of Professional Conduct 3.5A ("When a lawyer knows or reasonably should know the identity of a lawyer representing an opposing party, he or she should not take advantage of the lawyer by causing any default or dismissal to be entered without first inquiring about the opposing lawyer's intention to proceed.").

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

1    Defendant QCX LLC, which operates Polymarket US, is a designated contract market subject

2  to the "exclusive jurisdiction" of the CFTC.   7 U.S.C. § 2(a)(1)(A).   Federal law preempts the

3  application of state gambling laws to federally regulated contract markets, which cannot function under

4  a patchwork of conflicting state regimes.

5    As described in the footnote above, Defendant Adventure One QSS, Inc. does not operate in

6  Nevada at all.  It is a foreign corporation operating an international exchange not offered in the United

7  States, and it is not subject to personal jurisdiction in Nevada.  Defendant Blockratize, Inc. is not subject

8  to person jurisdiction either.

9    The Board's improper and meritless Application would inflict immediate and irreparable harm

10  on Defendants, their employees, their business partners, and their users.   .

11                                    **CONCLUSION**

12    For all of these reasons, the Court should deny the Board's request for an *ex parte* temporary

13  restraining order, permit Defendants to file an opposition on February 13, 2026, and schedule a hearing

14  on Plaintiff's application no fewer than fourteen days thereafter.

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**Affirmation Pursuant to NRS 239B.030**

The undersigned does hereby affirm that the preceding document does not contain the social security number of any person.

DATED this 22 day of January 2026.

DOTSON, HAYWARD & VANCE PC

ROBERT A. DOTSON
Nevada State Bar No. 5285
DANIEL T. HAYWARD
Nevada State Bar No. 5986
5355 Reno Corporate Drive, Ste 100
Reno, Nevada 89511
(775) 501-9400

GIBSON, DUNN & CRUTCHER LLP
ORIN SNYDER
*(Pro Hac Vice to be submitted)*
MATT BENJAMIN
*(Pro Hac Vice to be submitted)*
200 Park Avenue
New York, NY 10166
(212) 351-4000

GIBSON, DUNN & CRUTCHER LLP
THOMAS H. DUPREE JR.
*(Pro Hac Vice to be submitted)*
JACOB T. SPENCER
*(Pro Hac Vice to be submitted)*
1700 M Street, N.W.
Washington, DC 20036-4504
(202) 955-8500

*Attorneys for Defendants BLOCKRATIZE, INC. d/b/a POLYMARKET; QCX LLC d/b/a POLYMARKET US*

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

## CERTIFICATE OF SERVICE

Pursuant to NRCP 5(b), I hereby certify that I am an employee of DOTSON, HAYWARD & VANCE, PC and that on this date I caused to be served a true and correct copy of the foregoing by:

☒    (BY MAIL) on all parties in said action, by placing a true copy thereof enclosed in a sealed envelope in a designated area for outgoing mail, addressed as set forth below. At Dotson, Hayward & Vance, PC , mail placed in that designated area is given the correct amount of postage and is deposited that same date in the ordinary course of business, in a United States mailbox in the City of Reno, County of Washoe, Nevada.

☐    By electronic service by filing the foregoing with the Clerk of Court using the E-Flex system, which will electronically mail the filing to the following individuals.

☐    (BY PERSONAL DELIVERY) by causing a true copy thereof to be hand delivered this date to the address(es) at the address(es) set forth below.

☐    (BY FACSIMILE) on the parties in said action by causing a true copy thereof to be telecopied to the number indicated after the address(es) noted below.

☒    Email.

addressed as follows:

Jessica E. Whelan
Sabrena K. Clinton
John S. Michela
Abigail L. Pace
Nevada Office of the Attorney General
1 State of Nevada Way Ste 100
Las Vegas, NV 89119
jwhelan@ag.nv.gov
sclinton@ag.nv.gov
JMichela@ag.nv.gov
*Attorneys for Plaintiff*

DATED this ___ day of January 2026.

L. MORGAN BOGUMIL

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

REC'D & FILED

2026 JAN 23  PM 4: 20

WILLIAM SCOTT HOEN
CLERK
BY _____



IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR CARSON CITY

| | |
|---|---|
| STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD,<br><br>           Plaintiff,<br><br>    vs.<br><br>BLOCKRATIZE, INC. d/b/a POLYMARKET; QCX LLC d/b/a POLYMARKET US; ADVENTURE ONE QSS, INC. d/b/a POLYMARKET,<br><br>        Defendants. | Case No.: 26 OC 00012 1B<br><br>Dept. No.: 1 |

## ORDER DENYING APPLICATION FOR TEMPORARY RESTRAINING ORDER WITHOUT PREJUDICE AND SETTING HEARING ON MOTION FOR PRELIMINARY INJUNCTION

THIS MATTER is before the Court on a *Complaint for Permanent Injunction and Declaratory Relief* ("*Complaint*") and *Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction* ("*Application*") both of which were filed by the NEVADA GAMING CONTROL BOARD ("BOARD") on January 16, 2026. Certificates of service accompanying both the *Complaint* and the *Application* reflect that they were sent by mail to three addresses purporting to be associated with the Defendants.

This Court reviewed the *Complaint* and *Application* and familiarized itself with the legal authority cited therein. Initially, it was not clear whether the BOARD requested issuance of a

temporary restraining order without notice pursuant to NRCP 65(b)(1) as the *Application* included an express request for hearing. In any event, the initial *Application* failed to satisfy the procedural requirements for issuance of a temporary restraining order without notice because the *Complaint* is not verified and the *Application* was not supported by affidavit. NRCP 65(b)(1) ("The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if ... specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition....") In addition, there was no written certification by the BOARD's attorney concerning efforts to give notice to the Defendant named in the *Complaint* and *Application*. NRCP 65(b)(1)(B) ("The court may issue a temporary retraining order without written or oral notice to the adverse party or its attorney only if ... the movant's attorney certifies in writing any efforts made to give notice....")

Thereafter, additional filings have been made with the Court. First, on January 21, 2026, the Board filed an *Errata to Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction* ("*Errata*"). The *Errata* consists of a *Declaration of Jessica E. Whelan* ("*Declaration*") and a proposed *Temporary Restraining Order*. On January 22, 2026, the *Defendants' Preliminary Response and Request for Opportunity to File Full Opposition to Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction and to Attend Hearing and Be Heard Thereon* ("*Response*"). This Court reviewed the *Errata* and *Response* and familiarized itself with the legal authority cited therein.

Based on the filings made to date, the Court rules as follows:

The BOARD's request for issuance of a temporary restraining order without notice is deficient. As indicated above, Nevada authorizes issuance of a temporary restraining order without notice only if certain specific facts are clearly shown in an "affidavit or verified complaint." As also indicated above, the *Complaint* is not verified, and there is no "affidavit," as such, offered to establish the required factual basis. Rather, the *Declaration* is provided in lieu of an "affidavit." Generally, an unsworn declaration is a legally sufficient substitute for an affidavit under Nevada law, and the affidavit requirement of NRCP 65 is no exception. NRS

53.045. However, a declaration must be "signed by the declarant under penalty of perjury," and the *Declaration* before the Court is not. *Id.*

Further, the Declaration claims urges issuance of the temporary restraining order without notice because POLYMARKET is an "unlicensed entity" and the Board lacks information by which to provide it notice of the *Application*. Extending the BOARD the benefit of the doubt, this statement was presumably true when the *Declaration* was signed on January 20 and when it was filed on January 21. But it is no longer accurate. Therefore, formal notice of all filings and proceedings going forward will be required.

For these reasons, the *Application* will be denied in its current form, although the denial will be without prejudice to allow the BOARD to re-submit its request for a temporary restraining order in a form that cures these deficiencies. As the *Application* is denied on procedural grounds, this Court expresses no opinion concerning its merits at this time.

As to the *Application*'s corresponding request for a preliminary injunction, this Court will set the matter for hearing as requested.

Therefore, good cause appearing,

**IT IS HEREBY ORDERED** that *Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction* is **DENIED WITHOUT PREJUDICE** insofar as it requests issuance of a temporary restraining order.

**IT IS HEREBY FURTHER ORDERED** that a hearing on *Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction* will be held in the First Judicial District Court, located at 885 East Musser Street, Carson City, Nevada, Department I, on **February 19, 2026, at 1:30 p.m.**

Dated this 23rd day of January, 2026.

