AARON D. FORD
  Attorney General
Jessica E. Whelan (Bar No. 14781)
  Chief Deputy Solicitor General - Litigation
John S. Michela (Bar No. 8189)
  Senior Deputy Attorney General
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
State of Nevada,
  Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3773 (fax)
jwhelan@ag.nv.gov
jmichela@ag.nv.gov
sclinton@ag.nv.gov

*Attorneys for Plaintiff State of Nevada ex rel.
Nevada Gaming Control Board*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD, | Case No.: 3:26-cv-00089 |
| Plaintiff, | [Nev. Dist. Ct. No. 26OC000121B] |
| v. | **PLAINTIFF'S MOTION TO REMAND** |
| BLOCKRATIZE INC. d/b/a Polymarket; QCX LLC d/b/a Polymarket US; ADVENTURE ONE QSS INC. d/b/a Polymarket, | |
| Defendants, | |

Plaintiff the State of Nevada on relation of the Nevada Gaming Control Board (the Board) respectfully asks the Court to remand this case to state court. As explained below, the parties respectfully request a ruling from this Court by February 26, 2026. The parties are simultaneously filing a stipulation to a condensed briefing schedule, so that the Court is able to rule by that date. This motion is based on the following memorandum of points and authorities, the referenced pleadings and exhibits, and any oral argument the Court may entertain.

/ / /

/ / /

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Defendants Blockratize Inc. d/b/a Polymarket, QCX LLC d/b/a Polymarket US, and Adventure One QSS Inc. d/b/a Polymarket (collectively, Polymarket) offer unlicensed sports betting in Nevada. The Board brought this civil enforcement action under Nevada state law to enjoin Polymarket's unlawful gambling operations in Nevada until Polymarket obtains a Nevada gaming license and complies with Nevada's gaming laws. As state law requires, the Board filed this action in state court.

On January 29, 2026, the state court issued a TRO. It found that Polymarket's unlicensed operations likely violate Nevada's gaming laws. It also found that every day that those unlicensed operations continue, they irreparably harm the State, its gaming industry, and the public. These harms "cannot be mitigated" once incurred. ECF No. 2-4, at 68. "A day means more consumers. More consumers mean more transactions. More transactions means more potential harm." *Id*. "[E]very day matters in this case in a literal sense." *Id*. The court entered a TRO that lasts 14 days, until February 12, 2026. The court then set the case for expedited briefing on the Board's motion for a preliminary injunction, so that motion could be decided by February 12.

Polymarket told the state court it would respond by noon on February 5, 2026. But when that time came, Polymarket blew the deadline and instead filed a notice of removal. Polymarket asserts that this state-law case can only be heard in federal court—supposedly because Polymarket (a private company) can avail itself of the federal officer removal statute and because Polymarket's federal defense makes the case "arise under" federal law.

Polymarket's removal arguments are specious. Its federal-officer theory is based on the fact that it operates a designated contract market (DCM) registered with the Commodity Futures Trading Commission (CFTC). Polymarket asserts that because it is regulated by a federal agency, and the federal agency allows it to self-certify its event contracts, Polymarket actually is acting on behalf of the federal agency when it conducts its own business operations. That is wrong. Polymarket is a private company trying to make a profit. Its employees are not federal officers, and they are not acting on behalf of federal officers. The law on this is clear: Both the Supreme Court and the Ninth Circuit have held that complying with a federal regulatory scheme, even a highly detailed one, does not bring

a private party within the scope of the federal officer removal statute. Further, the Ninth Circuit has specifically held that it does not change the analysis if a federal agency has delegated authority to a private company to self-certify compliance with federal law. Polymarket cites no authority holding that a private entity can remove a state enforcement action to federal court simply because the private entity is federally regulated.

Polymarket's alternative basis for removal—that the Board's state law claims purportedly "arise under" federal law—likewise lacks merit. Polymarket seeks to raise a federal preemption *defense*, and it is well established that a federal defense does not provide a basis for removal. If Polymarket were correct, then state courts would never be able to adjudicate federal defenses. Yet it is black-letter law that state courts are competent to—and expected to—decide questions of federal law.

This Court therefore should remand this case. In light of the limited duration of the existing TRO, the parties intend to enter a stipulation to extend the existing TRO by 14 days, to February 26, 2026. The parties therefore respectfully request that the Court rule on this motion by February 26. To ensure that the Court can rule by that date, the parties are simultaneously filing a stipulation to a condensed briefing schedule. Under that condensed briefing schedule, Polymarket will file its opposition to this motion by February 13, 2026, and the Board will file its reply by February 18, 2026. The parties then respectfully suggest that, if the Court wishes to hear oral argument on the motion, it hold that argument on February 23 or 24, 2026.

Finally, given the lack of any objectively reasonable basis for removal, the Court also should award the Board its attorneys' fees and costs.

## II. BACKGROUND

### A. Nevada Law Comprehensively Regulates Gaming

Nevada's gaming industry is "vitally important to the economy of the State and the general welfare of the inhabitants." NRS § 463.0129(1)(a). All entities that conduct gaming in Nevada must "be licensed, controlled and assisted to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State." *Id.* § 463.0129(1)(d).