JASON D. WOODBURY
DISTRICT JUDGE

## CERTIFICATE OF MAILING

The undersigned, an employee of the First Judicial District Court, hereby certifies that on the _____ day of January, 2026, I served the foregoing Order by placing a copy in the United States Mail, postage prepaid, addressed as follows:

Aaron D. Ford, Attorney General
Jessica E. Whelan, Chief Deputy Solicitor General – Litigation
Sabrena K. Clinton, Senior Deputy Attorney General
John S. Michela, Senior Deputy Attorney General
State of Nevada
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119

Jacob T. Spencer, Esq.
Gibson, Dunn & Crutcher, LLP
1700 M. Street, N.W.
Washington, D.C. 20036-4504

Orin Snyder, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

Robert A. Dotson, Esq.
Daniel T. Hayward, Esq.
Justin C. Vance, Esq.
Dotson, Hayward & Vance, PC
5355 Reno Corporate Drive, Suite 100
Reno, NV 89511

_____
Julie Harkleroad
Judicial Assistant, Dept. 1

1   AARON D. FORD
      Attorney General
2   Jessica E. Whelan (Bar No. 14781)
    Chief Deputy Solicitor General - Litigation
3   John S. Michela (Bar No. 8189)
    Senior Deputy Attorney General
4   Sabrena K. Clinton (Bar No. 6499)
    Senior Deputy Attorney General
5   State of Nevada
    Office of the Attorney General
6   1 State of Nevada Way, Suite 100
    Las Vegas, NV 89119
7   (702) 486-3420 (phone)
    (702) 486-3773 (fax)
8   jwhelan@ag.nv.gov
    jmichela@ag,nv.gov
9   sclinton@ag.nv.gov

10  *Attorneys for Plaintiff*

11          **IN THE FIRST JUDICIAL DISTRICT COURT OF**

12        **THE STATE OF NEVADA IN AND FOR CARSON CITY**

13  STATE OF NEVADA ex rel. NEVADA          Case No. 26 0C 00012 1B
    GAMING CONTROL BOARD,
14
             Plaintiff(s),
15
    vs.
16
    BLOCKRATIZE, INC. d/b/a
17  POLYMARKET; QCX LLC d/b/a
    POLYMARKET US; ADVENTURE ONE
18  QSS, INC d/b/a POLYMARKET,,

19          Defendants.

20

21      **PLAINTIFF'S RENEWED EX PARTE APPLICATION FOR TEMPORARY
                      RESTRAINING ORDER**
22

23      Plaintiff, STATE OF NEVADA, ex rel. NEVADA GAMING CONTROL BOARD

24  ("BOARD"), by and through its attorneys, hereby files this Renewed Ex Parte Application

25  for Immediate Temporary Restraining Order against BLOCKRATIZE, INC. d/b/a

26  POLYMARKET, QCX LLC d/b/a POLYMARKET US, and ADVENTURE ONE QSS, INC.

27  d/b/a POLYMARKET (collectively, "POLYMARKET"). The BOARD seeks to immediately

28  restrain and enjoin POLYMARKET and any of its agents, employees, officers, or affiliates

from operating a derivatives exchange and prediction market ("market") that offers event-based contracts relating to sporting and other events to people within Nevada without obtaining all required Nevada gaming licenses, and from allowing its market to accept wagers from persons under the age of 21 in Nevada. This Renewed Application is made pursuant to NRCP 65 and is based upon the following Memorandum of Points and Authorities, the Declaration of Jessica E. Whelan, attached hereto as **Exhibit 1**, all papers on file herein, and any oral argument this Court permits.

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

I.    **FACTS**

  A. **The State Comprehensively Regulates Gaming in Nevada.**

  Nevada has a long history of gaming regulation. Except for a brief period during prohibition, Nevada has allowed some form of legalized gaming for over 150 years. *See* Becky Harris & Husna Alikhan, *Nevada, Over 60 Years Regulating Gambling—A Jurisdictional Overview*, 23 Gaming L. Rev. 645, 648 & n.18 (2019).

  Nevada's gaming industry is "vitally important to the economy of the State and the general welfare of the inhabitants." NRS 463.0129(1)(a). All entities that conduct gaming in Nevada must "be licensed, controlled and assisted to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State." NRS 463.0129(1)(d).

  The Nevada Legislature has found that the continued growth and success of gaming "is dependent on public confidence and trust that licensed gaming" is "conducted honestly and competitively." NRS 463.0129(1)(b). And the Legislature has made clear that "public confidence and trust can only be maintained by *strict* regulation of all persons, locations, practices, associates, and activities related" to the operation of gaming in Nevada. NRS 463.0129(1)(c) (emphasis added). The BOARD is statutorily charged with administering and enforcing Nevada gaming law. NRS 463.140(1).

  "Gaming" in Nevada is synonymous with "gambling" and includes any regulated game. NRS 463.0153. A "game" subject to regulation in Nevada includes "any game played with . . . equipment or any mechanical or electronic device or machine for money . . . or any

representative of value" that is accessible in Nevada. NRS 463.0152. The games subject to regulation in Nevada include "percentage game[s]." NRS 463.0152. A "percentage game" exists where the "house" does not directly participate in a wager and its only stake is a commission derived from the wager. *See Hughes Props. v. State*, 100 Nev. 295, 297 (1984). Gaming includes operating a "sports pool," which is "the business of accepting wagers on sporting events or other events by any system or method of wagering," NRS 463.0193; a "wager" is "a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain," NRS 463.01962.

Nevada law comprehensively regulates entities that conduct gaming activities in the State. Every entity that makes gaming activities accessible in Nevada is subject to a rigorous licensing process. NRS 463.160(1). Entities conducting gaming activities in the State of Nevada must pay taxes on gross gaming revenue derived from gaming activities accessible in the State. NRS 463.373. Licensed entities accepting wagers from persons in the State of Nevada must have a physical location in Nevada. Nev. Gam'g Comm. Reg. 22.060(2). Licensed entities may not accept wagers from those under 21 years of age. NRS 463.350. Further, licensed entities accepting wagers on sporting events must employ safeguards to ensure that wagers are not being placed on an event by owners, coaches, players, or officials participating in the event, and must communicate with Nevada gaming regulatory authorities about potential evidence of match fixing or point shaving. *See* Nev. Gam'g Comm. Reg. 22.1205(2). Failing to enforce these laws would severely weaken the State's ability to strictly regulate gaming and would jeopardize the growth and integrity of Nevada's gaming industry, which is vitally important to its economy and the welfare of its citizens.

**B. POLYMARKET's Market is a Gambling Game and/or Sports Pool and Accepts Wagers from Persons in Nevada.**

POLYMARKET operates a market that offers event-based contracts relating to sporting and other events. Compl. ¶ 20. These events include, but are not limited to, college basketball games, college and professional football games, and elections. *Id.*

POLYMARKET's event contracts are wagers under NRS 463.01962: POLYMARKET's market allows persons located in Nevada to risk money on sporting events and elections, and the outcomes of sporting events and elections are, by their very nature, uncertain. *See, e.g.,* POLYMARKET, *Rams vs Bears*, perma.cc/6YNG-F4PN (allowing a user to spend $0.36 on an event contract that pays out $1.00 if the Bears win their January 18, 2026, playoff game against the Rams). POLYMARKET consequently operates a "sports pool" under Nevada law. NRS 463.0193.

Further, POLYMARKET's market takes a commission, or percentage, on the wagers placed through its market. *See* POLYMARKET, *Fees & Operating Hours*, perma.cc/FWA6-RADG. POLYMARKET accordingly offers a "percentage game"—a type of "gambling game"—under Nevada law. NRS 463.0152.

A person can access POLYMARKET's market through its mobile app. Compl. ¶ 18. POLYMARKET uses computers and servers to make its event-based contracts available on its mobile app. *Id.* A person enters into an event-based contract on POLYMARKET's market with the payment of money. *Id.*

### C.     POLYMARKET's Activities in Nevada Cause Harm to Nevada.

Although POLYMARKET conducts gaming activity in Nevada, including by operating a sports pool, POLYMARKET does not comply with Nevada gaming law. Among other things, POLYMARKET has not undergone Nevada's rigorous licensing process to obtain a gaming license for its wagering activities. Compl. ¶ 27. It accordingly does not possess a Nevada license to conduct gaming activities, including operating a sports pool. *Id.* ¶ 37. Further, POLYMARKET does not pay taxes on gross gaming revenue generated from wagers placed by persons in Nevada. *Id.* ¶ 29. And POLYMARKET does not have a physical location in Nevada. *Id.* ¶ 31.

POLYMARKET also does not comply with the various regulations on gaming that Nevada has imposed to protect Nevada and its citizens. POLYMARKET does not require its patrons to be at least 21 years of age to place a wager in its markets, Compl. ¶ 33; instead, it allows anyone over the age of 18 to create an account and trade on its platform,

see POLYMARKET, *Terms of Service* (Aug. 26, 2025), perma.cc/L3Y2-U4YS. To Plaintiff's knowledge, POLYMARKET does not employ adequate safeguards to ensure that wagers are not being placed on an event by owners, coaches, players, or officials participating in the event, and does not communicate about potential evidence of match fixing or point shaving to Nevada regulatory authorities. Compl. ¶ 35.

## II.    PROCEDURAL HISTORY

On January 16, 2026, the BOARD filed a Complaint for Permanent Injunction and Declaratory Relief to obtain a declaration from this Court that POLYMARKET is violating Nevada law and an injunction ordering POLYMARKET to cease its violations of Nevada law. *See* Compl. 11. That same day, the BOARD filed an Application for Temporary Restraining Order and Motion for Preliminary Injunction ("PI Motion"). *See* 1/16/26 PI Mot. On January 21, 2026, the BOARD filed an Errata to its PI Motion, informing the Court that it had inadvertently omitted a declaration in support of its Application for Temporary Restraining Order, and including that declaration, as well as a proposed Temporary Restraining Order. *See* 1/21/26 Errata.