The Nevada Legislature has found that the continued growth and success of gaming "is dependent upon public confidence and trust that licensed gaming" is "conducted honestly and

competitively." NRS § 463.0129(1)(b). Further, the Legislature has made clear the judgment that "public confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations, and activities related" to the operation of gaming in Nevada. *Id.* § 463.0129(1)(c). The Board is statutorily charged with administering and enforcing Nevada gaming law. *Id.* § 463.140(1).

"Gaming" in Nevada is synonymous with "gambling" and includes any regulated game. NRS § 463.0153. A "gambling game" subject to regulation in Nevada includes "any game played with . . . equipment or any . . . electronic device or machine for money . . . or any representative of value" that is accessible in Nevada. *Id.* § 463.0152. The games subject to regulation in Nevada include "percentage games," *id.*, which exist when the "house" does not directly participate in a wager and its only stake is a commission derived from the wager, *see Hughes Props., Inc. v. State*, 100 Nev. 295, 297 (1984). Gaming also includes operating a "sports pool," which is "the business of accepting wagers on sporting events or other events by any system or method of wagering," NRS § 463.0193; a "wager" is a "sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain," *id.* § 463.01962.

Nevada law comprehensively regulates entities that conduct gaming activities in the State. Each entity that makes gaming activities accessible in Nevada is subject to a rigorous licensing process. NRS § 463.160(1). Entities conducting gaming activities in Nevada must pay taxes on gross gaming revenue derived from gaming activities accessible in the State. *Id.* § 463.373. Licensed entities accepting wagers from persons in the State must have a physical location in Nevada. Nev. Gaming Reg. 22.060(2). Licensed entities may not accept wagers from those under 21 years of age. NRS § 463.350. Further, licensed entities accepting wagers on sporting events must employ safeguards to ensure that wagers are not being placed on an event by owners, coaches, players, or officials participating in the event, and must communicate with Nevada gaming regulatory authorities about potential evidence of match fixing or point shaving. *See* Nev. Gaming Regs. 22.1205(2), 22.121.

To stop the unlawful operation of a gaming entity in Nevada, the Board is authorized to bring a civil action in state court. NRS § 463.343. Such an action must be brought in the district court for

/ / /

Carson City, Nevada, or the place where the company does business. *Id.* The Board may ask the state court to enter a declaratory judgment or injunction to enforce state gaming law. *Id.*

### B. The CFTC Regulates Commodities Trading

The CFTC regulates trading in commodity derivatives—financial instruments that companies use to manage risk. It is not a gaming regulator.

In 1936, Congress enacted the Commodity Exchange Act (CEA), 7 U.S.C. § 1 *et seq.*, to regulate trading in futures in wheat, corn, and other agricultural commodities. Pub. L. No. 74–675, § 3, 40 Stat. 1491, 1491 (1936). A "future" is a contract to buy or sell a quantity of a commodity at a specified price on a future date. *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995). Businesses use futures to hedge against price volatility. *Id.* The CEA initially authorized the Secretary of Agriculture to register "designated contract markets" (DCMs) for futures trading. 7 U.S.C. § 7 (1936).

In 1974, Congress expanded the CEA to cover additional commodities, including non-agricultural commodities, and to cover other derivatives, including "options." Pub. L. No. 93–463, § 201(b), 88 Stat. 1389 (1974). A "derivative" is a contract whose value depends on the performance of an underlying asset, such as a commodity. *Black's Law Dictionary* (12th ed. 2024). An "option" is a contract that "grants to the purchaser the right, for a specified period of time, to either buy or sell the subject of the option at a predetermined price." *CFTC v. White Pine Tr. Corp.*, 574 F.3d 1219, 1226 (9th Cir. 2009) (internal quotation marks omitted).

Also in 1974, Congress created the CFTC "to consolidate federal regulation of commodity futures trading" in one agency. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386–87 (1982). To that end, Congress gave the CFTC "exclusive jurisdiction" over futures and options that are traded on DCMs or other markets. *Id.*; *see* 7 U.S.C. § 2(a) (1974).

In 2010, Congress enacted the Dodd-Frank Act, which expanded the CEA to cover "swaps." Pub. L. No. 111–203, pt. II, 124 Stat. 1376, 1658–754 (2010). A "swap" is an agreement between two parties to exchange (or swap) cash flows on financial obligations (such as interest payments), to hedge risk on those obligations. *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1042–43 (9th Cir. 2003). Congress added "swaps" to the CEA because certain swaps, known as

"credit default swaps," had exacerbated the financial crisis. Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and Consumer Protection Act* 3 (2017).