On January 22, 2026, POLYMARKET filed a Preliminary Response and Request for Opportunity to File Full Opposition to Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction and to Attend Hearing and Be Heard Thereon ("Preliminary Opposition"). *See* 1/22/26 Preliminary Opp.

On January 23, 2026, this Court issued an order denying without prejudice the BOARD's Application for Temporary Restraining Order and setting a hearing on the PI Motion for February 19, 2026. *See* 1/23/26 Order. The Court's order denying the Application for Temporary Restraining Order did so "on procedural grounds" and allowed the BOARD to resubmit its request. *See* 1/23/26 Order at 3.

In this Renewed Application for Ex Parte Temporary Restraining Order, the BOARD seeks an ex parte temporary restraining order prohibiting POLYMARKET and any of its agents, employees, officers, or affiliates from operating a market that offers event-based contracts relating to sporting and other events to people within Nevada without obtaining

1  the required Nevada gaming licenses, and prohibiting POLYMARKET from allowing its
2  market to accept wagers from persons under the age of 21 in Nevada. Notwithstanding the
3  ex parte nature of the relief sought, because the BOARD is now aware of and in contact
4  with counsel for POLYMARKET, the BOARD provided email notice to POLYMARKET's
5  counsel on January 26, 2026, in advance of this filing. *See* Ex. 1, ¶ 7. The BOARD
6  nonetheless seeks immediate, ex parte relief, as POLYMARKET's unlicensed and
7  unregulated operation in the State of Nevada is causing significant harm to the State, its
8  citizens, and its gaming industry, every day that it is permitted to continue operating. *Id.*

9  **III.   LEGAL STANDARD**

10       Nevada Rule of Civil Procedure 65(b) authorizes a court to issue an ex parte
11  temporary restraining order. Courts often apply similar standards for temporary
12  restraining orders and preliminary injunctions, as both are forms of injunctive relief aimed
13  at preventing harm before a final resolution of the case. *See, e.g., LIT Ventures, LLC v.*
14  *Carranza,* 457 F. Supp. 3d 906, 908 (D. Nev. 2020). A court should grant such relief when
15  it "appear[s] by the complaint that the plaintiff is entitled to the relief demanded, and such
16  relief or any part thereof consists in restraining the commission or continuance of the act
17  complained of," NRS 33.010(1), and when "the commission or continuance of some act,
18  during the litigation, would produce great or irreparable injury to the plaintiff," NRS
19  33.010(2). The plaintiff must demonstrate two elements: (1) there is a reasonable likelihood
20  that the plaintiff will prevail in the underlying case and (2) absent a relief, the plaintiff will
21  suffer irreparable harm for which compensatory damages are not sufficient. *Elk Point*
22  *Country Club Homeowners' Ass'n, Inc. v. K.J. Brown, LLC,* 138 Nev. 640, 642, 515 P.3d 837,
23  839 (2022); *Posner v. U.S. Bank Nat'l Ass'n,* 140 Nev. Adv. Op. 22, 545 P.3d 1150, 1152
24  (Nev. 2024). The court may also consider the balance of hardships and the public interest.
25  *See Univ. & Cmty. Coll. Sys. of Nev. v. Nevadans for Sound Gov't,* 120 Nev. 712, 721, 100
26  P.3d 179, 187 (2004).

27  / / /

28  / / /

1     The key question in issuing a temporary restraining order is whether the Plaintiff

2 has shown that it will suffer "immediate and irreparable injury." NRCP 65(b); *see State ex*

3 *rel. Friedman v. Eighth Jud. Dist. Ct. In & For Clark Cnty.*, 81 Nev. 131, 134, 399 P.2d 632,

4 633 (1965).

5     The requirements a temporary restraining order are met here. In particular, the

6 BOARD is suffering serious, ongoing, irreparable harm every day that POLYMARKET

7 operates its market in violation of Nevada law, and so the Court should immediately issue

8 an ex parte temporary restraining order.

9 **IV.    ARGUMENT**

10     POLYMARKET has been willfully circumventing Nevada law requiring all gaming

11 activity in the State to be strictly regulated and licensed. POLYMARKET operates a "sports

12 pool" and/or "gambling game" under Nevada law. Yet POLYMARKET does not possess a

13 Nevada license to operate a sports pool or conduct other gaming activity in Nevada.

14 POLYMARKET also does not follow many of the restrictions on licensed gaming in the

15 State. In particular, POLYMARKET allows persons under 21 years of age to wager on its

16 market. Accordingly, the BOARD is entitled to a temporary restraining order prohibiting

17 POLYMARKET from operating an unlicensed sports pool in Nevada and prohibiting

18 POLYMARKET from accepting wagers from persons under the age of 21.

19     **A.    Plaintiff is likely to succeed on the merits of its claims.**

20     The BOARD is likely to succeed in showing that POLYMARKET violates, at a

21 minimum, NRS 463.160, 463.350, 465.086, and 465.092.

22     POLYMARKET violates NRS 463.160. Pursuant to NRS 463.160, it is unlawful for

23 a person to expose a game or a sports pool for play in Nevada without the required gaming

24 licenses. POLYMARKET's market exposes a percentage game and/or sports pool for play

25 in Nevada. Compl. ¶¶ 18–24. POLYMARKET does not possess a Nevada gaming license

26 either to offer a percentage game or to operate a sports pool in Nevada. *Id.* ¶ 39.

27 Accordingly, POLYMARKET, in making its market available to persons located in Nevada,

28 has violated and continues to violate NRS 463.160.

POLYMARKET violates NRS 463.350. Pursuant to NRS 463.350, a person under the age of 21 may not play, be allowed to play, place wagers at, or collect winnings from any game or sports pool. POLYMARKET's market constitutes a percentage game and/or sports pool. Compl. ¶¶ 18–24. Yet POLYMARKET's market does not restrict persons under the age of 21 from participating. *Id.* ¶ 43. Accordingly, POLYMARKET, in making its market available to persons located in Nevada who are under the age of 21, has violated and continues to violate NRS 463.350.

POLYMARKET violates NRS 465.086. Pursuant to NRS 465.086(1), it is unlawful for any person to directly or indirectly receive any compensation or any percentage or share of the money played for accepting or facilitating any wager upon the result of any sporting event without a gaming license. POLYMARKET is not licensed to accept wagers in Nevada. Compl. ¶ 47. POLYMARKET's market accepts wagers in Nevada. *Id.* ¶ 48. In addition to accepting wagers on the results of sporting events and other events, POLYMARKET's market facilitates wagers on sporting events and other events between individual participants in its market. *Id.* ¶ 49. POLYMARKET takes a percentage of money wagered through its market in the form of commissions styled as "trading fees." POLYMARKET, *Fees & Operating Hours*, perma.cc/FWA6-RADG. Accordingly, POLYMARKET, in operating its market, has violated and continues to violate NRS 465.086.

POLYMARKET violates NRS 465.092. Pursuant to NRS 465.092, it is unlawful for a person to knowingly accept a wager from a person inside of Nevada through a medium of communication unless the person accepting the wager is licensed pursuant to Nevada law and otherwise complies with applicable Nevada laws and regulations concerning wagering. POLYMARKET's market accepts wagers on sporting events and other events. Compl. ¶ 54. POLYMARKET's market accepts wagers from persons inside of Nevada. *Id.* ¶ 55. The Internet is a medium of communication. NRS 465.091. POLYMARKET's market uses the Internet for wagering activities. Compl. ¶ 57. Accordingly, in operating its market, POLYMARKET is a person knowingly accepting wagers from persons inside of Nevada

1  through a medium of communication and has violated and continues to violate NRS
2  465.092.

3   For at least these reasons, POLYMARKET is violating Nevada gaming law. Yet
4  POLYMARKET has made clear that it will not voluntarily obtain a gaming license or
5  otherwise comply with Nevada gaming law. The BOARD therefore is likely to succeed on
6  the merits of its claims and obtain a permanent injunction from this Court enjoining
7  POLYMARKET from operating its market without complying with Nevada gaming law.

8   **B. Plaintiff is suffering and will continue to suffer immediate and**
   **irreparable harm absent relief.**
9

10   Plaintiff suffers serious and irreparable harm every day that POLYMARKET
11  operates its market in violation of Nevada law. The Nevada Legislature has enacted a
12  "comprehensive regulatory structure, coupled with strict licensing standards" to ensure the
13  integrity of gaming in the State. NRS 463.745. Plaintiff is statutorily charged with
14  enforcing Nevada gaming law and overseeing Nevada's gaming industry, to protect the
15  reputation of the State of Nevada, to protect the reputation of gaming in Nevada, and to
16  protect the public health, safety, morals, good order, and general welfare of the inhabitants
17  of Nevada. NRS 463.140(1).