Thus, after the Dodd-Frank Act, the CFTC has "exclusive jurisdiction" over commodity derivatives, including "swaps," "'option[s]'" and "contracts of sale of a commodity for future delivery" (*i.e.,* futures), that are "traded or executed on a [designated] contract market" or "any other board of trade, exchange, or market." 7 U.S.C. § 2(a)(1)(A). The mere fact that a contract is traded on a DCM does not make it subject to the CFTC's "exclusive jurisdiction"; it also must qualify as one of the listed types of commodity derivatives. *Id.* Further, if a consumer contract qualifies as a swap, option, or future, it *only* can be traded on a CFTC-registered DCM. *See id.* § 2(e) (swaps); *id.* § 6(a) (futures); 17 C.F.R. § 33.3(a) (options).

To offer a contract for trading, a DCM can self-certify that the contract complies with the CEA and immediately start trading, without any action by the CFTC. 7 U.S.C. § 7a-2(c)(1)-(2). In its self-certification, the DCM must identify whether the contract is a swap, option, or future. *See* 17 C.F.R. § 38.4(b). The CFTC can review a self-certification and disallow a contract that fails to comply with the CEA's requirements. 7 U.S.C. § 7a-2(c)(3).

Further, under the "Special Rule," the CFTC may disallow a contract that involves "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," or "gaming." 7 U.S.C. § 7a-2(c)(5). Exercising its authority under the Special Rule, the CFTC categorically prohibited contracts "that involve[], relate[] to, or reference[]" "gaming." 17 C.F.R. § 40.11(a).

### C.     The Board Brought Suit To Stop Polymarket's Unlicensed Gaming

Polymarket operates a prediction market that allowed users in Nevada to wager on the outcome of events, including sporting events such as college basketball and professional football games. *See* ECF No. 2-3 (Compl.) ¶¶ 2, 25. For example, as of January 16, 2026, a user could buy an event contract for $0.36 that would pay out $1 if the Chicago Bears won their January 18, 2026, NFL playoff game against the Los Angeles Rams—essentially, approximately 3/1 odds. *Id.* ¶ 21. Polymarket takes a percentage of money wagered through its market in the form of commissions styled as "trading fees." *Id.* ¶ 23.

///

Polymarket's sports-based contracts are "wagers" under Nevada law because they allow a person located in Nevada to risk a "sum of money" on "an occurrence for which the outcome is uncertain." NRS § 463.01962. Polymarket thus is operating a "sports pool" under Nevada law, because it is in the business of accepting wagers on sporting events or other events. *Id.* § 463.0193; *see* Compl. ¶¶ 19–21, 44. And because Polymarket takes a commission from the wagers placed, it also runs "percentage games." NRS § 463.0152; *Hughes*, 100 Nev. at 297; *see* Compl. ¶¶ 22–23, 44. Operating sports pools or percentage games in Nevada requires a gaming license. NRS §§ 463.0152(1), 463.160(1). But Polymarket is not licensed to operate either a sports pool or a percentage game in Nevada and does not otherwise comply with Nevada gaming law. Compl. ¶ 25.

On January 16, 2026, the Board initiated enforcement proceedings against Polymarket by filing a complaint in state court, as NRS § 463.343 requires. The Board alleged that Polymarket is operating an unlicensed sports pool and unlicensed percentage games in violation of Nevada law. Compl. ¶¶ 36–59. The Board brought two claims for relief: The first seeks declaratory and injunctive relief under NRS §§ 463.343 and 463.346, Compl. ¶¶ 60–72; and the second seeks declaratory and injunctive relief under NRS § 30.030, Compl. ¶¶ 73–80.

In addition to filing the complaint, the Board moved for a TRO and a preliminary injunction. *See* ECF No. 2-4, at 2. The Board explained that Polymarket is offering unlicensed sports and other wagering in violation of Nevada law, and that Polymarket's unlicensed operations cause severe and irreparable harm to the State, its gaming industry, and the public. *Id.* at 7–13. In particular, the Board explained that Polymarket has not undergone Nevada's rigorous licensing process and does not pay taxes on gaming revenue, as state law requires. *Id.* at 9, 12–13. Polymarket also does not comply with the many state regulations that protect the public, including a prohibition on wagering by those under age 21, protections to address problem gaming, and measures designed to prevent criminal activity. *Id.* at 11–12.

Polymarket filed a preliminary response. *See* ECF No. 2-4, at 23. Polymarket did not dispute that it is offering unlicensed gaming in Nevada. Instead, Polymarket contended that it does not need to comply with state law because they offer their sports and other event contracts for trading on a DCM that has been registered with the CFTC. *Id.* at 27–28. According to Polymarket, "Federal law"