18   POLYMARKET's failure to comply with Nevada gaming law impairs the BOARD
19  from carrying out its statutory functions. For example, to ensure that wagering is fair,
20  Nevada gaming regulations prohibit accepting wagers on sporting events from owners,
21  coaches, players, officials, or other participants in the event and require licensees to take
22  reasonable steps to avoid circumvention of this regulation. Nev. Gam'g Comm. Reg.
23  22.1205(2). Licensed sports books also must: (1) obtain certain identification information
24  from patrons who place wagers of a certain size; (2) prevent multiple wagers designed to
25  circumvent the identification requirements for wagers of a certain size; and (3) prevent
26  wagers structured to circumvent the identification requirements. Nev. Gam'g Comm. Reg.
27  22.061, 22.062, and 22.063. Further, licensed sports books must communicate with the
28  BOARD about potential evidence of match fixing or point shaving. *See* Nev. Gam'g Comm.

Reg. 22.121. To Plaintiff's knowledge, POLYMARKET does not adhere to these requirements, which harms the BOARD by preventing it from ensuring the integrity of gaming in the State.

POLYMARKET's failure to comply with Nevada gaming law gives it a massive and unfair competitive advantage over its competitors, which greatly disrupts the gaming industry. That advantage is both pecuniary, in that POLYMARKET does not need to spend the money its competitors need to spend on licensing fees, taxes, and compliance (including maintaining a physical location in Nevada), as well as strategic, in that POLYMARKET's products are not subject to the same requirements as its competitors. Plaintiff, which is charged with ensuring that gaming in Nevada is fair, suffers irreparable harm when POLYMARKET is able to distort the playing field and disrupt the industry in this manner. *See Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1509 (9th Cir. 1993).

The harm only increases the longer POLYMARKET is allowed to operate unfettered. POLYMARKET's ability to profit from unlicensed gaming will incentivize others to enter into prediction markets instead of becoming (or remaining) licensed by the State. Indeed, that already has started to happen: DraftKings and FanDuel have decided to forgo licensing in Nevada so that they can enter the prediction-markets business in other States. *See KalshiEX LLC v. Hendrick*, 2025 WL 3286282, at *14 (D. Nev. Nov. 24, 2025), *appeal pending*, No 25-7516 (9th Cir. filed Nov. 25, 2025). Other sportsbooks could follow suit, "unleashing even more unregulated gambling." *Id.*

Thus, the harms caused by POLYMARKET are ongoing, serious, and irreparable. The BOARD seeks to stop the harms caused by POLYMARKET.

## C. The balance of hardships and the public interest weigh heavily in favor of granting an ex parte temporary restraining order.

Compared to the ongoing, severe, irreparable harm that POLYMARKET's market causes to the BOARD and to the State, any harms that POLYMARKET claims to suffer from an injunction are insignificant. Indeed, the BOARD seeks only for POLYMARKET to

1  follow Nevada gaming law, and following the law is not a harm. *See Goldman v. Newage*
2  *Lake Las Vegas, LLC*, 2019 WL 13254890, at *1 (D. Nev. Oct. 23, 2019).

3      POLYMARKET may contend that federal law preempts Nevada gaming law, and
4  that it is harmed by being required to follow preempted law. But a federal district court
5  evaluating this argument brought by POLYMARKET's competitor concluded that the
6  competitor is not likely to prevail on the argument. *KalshiEX*, 2025 WL 3286282, at *6–12.

7      The public interest similarly weighs in favor of enjoining POLYMARKET from
8  violating Nevada gaming law. The Legislature has determined that "[p]ublic confidence
9  and trust can only be maintained by strict regulation of all persons, locations, practices,
10 associations and activities related to the operation of licensed gaming establishments."
11 NRS 463.0129(1)(c). "All establishments where gaming is conducted . . . must therefore be
12 licensed, controlled and assisted to protect the public health, safety, morals, good order and
13 general welfare of the inhabitants of the State." NRS 463.0129(1)(d). The Legislature thus
14 has determined that the public interest requires *all* gaming operators to be licensed and to
15 follow Nevada gaming law. Any gaming business, including POLYMARKET, that does not
16 comply with Nevada gaming law poses a threat to this vital industry.

17     In particular, POLYMARKET does not adhere to the consumer-protection
18 requirements in Nevada law. To start, POLYMARKET's operations harm some of Nevada's
19 most vulnerable residents. Nevada law prohibits persons under 21 from placing sports
20 wagers, NRS 463.350(1)(a), but POLYMARKET does not require its participants to be 21
21 years of age. Nevada law also protects those suffering from problem gaming by requiring,
22 among other measures, that gaming licensees letting patrons set deposit limits,
23 "conspicuously display" information about responsible-gaming resources, train employees
24 to identify signs of problem gaming, and refrain from marketing to customers who have
25 excluded themselves. Nev. Gam'g Comm. Reg. 5.225(18)(a)-(b). To Plaintiff's knowledge,
26 POLYMARKET does not adhere to these requirements to the extent required by Nevada
27 law.
28 ///

POLYMARKET's operations further harm the gaming public because POLYMARKET does not participate in the State's process to resolve patron disputes. *See* NRS 463.362 *et seq.* Patrons of licensed gaming establishments may utilize a process with the BOARD to resolve disputes related to wagering activities. But this structure is in place only for disputes between a Nevada licensee and its patron. NRS 463.362. A person entering a wager through an event contract available on POLYMARKET's market is not a patron of a Nevada licensee and, thus, pursuant to the applicable statutes, has no recourse should there be a dispute over the wager. POLYMARKET's market thus harms the public interest because it does not provides adequate protection to purchasers of event contracts.

POLYMARKET also harms the State's economy and the public fisc. Licensed gaming is "vitally important to the economy of the State and the general welfare of the inhabitants." NRS 463.0129(1)(a). All licensed gaming operators must pay taxes, *see* NRS 463.370— revenues that finance "indispensable" State functions, from schools to highways. *Sacco v. State*, 105 Nev. 844, 847 (1989). POLYMARKET's unlicensed gaming operations threatens that revenue, by evading taxes and diverting business from licensed sports books that pay taxes, and thus "represents a serious threat to the state's economic base." *Id.* Allowing POLYMARKET to offer unlawful gaming activities risks "devastating the Nevada economy and related tax revenues." *KalshiEX*, 2025 WL 3286282, at *14. The public interest thus weighs decisively in favor of enjoining POLYMARKET.

**D.    The Court should extend the temporary restraining order until February 19, 2026, the date of its hearing on the PI Motion.**

NRCP 65(b)(2) states that a temporary restraining order expires no later than fourteen days after its issuance. Should the Court issue the temporary restraining order today, the temporary restraining order would expire, on its own terms, on February 9, 2026. However, the Court has set a hearing on the PI Motion for February 19, 2026, *see* 1/23/26 Order, and therefore good cause exists to extend the effectiveness of the temporary restraining order until that date. To allow the temporary restraining order to expire before the hearing on the PI Motion would be to allow the substantial harms to the BOARD, the

1  State, its citizens, and its gaming industry to resume unchecked. Therefore, the BOARD

2  respectfully requests that the temporary restraining order be extended up to and including

3  February 19, 2026.

4      **E.**      **No security is required.**

5      NRCP 65(b)(c) generally requires that a party in whose favor a temporary

6  restraining order is issued post security "in an amount that the court considers proper to

7  pay the costs and damages sustained by any party found to have been wrongfully enjoined

8  or restrained." However, that same provision requires unequivocally that "[t]he State, its

9  officers, and its agencies are not required to give security." Therefore, the ex parte

10  temporary restraining order can and should be issued and effective without the posting of

11  security.

<strong>CONCLUSION</strong>

13      The Court should grant this renewed application for ex parte temporary restraining

14  order and immediately enter an order prohibiting POLYMARKET and any of its agents,

15  employees, officers, or affiliates from operating a market that offers event-based contracts

16  relating to sporting and other events to people in Nevada without obtaining all required

17  Nevada gaming licenses, and prohibiting POLYMARKET from allowing its market to

18  accept wagers from persons under the age of 21 in Nevada.

26  / / /

27  / / /

28  / / /

1

2

### AFFIRMATION
### (Pursuant to NRS 239B.030)

3

The undersigned does hereby affirm that the foregoing document does not contain

4

the social security number of any person.

5

Dated: January 26, 2026.