1  (the CEA) "preempts the application of state gambling laws to federally regulated contract markets"
2  like its DCM. *Id.* at 28.
3      On January 29, 2026, the state court granted the Board a TRO. ECF No. 2-4, at 69. The TRO
4  enjoins Polymarket from "operating or offering a market in Nevada that involves 'events-based con-
5  tracts' without a valid license" to conduct gaming in Nevada. *Id.* at 72–73.
6  The state court noted that "gaming in Nevada is expansively and strictly regulated," and it found that
7  Polymarket's activities likely violate Nevada's gaming laws. ECF No. 2-4, at 65–67. The court re-
8  jected Polymarket's preemption defense, explaining that "the balance of convincing legal authority
9  weighs against federal preemption." *Id.* at 66 (citing *KalshiEX LLC v. Hendrick*, 2025 WL 3286282
10 (D. Nev. Nov. 24, 2025); *N. Am Derivatives Exch. Inc. v. Nevada* (*Crypto.com*), 2025 WL 2916151
11 (D. Nev. Oct. 14, 2025); and *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025)). In par-
12 ticular, the state court found the reasoning of Judge Gordon in Nevada federal district court in
13 *KalshiEX* "persuasive" on this point. *Id.* The state court thus concluded that "the Commodit[y] Ex-
14 change Act, more specifically 7 U.S.C. § 2(a)(1)(A), fairly interpreted, does not vest exclusive juris-
15 diction over POLYMARKET'S contracts with the Commodity Futures Trading Commission." *Id.*
16     The state court also found that Polymarket's unlicensed operations cause immediate and ir-
17 reparable injury to State Defendants, Nevada's gaming industry, and the public. ECF No. 2-4, at 67.
18 Among other harms, underage individuals can gamble; players, coaches, and other insiders could be
19 betting on their own events; and "unsuitable individuals" could be involved in gaming. *Id.* These
20 harms, by their nature, "cannot be mitigated" once incurred. *Id.* at 67–68. The court found that each
21 day a prediction market operates in violation of Nevada law causes additional harm: "A day means
22 more consumers. More consumers mean more transactions. More transactions means more potential
23 harm." *Id.* at 68. "[E]very day matters in this case in a literal sense." *Id.*
24     The court set the TRO to expire on February 12, 2026, and scheduled a hearing on the motion
25 for a preliminary injunction for February 11, 2026. ECF No. 2-4, at 69, 73. The court entered an
26 expedited briefing schedule so that it could decide whether to grant the preliminary-injunction motion
27 (or extend the TRO) before the TRO expired. *See id.* At Polymarket's request, the Board agreed to a
28 ///

deadline of noon PT on February 5, 2026, for Polymarket's opposition and noon PT on February 10, 2026, for the Board's reply. *See* Ex. 1.

On February 5, 2026, Polymarket did not file its brief in state court. Instead, it filed a notice of removal, asserting that the state law enforcement action must be heard by this Court. *See* ECF No. 2-1 (Notice).

Because the TRO will expire on February 12, 2026, Polymarket has agreed that the Court should extend the TRO until February 26, 2026. The parties intend to imminently file a stipulation to extend the TRO to that date. The parties therefore respectfully request that this Court rule on this motion by February 26. To ensure that the Court can rule by that date, the parties are simultaneously filing a stipulation to a condensed briefing schedule. Under that condensed briefing schedule, Polymarket will file its opposition to this motion by February 13, 2026, and the Board will file its reply by February 18, 2026. The parties then respectfully suggest that the Court hold any oral argument on this motion on February 23 or 24, 2026.

## III.   LEGAL STANDARD

It is black-letter law that state courts have both the power and the duty to address federal issues that arise in state court. *See Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 477–78 (1981). It also is black-letter law that the mere presence of a possible federal defense to a state law enforcement action does not make a case removable to federal court. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987).

A defendant can remove to federal court a "civil action . . . commenced in a State Court and that is against . . . any officer (or any person acting under that officer) of the United States or of any agency thereof," 28 U.S.C. § 1442(a), as well as "any civil action brought in a State court of which the district courts of the United States have original jurisdiction," *id.* § 1441(a). But if those predicates do not exist—and thus the "case is improperly removed"—then "the federal court must remand the action because it has no subject-matter jurisdiction to decide the case." *ARCO Envt'l Remediation, L.L.C. v. Dep't of Health & Envt'l Quality of Mont.*, 213 F.3d 1108, 1113 (9th Cir. 2000).

/ / /

/ / /

## IV.  ARGUMENT

When Polymarket began offering unlicensed sports betting in violation of Nevada law, the Board promptly brought suit in state court to stop that unlawful activity. The state court, recognizing the clear violation of state law, entered a TRO. In so doing, it preliminarily rejected Polymarket's asserted federal defense. The state court was well within its authority to do that. But apparently dissatisfied with the state court, Polymarket came running to this Court, asserting two truly extreme theories of removal jurisdiction.

Polymarket's first asserted ground for removal is federal-officer jurisdiction under 28 U.S.C. § 1442(a). But Polymarket is not a federal officer, and it is not acting under any federal officer—it is a private entity that conducts a private business subject to federal regulation. It is well established that merely being regulated by a federal agency does not create federal-officer jurisdiction. Polymarket's theory, if accepted, would turn many run-of-the-mill state enforcement actions into federal cases simply because the defendants are federally regulated, which would dramatically expand federal jurisdiction.

Polymarket's second theory is that there is federal-question jurisdiction under 28 U.S.C. § 1331 because adjudicating the Board's claims necessarily requires deciding a question of federal law. But federal law appears *nowhere* on the face of the complaint; the only federal question here is one that Polymarket asserts as a defense. It is well established that a federal defense does not create federal-question jurisdiction.

This Court therefore should remand this case to the state court.