6

AARON D. FORD
Attorney General

7

8

By: _____ #11543

9

Jessice E. Whelan (Bar No. 14781)
   Chief Deputy Solicitor General – Litigation

10

John S. Michela (Bar No. 8189)
   Senior Deputy Attorney General

11

Sabrena K. Clinton (6499)
   Senior Deputy Attorney General

12

State of Nevada
Office of the Attorney General

13

1 State of Nevada Way, Suite 100
Las Vegas, NV 89119

14

jwhelan@ag.nv.gov

15

jmichela@ag.nv.gov
sclinton@ag.nv.gov

16

*Attorneys for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

1  AARON D. FORD
     Attorney General
2  Jessica E. Whelan (Bar No. 14781)
   Chief Deputy Solicitor General - Litigation
3  John S. Michela (Bar No. 8189)
   Senior Deputy Attorney General
4  Sabrena K. Clinton (Bar No. 6499)
   Senior Deputy Attorney General
5  State of Nevada
   Office of the Attorney General
6  1 State of Nevada Way, Suite 100
   Las Vegas, NV 89119
7  (702) 486-3420 (phone)
   (702) 486-3773 (fax)
8  jwhelan@ag.nv.gov
   jmichela@ag.nv.gov
9  sclinton@ag.nv.gov

10  *Attorneys for Plaintiff*

11        **IN THE FIRST JUDICIAL DISTRICT COURT OF
           THE STATE OF NEVADA IN AND FOR CARSON CITY**

12
   STATE OF NEVADA ex rel. NEVADA          | Case No. 26 0C 00012 1B
13  GAMING CONTROL BOARD,

14          Plaintiff(s),

15  vs.

16  BLOCKRATIZE, INC. d/b/a
   POLYMARKET; QCX LLC d/b/a
17  POLYMARKET US; ADVENTURE ONE
   QSS, INC d/b/a POLYMARKET,,

18
          Defendants.
19

20    **DECLARATION OF JESSICA E. WHELAN IN SUPPORT OF PLAINTIFF'S
       RENEWED APPLICATION FOR EX PARTE TEMPORARY RESTRAINING
21                            ORDER**

22        I, Jessica E. Whelan, declare as follows:

23        1.      I am the Chief Deputy Solicitor General—Litigation in the Nevada Attorney

24  General's Office, and I make this declaration in support of Plaintiff's renewed application

25  for an *ex parte* temporary restraining order under NRS 463.346 and NRCP 65(b). All facts

26  stated herein are based on my personal knowledge

27        2.      On October 15, 2025, the Nevada Gaming Control Board ("BOARD") issued

28  public guidance explaining that "it considers offering sports event contracts, or certain

                            Page 1 of 4

1    other events contracts, as constituting wagering activity under NRS 463.0193 and

2    463.01962," regardless of whether "the contract is listed on an exchange regulated by the

3    Commodity Futures Trading Commission (CFTC) or elsewhere." Nev. Gaming Control Bd.,

4    *Notice to Licensees No. 2025-77: Sports Event Contracts Are Wagers* 1 (Oct. 15, 2025),

5    perma.cc/7XEH-BZLV. The BOARD further explained that "[e]xamples of event contracts

6    that the Board specifically considers to be wagering subject to its jurisdiction include event

7    contracts based on the outcome or partial outcome of any sporting or athletic event, or other

8    selected events such as the World Series of Poker, the Oscars, Esports, and political

9    elections." *Id.*

10           3.     The BOARD also explained that "[o]fferings for Sports and Other Events

11   Contracts may be conducted in Nevada only if the offering entity possesses a nonrestricted

12   gaming license with sports pool approval in Nevada and meets the other requirements for

13   sports wagering including, without limitation, wagering accounts and sports book

14   systems." *Id.*

15           4.     Accordingly, as of October 15, 2025, the Board had provided public notice to

16   all entities that allow for the purchase or sale of event contracts based on the outcome of

17   sporting and certain other events in Nevada without possessing a gaming license with

18   sports pool approval that such conduct violates Nevada law.

19           5.     Defendants BLOCKRATIZE, INC. d/b/a POLYMARKET, QCX LLC d/b/a

20   POLYMARKET US, and ADVENTURE ONE QSS, INC. d/b/a POLYMARKET (collectively,

21   "POLYMARKET") operate a market that offers event-based contracts relating to sporting

22   and other events. Compl. ¶ 20. These events include, but are not limited to, college

23   basketball games, college and professional football games, and elections. *Id.* Although

24   POLYMARKET's website states that POLYMARKET is "not available to . . . persons

25   located in the United States," users in Nevada are able to access POLYMARKET by signing

26   up for an account through its mobile app. *Id.* ¶ 18.

27           6.     POLYMARKET's activities meet the definition of a "game" subject to

28   regulation in Nevada—specifically, it operates a "sports pool" under Nevada law.

*See* Compl. ¶¶ 18-23. But despite conducting gaming accessible in the State of Nevada, POLYMARKET is not licensed in Nevada and does not comply with Nevada gaming law. *Id.* ¶ 25. It has not undergone Nevada's rigorous licensing process for its gaming activities, nor has does it comply with the restrictions and requirements of Nevada law for operators of sports pools. *See id.* ¶¶ 26, 35.

7.    On January 26, 2026, undersigned counsel provided notice to counsel for POLYMARKET via email that the BOARD intended to file its Renewed Application for Ex Parte Temporary Restraining Order on the same date. *See* **Exhibit 1-1** (1/26/26 email from J. Whelan to opposing counsel). Despite notice being given to counsel for POLYMARKET, the BOARD requests issuance of a temporary restraining order on an *ex parte* basis because POLYMARKET's activities in Nevada are causing immediate and irreparable injury to Plaintiff and the State of Nevada and will continue to do so before POLYMARKET can be heard in opposition to Plaintiff's renewed application.

8.    The BOARD enforces Nevada gaming law and oversees the State's gaming industry to protect the integrity and reputation of gaming in Nevada and to safeguard the public. POLYMARKET's failure to comply with Nevada gaming law harms the public. For example, Nevada law prohibit persons under the age of 21 from engaging in gaming, yet POLYMARKET allows those as young as 18 to wager on its platform. Nevada law also prohibits wagers by owners, coaches, players, officials, or other participants in sporting events and require licensees to take reasonable steps to prevent circumvention of that rule. To the undersigned counsel's knowledge, POLYMARKET does not comply with these requirements.

9.    POLYMARKET's failure to comply with Nevada gaming law also gives it a massive and unfair competitive advantage over its competitors, which upends the gaming industry. That advantage is both pecuniary, in that POLYMARKET does not need to spend the money its competitors need to spend on licensing fees, taxes, and compliance (including maintaining a physical location in Nevada), as well as strategic, in that POLYMARKET's products are not subject to the same requirements as its competitors.

The BOARD suffers irreparable harm when POLYMARKET is able to distort the playing field and disrupt the industry in this manner.

10.    The harm only increases the longer POLYMARKET is allowed to operate unfettered.  POLYMARKET's ability to profit from unlicensed gaming will incentivize others to enter into prediction markets rather than becoming (or remaining) licensed by the State.

11.    Plaintiff and the State of Nevada are currently suffering the serious, ongoing, and irreparable harms outlined above every day that POLYMARKET operates its market in violation of Nevada law.  These harms justify issuance of the temporary restraining order on an *ex parte* basis without notice to POLYMARKET or an opportunity for it to respond.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 26th day of January, 2026.

By: _____
JESSICA E. WHELAN

Page 4 of 4

# EXHIBIT 1-1

| From: | Jessica E. Whelan |
|---|---|
| To: | Spencer, Jacob T.; OSnyder@gibsondunn.com; Benjamin, Matt; TDupree@gibsondunn.com; "Robert Dotson"; morgan dhvnv |
| Cc: | Sabrena K. Clinton; John S. Michela; Jeny M. Beesley |
| Subject: | State of Nevada v. Polymarket - Notice of Filing of Renewed Application for Ex Parte Temporary Restraining Order |
| Date: | Monday, January 26, 2026 1:21:12 PM |
| Attachments: | image001.png |

Counsel,

Pursuant to NRCP 65(b)(1), I am hereby providing you notice that the State intends to file a Renewed Application for Ex Parte Temporary Restraining Order in the 1st Judicial District Court today. We are providing you notice but will ask the Court to sign the TRO on an ex parte basis given the substantial and irreparable harm that the State is facing due to Polymarket's unlicensed and unregulated operation in the State. I will provide a courtesy copy by email of our filing, as we agreed last week.

If you have reconsidered our proposal to cease operating in the State while the Motion for Preliminary Injunction is pending, please let me know and we can discuss.

Thank you,
Jessica

Jessica E. Whelan
Chief Deputy Solicitor General - Litigation
Office of the Attorney General
1 State of Nevada Way
Suite 100
Las Vegas, Nevada 89119
jwhelan@ag.nv.gov
D: 702-486-4346



*Notice: This e-mail message and any attachments thereto may contain confidential, privileged, or non-public information. Use, dissemination, distribution, or reproduction of this information by unintended recipients is strictly prohibited. If you have received this message in error, please notify the sender immediately and destroy all copies.*

**CERTIFICATE OF SERVICE**

I certify that I am an employee of the Office of the Attorney General, State of Nevada, and that on January 26, 2026, I deposited for mailing in the United States Mail, first-class postage prepaid, at Carson City, a true and correct copy of the foregoing document, addressed to the following:

Jacob T. Spencer, Esq.
Gibson, Dunn & Crutcher LLP
1700 M Street, N.W.
Wahington, D.C. 20036-4504
JSpencer@gibsondunn.com

Blockratize, Inc. d/b/a Polymarket
C/O Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

*Attorneys for Defendants*

QCX LLC d/b/a Polymarket US
C/O Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

Adventure One QSS, Inc. d/b/a
Polymarket
1280 Lexington Ave
New York, NY 10028

_____
AG Legal Secretary, an employee of
the Office of the Nevada Attorney General

ROBERT A. DOTSON
Nevada State Bar No. 5285
DANIEL T. HAYWARD
Nevada State Bar No. 5986
JUSTIN C. VANCE
Nevada State Bar No. 11306
DOTSON, HAYWARD & VANCE, PC
5355 Reno Corporate Drive, Ste 100
Reno, Nevada 89511
Tel:    (775) 501-9400
Email: rdotson@dhvnv.com
        dhayward@dhvnv.com
        jvance@dhvnv.com

Orin Snyder (*pro hac vice forthcoming*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
212.351.4000
OSnyder@gibsondunn.com

*Attorneys for Defendants BLOCKRATIZE, INC.*
*d/b/a POLYMARKET; QCX LLC d/b/a*
*POLYMARKET US*

*Additional counsel listed on signature page*

## IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

## IN AND FOR CARSON CITY

STATE OF NEVADA ex rel. NEVADA
GAMING CONTROL BOARD,

          Plaintiff,

v.