### A.   Polymarket Is Not "Acting Under" Any Federal Officer

The federal officer removal statute allows removal to federal court of cases brought against "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). This statute is intended to give federal officers a federal forum, in order to ensure that state courts do not interfere with federal officers' performance of their federal duties. *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 150 (2007). Although this

/ / /

statute is "liberally construed" to give federal officers the ability to have their cases heard in federal court, *Colorado v. Symes*, 286 U.S. 510, 517 (1932), it is "not limitless," *Watson*, 551 U.S. at 147.

To show a basis for removal under this statute, a removing defendant must (1) demonstrate that it is a federal officer or person "acting under" a federal officer, (2) demonstrate that the plaintiff's claims are "for, or relating to" an act under color of federal office, and (3) raise a colorable federal defense. *See Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1099 (9th Cir. 2018). Here, Polymarket fails to establish the first element—it is not a person "acting under" a federal officer. It also cannot establish the second element—the Board's claims do not relate to any actions taken at the direction of a federal officer, because no such action exists.

"Acting under" a federal officer means acting at the direction of a federal officer, to carry out federal law. *Watson*, 551 U.S. at 151–52. As the Supreme Court has held, a person is not "acting under" a federal officer merely because the person is regulated by a federal agency. In *Watson*, the Supreme Court held that a tobacco company could not avail itself of the federal officer removal statute based on "the fact that a federal regulatory agency directs, supervises, and monitors a company's activities in considerable detail." *Id.* at 145. The Court explained that the term "under" refers to a relationship of subservience that "typically involves subjection, guidance, or control." *Id.* at 151. "In addition," a private person "acting under" a federal officer must be involved in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 151–52. To show that a defendant is carrying out the government's tasks, the defendant must identify an "unusually close" relationship with a federal officer that is "distinct from the usual regulator/regulated relationship." *Id.* at 157. Anything less, the Supreme Court warned, would impermissibly "expand the scope of th[is] [removal] statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries." *Id.* at 153.

Following this guidance, the Ninth Circuit has recognized that federal officer removal requires more than "mere compliance with a regulation," even if that regulation "'is highly detailed'" and even if the private entity's activities "'are highly supervised and monitored.'" *Riggs v. Airbus Helicopters, Inc.*, 939 F.3d 981, 985 (9th Cir. 2019) (quoting *Watson*, 551 U.S. at 153). When all the defendant alleges is that it complies with federal "government regulations and recommendations,"

the defendant "has failed to establish that it was 'acting under' a federal official, and it has not identified a duty of the federal government that it performed." *Saldana v. Glenhaven Healthcare LLC*, 27 F.4th 679, 685 (9th Cir. 2022). That is true, the Ninth Circuit has held, even when the party is acting pursuant to "formally delegated legal authority" from a federal agency. *Riggs*, 939 F.3d at 985. In *Riggs*, for example, a helicopter manufacturer argued that it was "acting under" the Federal Aviation Administration because the agency delegated to the manufacturer the authority to certify that helicopter designs complied with federal requirements. *Id.* The Ninth Circuit held that the manufacturer was not acting under the FAA, because the manufacturer was only following "a detailed, FAA-approved procedures manual." *Id.* at 988–89 (internal quotation marks and emphasis omitted). That is the most that Polymarket could say about federal regulation here.

Polymarket argues that it is "acting under" the CFTC because it operates a DCM regulated by the CFTC and the CFTC allows it to self-certify its event contracts. Notice ¶ 6. Specifically, Polymarket asserts that it "acts as a self-regulatory organization exercising delegated authority from the CFTC" because it is able to self-certify its contracts as complying with the CEA and then list them for trading on its DCM. *Id.* That is nowhere near enough for federal officer removal.

The Ninth Circuit has specifically held that the "delegation of authority 'to self-certify compliance with the relevant regulations'" is insufficient to show that someone is acting under the direction of a federal officer. *Riggs*, 939 F.3d at 988 (quoting *Fidelitad*, 904 F.3d at 1100). Although courts have explained that some self-regulatory organizations can "exercis[e] quasi-governmental powers," *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1213 (9th Cir. 1998), *abrogated on other grounds by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374 (2016), *no court* has held that a self-regulatory organization comes within the federal officer removal statute on that basis alone. Indeed, under Polymarket's theory, *every* DCM across the country would be able to remove any case alleging its conduct violates state law to federal court—a dramatic expansion of federal jurisdiction that would be directly contrary to the Supreme Court's guidance in *Watson*.