BLOCKRATIZE, INC., d/b/a POLYMARKET;
QCX, LLC, d/b/a POLYMARKET US; and
ADVENTURE ONE QSS, INC., d/b/a
POLYMARKET,

          Defendants.

Case No. 26-OC-00012-1B
Department No. I

**DEFENDANTS' PRELIMINARY RESPONSE AND RENEWED REQUEST FOR
OPPORTUNITY TO FILE FULL OPPOSITION TO PLAINTIFF'S RENEWED
APPLICATION FOR *EX PARTE* TEMPORARY RESTRAINING ORDER**

1

Defendants BLOCKRATIZE, INC., d/b/a POLYMARKET, and QCX, LLC, d/b/a POLYMARKET US ("Defendants"), by and through their counsel, hereby provide the following preliminary response:[1]

## REQUEST FOR RELIEF

The Court should deny the Nevada Gaming Control Board's renewed request for an *ex parte* temporary restraining order. The Board has not met the demanding standard required for such extraordinary relief. The Court should instead permit Defendants to file a full opposition to the Board's application for injunctive relief, in accordance with a normal briefing schedule, on or before February 2, 2026. The Court should then hear arguments on any request for a temporary restraining order or preliminary injunction.

This is the Board's second attempt to obtain extraordinary *ex parte* relief without affording Defendants a meaningful opportunity to be heard. The Court has already rejected the Board's first effort as "deficient." Order Denying TRO at 2. The Board's renewed application fares no better. Although the Board repackages its allegations in a newly sworn declaration, it still fails to present the "specific facts" that "clearly show" an immediate and irreparable injury necessary to justify *ex parte* relief under N.R.C.P. 65(b)(1)(A). Worse, the Board either has not filed or (in violation of this Court's Friday order) has not served Defendants with a proposed order for the renewed motion. So, as with the Board's first filing, Defendants have no way of knowing precisely what the Board is asking the Court to order Defendants to do – or how it differs from the original request.

Equally troubling, the Board's submission omits material facts known to it that undermine any claim of emergency, including:

1. Jurisdictional Misstatements. Defendant Adventure One QSS is a Panamanian corporation that does no business in Nevada. The Board nevertheless seeks emergency relief against that foreign entity.

---

[1] Adventure One QSS, Inc, is not a U.S. corporation and does no business in Nevada. To the extent necessary, this should be considered a special appearance. Defendants do not waive—and expressly reserve—all defenses available to them, including, without limitation, improper service of process and lack of personal jurisdiction.

DOTSON, HAYWARD & VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

2. Absence of Urgency. Just last year, a federal district court in Nevada enjoined the Board from enforcing its gaming laws against another federally designated contract market for six months. *KalshiEX, LLC v. Hendrick*, 2025 WL 1073495, at *2 (D. Nev. Apr. 9, 2025). The Board did not appeal that injunction. Its inaction in that case undermines any claim of imminent harm now.

3. Exclusive Federal Jurisdiction. Polymarket US operates a federally designated contract market subject to the "exclusive jurisdiction" of the Commodity Futures Trading Commission. 7 U.S.C. § 2(a)(1)(A). Congress established a comprehensive federal regulatory regime governing such markets to ensure fair and financially secure trading facilities, protect market participants, and promote responsible innovation and fair competition. *See id.* § 5. The Board's application asks this Court to disrupt that federally regulated system through emergency relief, without briefing, evidence, or adversarial testing.

Granting an *ex parte* temporary restraining order under these circumstances would be neither fair nor prudent. It would disrupt national trading on a federally regulated exchange. It would impose irreparable harm on Defendants and third parties. It would enjoin a foreign corporation lacking meaningful contacts with Nevada. And it would reward an attempt to bypass both exclusive federal regulatory authority and fundamental principles of due process.

There is a more sensible and orderly course. Defendants are prepared to file a comprehensive opposition, addressing the applicable facts and law as well as the numerous other deficiencies in the Board's applications for injunctive relief. Defendants anticipate making that filing by February 2, 2026—or by any shortened deadline the Court deems appropriate. To satisfy the demands of due process, the Court should permit that briefing and consider the complete record at a hearing, where the parties can address any questions the Court might have.

## CONCLUSION

The Court should deny the Board's renewed request for an *ex parte* temporary restraining order, permit Defendants to file their opposition on February 2, 2026, and consider all requests for injunctive relief on a full and adversarial record at a hearing. If the Court denies the request for *ex parte* relief, Defendants will work with counsel for the Board to propose a mutually agreeable hearing date, since Defendants' lead counsel is not available on February 19. If the Court does grant *ex parte* relief, the

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511

Court should set an immediate hearing. *See* N.R.C.P. 65(b)(3). Lead counsel for Defendants would be available for that hearing any day from February 4 through February 18 except February 12.

**Affirmation Pursuant to NRS 239B.030**

The undersigned does hereby affirm that the preceding document does not contain the social security number of any person.

DATED this 27 day of January 2026.

DOTSON, HAYWARD & VANCE PC

ROBERT A. DOTSON
Nevada State Bar No. 5285
DANIEL T. HAYWARD
Nevada State Bar No. 5986
JUSTIN C. VANCE
Nevada State Bar No. 11306
5355 Reno Corporate Drive, Ste 100
Reno, Nevada 89511
(775) 501-9400

GIBSON, DUNN & CRUTCHER LLP
ORIN SNYDER *(Pro Hac Vice to be submitted)*
MATT BENJAMIN *(Pro Hac Vice to be submitted)*
200 Park Avenue
New York, NY 10166
(212) 351-4000
OSnyder@gibsondunn.com
MBenjamin@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
THOMAS H. DUPREE JR.
*(Pro Hac Vice to be submitted)*
JACOB T. SPENCER *(Pro Hac Vice to be submitted)*
1700 M Street, N.W.
Washington, DC 20036-4504
(202) 955-8500
TDupree@gibsondunn.com
JSpencer@gibsondunn.com

*Attorneys for Defendants BLOCKRATIZE, INC.*
*d/b/a POLYMARKET; QCX LLC d/b/a*
*POLYMARKET US*

## CERTIFICATE OF SERVICE

Pursuant to NRCP 5(b), I hereby certify that I am an employee of DOTSON, HAYWARD & VANCE, PC and that on this date I caused to be served a true and correct copy of the foregoing by:

☒    (BY MAIL) on all parties in said action, by placing a true copy thereof enclosed in a sealed envelope in a designated area for outgoing mail, addressed as set forth below. At Dotson, Hayward & Vance, PC , mail placed in that designated area is given the correct amount of postage and is deposited that same date in the ordinary course of business, in a United States mailbox in the City of Reno, County of Washoe, Nevada.

☐    By electronic service by filing the foregoing with the Clerk of Court using the E-Flex system, which will electronically mail the filing to the following individuals.

☐    (BY PERSONAL DELIVERY) by causing a true copy thereof to be hand delivered this date to the address(es) at the address(es) set forth below.

☐    (BY FACSIMILE) on the parties in said action by causing a true copy thereof to be telecopied to the number indicated after the address(es) noted below.

☒    Email.

addressed as follows:

Jessica E. Whelan
Sabrena K. Clinton
John S. Michela
Nevada Office of the Attorney General
1 State of Nevada Way Ste 100
Las Vegas, NV 89119
jwhelan@ag.nv.gov
sclinton@ag.nv.gov
JMichela@ag.nv.gov
*Attorneys for Plaintiff*

DATED this 27 day of January 2026.

_____
L. MORGAN BOGUMIL

DOTSON, HAYWARD
& VANCE, PC
5355 RENO CORPORATE DR.
SUITE #100
RENO, NEVADA 89511



IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR CARSON CITY

STATE OF NEVADA ex rel. NEVADA
GAMING CONTROL BOARD,

          Plaintiff,

   vs.

BLOCKRATIZE, INC. d/b/a
POLYMARKET; QCX LLC d/b/a
POLYMARKET US; ADVENTURE ONE
QSS, INC. d/b/a POLYMARKET,

          Defendants.