The key case on which Polymarket relies, *Sparta Surgical*, was not a case where a party asserted federal officer removal. Instead, it is a case about governmental immunity, and the facts are

completely distinguishable from the situation here. There, the National Association of Securities Dealers (NASD), which operates the NASDAQ stock exchange and has the power to regulate trading on that exchange, delisted the plaintiff company's stock from the NASDAQ SmallCap market on the grounds that the listing violated the market's rules. *Sparta Surgical*, 159 F.3d at 1211. The plaintiff brought state and federal claims against NASD, and NASD claimed government immunity on the ground that it was "exercising quasi-governmental powers." *Id.* at 1213. The Ninth Circuit explained that NASD was entitled to governmental immunity on the plaintiff's non-federal claims because NASD was "acting in an adjudicatory, prosecutorial, arbitrative or regulatory capacity" with respect to the plaintiff's stock. *Id.* at 1214–15. The key point is that NASD was regulating *third parties* on behalf of the government. As the Court explained, NASD would not have been entitled to immunity if the case involved only NASD's "private business." *Id.*

This case involves only Polymarket's private business, not any regulatory function with respect to third parties. The contracts at issue on Polymarket's markets *are its own contracts*; the only relevant conduct is Polymarket's own conduct. Polymarket is not claiming that it regulates anyone else's conduct. Polymarket's removal notice confirms this. The notice cites various "functions" with which Polymarket asserts it has been "specifically charged" under the CEA as a DCM, Notice ¶¶ 32–37—but the cited provisions of the CEA simply impose various requirements on Polymarket that govern the operation of its own DCM. To the extent Polymarket follows those provisions, that would show "mere compliance with federal directives," which the Ninth Circuit has held is insufficient to show that a company is acting under a federal officer. *Riggs*, 939 F.3d at 989. As the Ninth Circuit emphasized, "compliance with the law 'does not bring a private actor within the scope of the federal officer removal statute.'" *Id.* at 988 (quoting *Fidelitad*, 904 F.3d at 1100).

Polymarket suggests (Notice ¶ 30) that it acts as the CFTC's "agent" or otherwise "assist[s] the [CFTC] in fulfilling 'basic governmental tasks' that 'the Government itself would have had to perform' if it had not contracted with a private firm." *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 756 (9th Cir. 2022) (quoting *Watson*, 551 U.S. at 153–54); *see Watson*, 551 U.S. at 153 (noting that a contractor "helping the Government to produce an item that it needs" may be able to make use of the federal officer removal statute). Again, this basis for acting-under jurisdiction does not apply

when an entity merely ensures its own compliance with federal law. For example, the Ninth Circuit has concluded that a private insurer pursuing subrogation benefits on behalf of the Office of Personnel Management acts under a federal officer in bringing claims against a third party, which is different from it "simpl[y] compl[ying] with the law" in its own conduct. *Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1246–47 (9th Cir. 2017). Here, Polymarket does not identify any comparable assistance it provides to the government in regulating third parties; all of its assertions are about how it lists its own contracts for trading on its own market.[1]

Polymarket also suggests that it acts under the CFTC's "close direction." Notice ¶ 29 (quoting *Doe v. Cedars-Sinai Health Sys.*, 106 F.4th 907, 914 (9th Cir. 2024)). But it identifies no examples of such close direction—indeed, it does not say that the CFTC (or any other federal agency) played any role in its decision to list sports and other wagers on its market. Polymarket instead notes (Notice ¶ 37) that the CFTC has the authority to stay, amend, or prohibit Polymarket's self-certified listings, which Polymarket argues shows that the CFTC closely supervises its activities. But the fact that the CFTC can review Polymarket's self-certifications reflects only that, in determining whether to list contracts on its market, Polymarket is "duty-bound to follow prescriptive rules set forth by" the CFTC and the CEA, "thus falling within the 'simple compliance with the law' circumstance that does not meet the 'acting under' standard." *Riggs*, 939 F.3d at 989. That is, this shows only that the CFTC regulates Polymarket, not that Polymarket is itself exercising any regulatory authority. Polymarket also suggests that it faces a "risk of state-court 'prejudice'" if its case is not permitted to be removed. Notice ¶ 43. But it provides no basis to think that its activities are "so closely related to the government's implementation of its federal duties that [it] faces 'a significant risk of state-court prejudice.'" *Cnty. of San Mateo*, 32 F.4th at 757 (quoting *Watson*, 551 U.S. at 152). The federal officer removal statute is intended to protect the federal government from interference with its operations through state-court proceedings. *See id.* at 755–56. The state-law claims asserted against

---

[1] Polymarket cites (Notice ¶ 30) a district court decision stating that self-regulatory organizations can perform "a variety of regulatory functions that would, in other circumstances, be performed by a government agency." *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 390 F. Supp. 3d 916, 929 (N.D. Ill. 2019). But that decision did not involve the federal officer removal statute, and Polymarket does not explain how the conduct in this case involves the sort of governmental tasks that the government would have to perform if Polymarket did not.

Polymarket here do not interfere with the activities of any federal officers. Rather, the claims relate to Polymarket's private conduct—offering sports wagers within the State of Nevada without complying with Nevada's gaming laws.

At bottom, Polymarket is a private entity that has chosen to offer sports and other event contracts on its DCM in order to make a profit. The fact that the CEA permits DCMs to self-regulate in certain circumstances does not turn Polymarket itself into a federal officer or mean that it is acting under the CFTC's supervision or direction, or that it is performing a governmental function on behalf of the CFTC. Instead, Polymarket is merely ensuring its own compliance with federal law. That is what every regulated entity must do. If that were enough to invoke the federal-officer removal statute, then every regulated entity would be able to do so in every case. This Court should reject Polymarket's expansive theory of federal officer removal jurisdiction.