Case No.:  26 OC 00012 1B

Dept. No.: 1

## ORDER GRANTING PLAINTIFF'S RENEWED *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

THIS MATTER is before the Court on a *Complaint for Permanent Injunction and Declaratory Relief* ("*Complaint*") filed January 16, 2026 by the NEVADA GAMING CONTROL BOARD ("BOARD") and *Plaintiff's Renewed Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction* ("*Renewed Application*") filed by the BOARD on January 26, 2026. With the *Renewed Application*, the BOARD included the *Declaration of Jessica E. Whelan in Support of Plaintiff's Renewed Application for Ex Parte Temporary Restraining Order* ("*Declaration*"). Previously, in response to *Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction* ("*Original Application*") filed January 16, 2026 and *Errata to Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction* ("*Errata*") filed January 21, 2026, the

*Defendants' Preliminary Response and Request for Opportunity to File Full Opposition to Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction and to Attend Hearing and Be Heard Thereon* was filed January 22, 2026 ("*Original Opposition*"). And in response to the *Renewed Application*, *Defendants' Preliminary Response and Renewed Request for Opportunity to File Full Opposition to Plaintiff's Renewed Application for Ex Parte Temporary Restraining Order* was filed January 27, 2026 ("Renewed Opposition"). The *Original Opposition* and *Renewed Opposition* are collectively referred to as the "*Opposition*" hereinafter. The *Original Application* and *Errata* were previously denied on procedural grounds without prejudice to the BOARD to resubmit the *Application*, and the BOARD's request for a preliminary injunction was scheduled for a hearing on February 19, 2026. The Court has reviewed the *Complaint*, *Renewed Application*, and *Opposition* and familiarized itself with the legal authorities cited therein.

### A. LEGAL STANDARD

As pertinent to the *Renewed Application*, NRCP 65 provides:

> (b) **Temporary Restraining Order.**
>
> > (1) **Issuing Without Notice.** The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
> >
> > > (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
> > >
> > > (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.
>
> ....

\\\\
\\\\
\\\\
\\\\

**(d)  Contents and Scope of Every Injunction and Restraining Order.**

**(1)  Contents.**   Every order granting an injunction and every restraining order must:

(A)  state the reasons why it issued;

(B)  state its terms specifically; and

(C)  describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.

**(2)  Persons Bound.**   The order binds only the following who receive actual notice of it by personal service or otherwise:

(A)  the parties;

(B)  the parties' officers, agents, servants, employees, and attorneys; and

(C)  other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

Nevada law further explains that the injunctive relief of a temporary restraining order is authorized when it "appear[s] by the complaint that the plaintiff is entitled to the relief demanded"; the relief involves "restraining the commission or continuance of the act complained of"; and when continuance of the act "would produce great or irreparable injury to the plaintiff."  NRS 33.010; *Posner v. U.S. Bank N.A.*, 140 Nev. Adv. Op. 22, 545 P.3d 1150, 1152 (Nev. 2024) (holding injunctive relief is "'proper where the moving party can demonstrate that it has a reasonable likelihood of success on the merits and that, absent [such relief], it will suffer irreparable harm for which compensatory damages would not suffice.'" (*quoting Excellence Cmty. Mgmt., LLC v. Gilmore*, 131 Nev. 347, 351, 351 P.3d 720, 722 (Nev. 2015))).

In addition, the balance of hardships and public interest may be considered in determining whether injunctive relief is warranted and, if so, the scope and nature of that relief. *University & Cmty. College Sys. of Nev. v. Nevadans for Sound Gov't*, 120 Nev. 712, 721, 100 P.3d 179, 187 (2004).

\\\\

\\\\

\\\\

\\\\

\\\\

## B. ANALYSIS

1. **Based on the information that has been presented at this early stage in the proceedings, the BOARD appears to be reasonably likely to prevail on the merits of the underlying case.**

Here, the *Complaint*, *Application*, and *Declaration* satisfy the requirements of NRCP 65(b)(1) for issuance of the requested temporary restraining order without notice. As a threshold matter, the BOARD has a "reasonable likelihood of success on the merits." First, the *Complaint* establishes that gaming in Nevada is expansively and strictly regulated. The BOARD, in conjunction with the Nevada Gaming Commission, has virtually comprehensive statutory authority over gaming in Nevada. *See generally* Nev. Rev. Stat. ch. 463. The strict regulation of gaming promotes the public interest in several respects, including the prevention of underage gambling, preservation of the integrity of the events which are the subject of gaming wagers, and exclusion of unsuitable individuals from gaming activities. NRS 463.166, .350, *Nev. Gam'g Comm. Reg.* 22.1205(2). Gaming in Nevada may only be conducted by an entity licensed under the authority of the Nevada Gaming Control Act. NRS 463.160

Second, "gaming" as used in Nevada law includes a "percentage game," and a "wager" in a "sports pool." NRS 493.0152, .0193, .01962. "Percentage games are … games where patrons wager against each other and the house takes a percentage of each wager as a 'rake-off.'" *Hughes Properties v. State*, 100 Nev. 295, 297, 680 P.2d 970, 971 (1984). A "wager" is "a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain." NRS 463.01962. And a "sports pool" is "the business of accepting wagers on sporting events or other events by any system or method of wagering." NRS 463.0193.

Third, the record at this early stage in the proceedings indicates BLOCKRATIZE, INC. d/b/a POLYMARKET, QCX LLC d/b/a POLYMARKET US, and ADVENTURE ONE QSS, INC. d/b/a POLYMARKET (collectively, "POLYMARKET") are not licensed under the Nevada Gaming Control Act.

\\\\

Fourth, the record at this early stage in the proceedings indicates POLYMARKET offers "event-based contracts" that relate to sporting and other events, including college basketball games, college and professional football games and elections. Under Nevada law, this conduct constitutes the operation of a "sports pool" as it involves the acceptance of "wagers" concerning "sporting events or other events" "for which the outcome is uncertain." Further, the record indicates POLYMARKET takes a commission on contracts purchased through its system, meaning it is operating a "percentage game" as defined in Nevada law.

And, finally, the Court has considered POLYMARKET's contention that it "operates a federally designated contract market subject to the 'exclusive jurisdiction' of the Commodity Futures Trading Commission." As such, POLYMARKET asserts federal law, specifically 7 U.S.C. §2(a)(1)(A), preempts the BOARD's effort to subject its "event-based contracts" to Nevada law. The question of federal preemption in this regard is nuanced and rapidly evolving. At the moment, the balance of convincing legal authority weighs against federal preemption in this context. *See KalshiEx, LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 U.S. Dist. LEXIS 234246 at *11-38 (D. Nev. Nov. 24, 2025) [hereinafter referred to as "*KalshiEx*"]; *see also North American Derivatives Ex., Inc. v. Nev. Gaming Control Bd.*, No. 2:25-cv-00978-APG-BNW, 2025 U.S. Dist. LEXIS 466366 (D. Nev. Oct. 14, 2025) (holding contracts based on outcome of sporting events are not "swaps" under the Commodity Exchange Act and are not subject to exclusive jurisdiction of CFTC), *KalshiEx, LLC v. Martin*, No. 25-cv-1283-ABA, 793 F. Supp. 3d 667, 2025 U.S. Dist. LEXIS 147815 (D. Maryland Aug. 1, 2025) (holding state law not preempted by Commodity Exchange Act as applied to sports-related event contracts). *But see KalshiEx, LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 U.S. Dist. LEXIS 79893 (D.N.J. April 28, 2025) (holding state law preempted by Commodity Exchange Act as applied to sports-related event contracts). The reasoning in *KalshiEx* is persuasive. Therefore, this Court concludes that based on the current state of the law, the Commodities Exchange Act, more specifically 7 U.S.C. §2(a)(1)(A), fairly interpreted, does not vest exclusive jurisdiction over POLYMARKET's contracts with the Commodity Futures Trading Commission. As such,

\\\\

Nevada law is not preempted and the BOARD has authority to prosecute the enforcement action presented by the *Complaint* and *Renewed Application*.

### 2. The BOARD's injuries are irreparable and non-compensable.

If POLYMARKET's acts are wrongful, the resulting harm in evasion of Nevada's "comprehensive regulatory structure" and "strict licensing standards" is immediate, irreparable and not sufficiently remediable by compensatory damages. The BOARD has a statutory duty to protect the public and advance Nevada's interest in administering a reputable gaming industry with integrity. In furtherance of that duty, the BOARD is obliged to consistently and equitably monitor and enforce regulatory and statutory compliance among all industry participants and protect the health, safety, morals, good order, and general welfare of gaming consumers. An unlicensed participant beyond the BOARD's control, such as POLYMARKET, obstructs the BOARD's ability to fulfill its statutory functions. For example, the BOARD lacks authority to ensure that wagers are not being accepted by POLYMARKET from owners, coaches, players or officials who are in a position to influence the outcome of a sporting event. The BOARD also has no means to ensure that underage individuals are not allowed to purchase POLYMARKET's contracts and no ability to enforce any sanction against POLYMARKET even it determined this to be the case. Additionally, the BOARD has no way to know, much less prevent, if unsuitable individuals are involved with POLYMARKET's activities in Nevada. By their nature, the nature of these injuries cannot be mitigated, much less restored, by compensatory damages after the injury is incurred.