### B. The Board's State-Law Claims Do Not Support Federal-Question Jurisdiction

Polymarket's second theory is that this case belongs in federal court because it purportedly "arises under" federal law. *See* Notice ¶¶ 45–52. That also is mistaken. The Board filed this action in Nevada state court, seeking to enforce state gaming law and asserting only state-law causes of action. Compl. ¶¶ 60–80. There is no federal claim on the face of the well-pleaded complaint. That is the end of the jurisdictional inquiry. If Polymarket believes federal law supplies a defense to those claims, it is free to raise that defense in state court. It may not transform a state-law enforcement action into a federal case through removal.

Under 28 U.S.C. § 1331, federal courts have jurisdiction to decide cases "arising under" federal law. 28 U.S.C. § 1331; *see Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025). "Arising under" jurisdiction is carefully circumscribed: A case "arises under federal law only if either (1) federal law creates the cause of action, or (2) a "substantial question of federal law is a necessary element of a plaintiff's well-pleaded complaint." *Newtok Vill. v. Patrick*, 21 F.4th 608, 616 (9th Cir. 2021) (citation omitted). Polymarket relies only on the second category. It argues that this is one of the "rare" class of cases in which a complaint asserting only state-law claims nonetheless "necessarily raise[s]" a "substantial" and "actually disputed" federal issue—that is, where it is not legally possible for the plaintiff to prevail without addressing federal law. *Royal Canin*, 604 U.S. at 26; *see Gunn v.*

*Minton*, 568 U.S. 251, 258 (2013) (referring to the second category as a "special and small category" of cases).

Polymarket is wrong, and its position (if accepted) would dramatically expand federal-question jurisdiction. Polymarket's main argument is that a court cannot decide whether Polymarket is violating Nevada law without also deciding whether state law is preempted by the federal CEA. Notice ¶¶ 10, 47–52. But that preemption issue was not raised by the Board in the complaint; instead, it is a preemption defense. Whether Polymarket's unlicensed operations violate Nevada law depends on what contracts it is offering, whether its sports bets qualify as "wagers" and whether it is operating a "sports pool" or "percentage game" under Nevada law, and whether it is licensed, pays Nevada taxes, and otherwise complies with Nevada gaming law. *See* Compl. ¶¶ 25–59. Polymarket admitted that the federal preemption argument is a defense to enforcement—not an element of the State's causes of action—when it raised the issue in opposing the TRO. *See* ECF No. 2-4, at 28 ("Federal law," including the CFTC's "exclusive jurisdiction," "preempts the application of state gambling laws to federally regulated contract markets."). Polymarket's competitors that are in litigation against state regulators likewise have recognized that their CEA arguments are preemption defenses, not elements of a state complaint for violation of the gaming laws. *See, e.g.*, *Crypto.com*, 2025 WL 2916151, at *1 ("Crypto contends that . . . Nevada law is preempted due to the CFTC's exclusive jurisdiction over transactions on DCMs."); *Martin*, 793 F. Supp. 3d at 678 ("Kalshi argues that Congress manifested a field-preemptive intent by granting the CFTC 'exclusive jurisdiction' over . . . 'swaps' traded on a [designated contract market].").

Polymarket studiously avoids using the word "preemption" now, but that is its argument. It is well established that a preemption defense is not a basis for removal: Cases "may not be removed to federal court on the basis of . . . the defense of pre-emption." *Caterpillar*, 482 U.S. at 393; *see Negrete v. City of Oakland*, 46 F.4th 811, 817 (9th Cir. 2022) (same). Thus, the mere assertion of a federal preemption defense does not provide a basis for "arising under" jurisdiction.

Polymarket relies (Notice ¶ 48) on one particular Nevada statute that the Board alleges Polymarket violates, NRS § 465.086, but its reliance is misplaced. Section 465.086 requires entities offering gaming in Nevada to obtain a Nevada gaming license "[e]xcept as otherwise provided by law,"

and to obtain all licenses "as required by statute." NRS § 465.086(1). Polymarket contends that the CEA is a "law" that "provides" that it is not "required" to obtain a Nevada license. Notice ¶ 49. But Section 465.086 does not directly refer to any federal law, let alone the CEA. And the CEA does not say anything about compliance with Nevada gaming law—let alone provide that a DCM is exempt from all state licensing. *See Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005). What Polymarket means—again—is that it believes federal law preempts Nevada's licensing regime as applied to it. But that is not a basis for federal-question jurisdiction. Further, even if the CEA provided an exception to the state-law licensing requirement, the statutory phrasing "except as otherwise provided" indicates that this would be an affirmative defense to be raised and proved by Polymarket—not an element of the Board's claim. *See Cunningham v. Cornell Univ.*, 604 U.S. 693, 701 (2025). It is black-letter law that an affirmative defense cannot form the basis of federal-question jurisdiction, "even if both parties concede that the federal defense is the only question truly at issue." *Caterpillar*, 482 U.S. at 393.