These potential consequences must be characterized as irreparable under Nevada law. As such, they support issuance of a temporary restraining order.

### 3. The *Declaration* establishes immediate and irreparable injury will result if POLYMARKET is allowed a full opportunity to respond before the temporary restraining order is issued.

As the *Declaration* and the record establish, POLYMARKET has been provided notice of the BOARD's filings as well as the actual filings themselves. Further, POLYMARKET has been given some opportunity to respond and, in fact, responded, albeit to a limited extent. POLYMARKET requests that this Court defer issuance of any injunctive relief until it is able to

"file a comprehensive opposition" which it anticipates filing "February 2, 2026 or by any shortened deadline the Court deems appropriate." POLYMARKET's request is clearly in good faith and not for the purposes of delay, as it unilaterally proposes a significantly expedited schedule. Issuance of the temporary restraining order in advance of POLYMARKET's comprehensive response may necessitate conversion of the response to a motion to dissolve under NRCP 65(b)(4), but there is nothing to otherwise prevent POLYMARKET from being fully and fairly heard on the issues in dispute and on an expedited basis. However, the nature of the BOARD's injuries which are alleged and, at least preliminarily, substantiated are imminent. They are also the types of injuries that exacerbate with each day that POLYMARKET operates in Nevada outside the authority of the BOARD. A day means more consumers. More consumers mean more transactions. More transactions means more potential harm to the BOARD. As such, every day matters in this case in a literal sense. For these reasons, this Court deems immediate action to be necessary and issues the temporary restraining order in advance of POLYMARKET providing the comprehensive response it contemplates.

### 4. The balance of hardships and public interest weigh in favor of issuing the temporary restraining order.

Largely for the reasons that have already been explained above, the balance of hardships and public interest in maintaining meaningful control over Nevada's gaming industry for the purpose of ensuring its integrity strongly supports issuance of the temporary restraining order. Beyond the factors previously addressed, if it is later determined that the temporary restraining order was issued wrongfully, POLYMARKET would have been denied a brief period in the market which damaged them in an amount that should be relatively straightforward to quantify and, if legally redressable, compensate. There is no reciprocal remedy for the BOARD if the temporary restraining order is wrongfully denied.

### 5. No security is required.

A party who is the beneficiary of a temporary restraining order is typically required to post security for damages resulting from wrongful issuance of the temporary restraining order.

\\\\

NRCP 65(c). However, the BOARD, as an agency of the State of Nevada, is exempted from that typical requirement. *Id.* Therefore, no security will be required.

**6. The duration of the temporary restraining order is limited to 14 days.**

NRCP 65(b)(2) limits the duration of a temporary restraining order without notice to a maximum of 14 days unless it is extended for good cause or the adverse party consents to a longer period. The *Renewed Application* urges this Court to extend the temporary restraining order until February 19, 2026 when the hearing on the preliminary injunction was set. This is insufficient to establish good cause for an extended duration. First, the February 19, 2026 hearing was set at a time when no temporary restraining order had been issued. As such, no effort was made to expedite the hearing further and schedule it within a 14-day period. Second, the *Renewed Opposition* indicates POLYMARKET's counsel is not available on February 19, 2026, so the hearing must be re-scheduled anyway. For these reasons, there is insufficient cause to extend the order beyond the normal 14-day time period at this time. Therefore, the BOARD's request to do so is denied, but denied without prejudice to request an extension in a subsequent filing if it believes circumstances develop to support good cause for a renewed request.

**C. ORDER**

Therefore, good cause appearing,

**IT IS HEREBY ORDERED** that *Plaintiff's Renewed Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction* filed on January 26, 2026 is **GRANTED** insofar as it requests issuance of a temporary restraining order.

**IT IS HEREBY FURTHER ORDERED** that a hearing on *Plaintiff's Renewed Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction* filed January 26, 2026 will be held in the First Judicial District Court, located at 885 East Musser Street, Carson City, Nevada, Department I, on **February 11, 2026, at 9:00 a.m.**

**IT IS HEREBY FURTHER ORDERED** that the hearing on the *Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction* filed January 16, 2026 set by the January 23, 2026 *Order Denying Application for Temporary Restraining Order*

*Without Prejudice and Setting Hearing on Motion for Preliminary Injunction* on **February 19, 2026 at 1:30 p.m.** is **VACATED**.

Dated this 29ᵗʰ day of January, 2026.

Jason D. Woodbury
DISTRICT JUDGE

1

## CERTIFICATE OF MAILING

2

The undersigned, an employee of the First Judicial District Court, hereby certifies that on

3

the _2/_ day of January, 2026, I served the foregoing Order by placing a copy in the United States

4

Mail, postage prepaid, addressed as follows:

5

6

Aaron D. Ford, Attorney General
Jessica E. Whelan, Chief Deputy Solicitor General – Litigation
Sabrena K. Clinton, Senior Deputy Attorney General

7

John S. Michela, Senior Deputy Attorney General
State of Nevada

8

Office of the Nevada Attorney General

9

1 State of Nevada Way, Suite 100
Las Vegas, NV 89119

10

11

Jacob T. Spencer, Esq.
Gibson, Dunn & Crutcher, LLP

12

1700 M. Street, N.W.
Washington, D.C. 20036-4504

13

14

Orin Snyder, Esq.
Gibson, Dunn & Crutcher LLP

15

200 Park Avenue
New York, NY 10166

16

17

Robert A. Dotson, Esq.
Daniel T. Hayward, Esq.

18

Justin C. Vance, Esq.
Dotson, Hayward & Vance, PC

19

5355 Reno Corporate Drive, Suite 100
Reno, NV  89511

20

21

22

23

Julie Harkleroad
Judicial Assistant, Dept. 1

24

25

26

27

28



REC'D & FILED

2026 JAN 29  AM 9: 09

WILLIAM SCOTT HOEN
CLERK
BY_____
DEP

IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR CARSON CITY

| | |
|---|---|
| STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD,<br><br>           Plaintiff,<br>    vs.<br><br>BLOCKRATIZE, INC. d/b/a POLYMARKET; QCX LLC d/b/a POLYMARKET US; ADVENTURE ONE QSS, INC. d/b/a POLYMARKET,<br><br>           Defendants. | Case No.: 26 OC 00012 1B<br><br>Dept. No.: 1 |

## TEMPORARY RESTRAINING ORDER

For the reasons set forth in the *Order Granting Plaintiff's Renewed Ex Parte Application for Temporary Restraining Order* issued this 29th day of January, 2026, which is expressly incorporated herein by this reference, this Court **HEREBY ORDERS** as follows:

BLOCKRATIZE, INC. d/b/a POLYMARKET, QCX LLC d/b/a POLYMARKET US, and ADVENTURE ONE QSS, INC. d/b/a POLYMARKET (collectively, "POLYMARKET") and any of POLYMARKET's principals, employees, or agents are **HEREBY ENJOINED** from operating or offering a market in Nevada that involves "events-based contracts" without a valid license issued in accordance with Chapter 463 of Nevada Revised Statutes and regulations adopted in accordance therewith. For purposes of this *Temporary Restraining Order*, the term "events-based contracts" includes any "percentage game," "sports pool" or "wager" as those terms are defined in *Hughes Properties v. State*, 100 Nev. 295, 297, 680 P.2d 970, 971 (1984),

NRS 463.0193, and NRS 463.01962, respectively, and in the *Order Granting Plaintiff's Renewed Ex Parte Application for Temporary Restraining Order* dated January 29, 2026.

This *Temporary Restraining Order* is effective on January 29, 2026 as of the time reflected on the file-stamp on the first page of this *Temporary Restraining Order* and expires at the same time on February 12, 2026 unless dissolved, modified or extended sooner by order of this Court.

Dated this 29ᵗʰ day of January, 2026.

Jason D. Woodbury
DISTRICT JUDGE

## CERTIFICATE OF MAILING

The undersigned, an employee of the First Judicial District Court, hereby certifies that on the _11_ day of January, 2026, I served the foregoing Order by placing a copy in the United States Mail, postage prepaid, addressed as follows:

Aaron D. Ford, Attorney General
Jessica E. Whelan, Chief Deputy Solicitor General – Litigation
Sabrena K. Clinton, Senior Deputy Attorney General
John S. Michela, Senior Deputy Attorney General
State of Nevada
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119

Jacob T. Spencer, Esq.
Gibson, Dunn & Crutcher, LLP
1700 M. Street, N.W.
Washington, D.C. 20036-4504

Orin Snyder, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

Robert A. Dotson, Esq.
Daniel T. Hayward, Esq.
Justin C. Vance, Esq.
Dotson, Hayward & Vance, PC
5355 Reno Corporate Drive, Suite 100
Reno, NV 89511

Julie Harkleroad
Judicial Assistant, Dept. 1