Polymarket's reliance (Notice ¶¶ 48–49) on NRS § 465.086(1)'s requirement of "federal" licenses in addition to "state, county and municipal gaming licenses" equally is unavailing. Those state law requirements are cumulative; possessing one license does not excuse the absence of another. In other words, if Polymarket lacks a Nevada gaming license (which it does not dispute), then it violates Section 465.086 even if it has a federal license. Thus, this portion of Section 465.086 does not "necessarily raise" a federal issue. *Royal Canin*, 604 U.S. at 26. And in any event, "mere references to federal law in [a statute] do not convert the claim into a federal cause of action." *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 675 (9th Cir. 2012).[2]

Polymarket's expansive position would mean that anytime a defendant raises a federal defense, there is "arising under" jurisdiction. It should be rejected for that reason. And if there were any doubt, principles of federalism foreclose Polymarket's removal attempt. Exercising federal-question jurisdiction here would upset the "balance of federal and state judicial responsibilities." *Bank of Am.*,

---

[2] Polymarket also argues that the CFTC's "discretion" under the Special Rule to prohibit the listing of event contracts involving gaming somehow triggers federal-question jurisdiction. Notice ¶ 51; *see* 7 U.S.C. § 7a-2(c)(5)(C). But the Special Rule has nothing to do with this case; the Board is not asking the CFTC to de-list Polymarket's gaming-related contracts, it is seeking to have Polymarket comply with state gaming law.

672 F.3d at 675. The Board brought this action "in state court to enforce its own state laws," alleging only "state law causes of action, brought to protect Nevada residents." *Id.* at 676. Under these circumstances, "the claim of sovereign protection from removal arises in its most powerful form." *Id.* (citation omitted). The Court should be "reluctant to snatch" a case that "a State has brought from the courts of that State, unless some clear rule demands it." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 21 n.22 (1983). No such rule does. Nevada courts should adjudicate this matter, even if doing so requires them to contend with issues of federal law. *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 150 (1988). After all, the Supreme Court has long recognized that "state courts . . . are presumed competent to resolve federal issues." *Id.*

Polymarket's reliance (Notice ¶ 50) on *Georgia Gambling Recovery LLC v. Kalshi Inc.*, 2026 WL 279375 (M.D. Ga. Feb. 3, 2026), is misplaced. In that case, to succeed on its state-law cause of action, the plaintiff had to prove that the challenged contracts were illegal under federal law. *See id.* at *2–3. Here, by contrast, the Board does not have to prove anything about Polymarket's compliance with federal law in order to prove that Polymarket violates Nevada gaming law. *Georgia Gambling* also involved a lawsuit seeking recovery of gambling losses, not a sovereign enforcement action brought by a State, *see id.* at *1, so there were no similar federalism concerns in that case, *see Bank of Am.*, 672 F.3d at 676.

For all of these reasons, the Court should reject Polymarket's expansive theory of "arising under" jurisdiction.

### C.     An Award of Attorneys' Fees is Appropriate

The Court should award the Board its attorneys' fees and costs incurred for this motion to remand. Under 28 U.S.C. § 1447(c), an order remanding a case "may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." Although attorneys' fees are not automatic, attorneys' fees are appropriate where the removal was not objectively reasonable. *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). Assessing costs and fees for unreasonable removals deters defendants from abusing the removal process to unjustly delay litigation and impose unwarranted costs on plaintiffs. *Id.* at 140.

///

Polymarket's removal was not reasonable because Polymarket plainly does not fall under the federal officer removal statute, 28 U.S.C. § 1442, and this case does not arise under federal law, *see* 28 U.S.C. § 1331. No objective basis exists to support Polymarket's contention that it qualifies as a federal officer based on its status as a DCM. The few cases Polymarket cites do not support its contention, and it entirely fails to engage with the Ninth Circuit's holdings that mere compliance with federal law is insufficient. Indeed, common sense rejects the suggestion that every DCM in the country can suddenly become a person acting under a federal officer and entitled to remove an action to federal court whenever such an entity is sued under state law. Polymarket's effort to couch a preemption defense as a basis for federal question jurisdiction fares no better. It entirely fails to grapple with the long line of case law rejecting that argument—Polymarket does not even cite those cases, let alone attempt to distinguish them. The Board accordingly requests that this Court award fees and costs under 28 U.S.C. § 1447(c).

## V. CONCLUSION

The Court should remand this matter to the First Judicial District Court of Nevada, Carson City prior to the expiration of the TRO on February 26, 2026, and should award attorney's fees to the Board.

DATED this 9th day of February, 2026.

AARON D. FORD
Attorney General

By: /s/ *Jessica E. Whelan*
Jessice E. Whelan (Bar No. 14781)
 Chief Deputy Solicitor General – Litigation
John S. Michela (Bar No. 8189)
 Senior Deputy Attorney General
Sabrena K. Clinton (6499)
 Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
jwhelan@ag.nv.gov
jmichela@ag.nv.gov
sclinton@ag.nv.gov

*Attorneys for Plaintiff State of Nevada ex rel.*
*Nevada Gaming Control Board*