AARON D. FORD
  Attorney General
Jessica E. Whelan (Bar No. 14781)
  Chief Deputy Solicitor General - Litigation
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
John S. Michela (Bar No. 8189)
  Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3416 (fax)
jwhelan@ag.nv.gov
sclinton@ag.nv.gov
jmichela@ag.nv.gov

*Attorneys for Plaintiff State of Nevada ex rel.*
*Nevada Gaming Control Board*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BORAD,<br><br>Plaintiff,<br><br>vs.<br><br>BLOCKRATIZE, INC. d/b/a/ POLYMARKET; QCX LLC, d/b/a POLYMARKET US; ADVENTURE ONE QSS INC. d/b/a/ POLYMARKET,<br><br>Defendants. | Case No. 3:26-cv-00089-MMD-CLB |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR STAY PENDING APPEAL**
**(ECF NO. 46)**

Plaintiff State of Nevada ex rel. Nevada Gaming Control Board (Board) files this response to the Motion for Stay Pending Appeal filed by Defendants Blockratize Inc. d/b/a Polymarket, QCX LLC d/b/a Polymarket US, and Adventure One QSS Inc. d/b/a Polymarket (collectively, Polymarket), ECF No. 46 (Mot.). Polymarket's merits arguments are weak, and the balance of harms strongly favors the Board. Indeed, as the state court found, every day that Polymarket is allowed to operate in the State imposes

severe and irreparable harms on the State, its gaming industry, and the public. The Court therefore should deny the Motion, which represents just another unfounded attempt by Polymarket to delay enforcement proceedings against its unlicensed gambling operations in Nevada.

**INTRODUCTION**

This case involves a civil enforcement action under Nevada state law brought by the Board to enjoin Polymarket's unlawful gambling operations in Nevada. The Board brought this case in state court as state law requires and, after Polymarket removed this case to federal court, this Court concluded that Polymarket had no valid basis for removal. Polymarket now seeks to stay the Court's remand order, preventing the state court from taking further action in a case in which that court has already concluded that a temporary restraining order (TRO) is necessary to prevent Polymarket from causing irreparable harm to the State, its gaming industry, and the public. The Court should deny that request.

Polymarket first argues that the remand order should be automatically stayed for 30 days under Federal Rule of Civil Procedure 62(a). But that provision expressly grants the Court discretion not to enter a stay, and the Ninth Circuit has recently held that courts should not automatically stay remand orders pending appeal, but instead should evaluate requests for stays under the four-factor test set out in *Nken v. Holder*, 566 U.S. 418 (2009). *California ex rel. Harrison v. Express Scripts, Inc.*, 139 F.4th 763, 768 (9th Cir. 2025), *cert. denied*, 2026 WL 79931 (U.S. Jan. 12, 2026). Polymarket does not even mention that on-point, binding precedent.

Applying the *Nken* factors here, no stay is warranted. As this Court already has found, Polymarket is not likely to succeed on the merits. The Court correctly rejected Polymarket's arguments that it is acting under a federal officer and that its preemption defense supports federal-question jurisdiction. Those arguments are insubstantial and do not raise any serious legal questions; indeed, both arguments are foreclosed by binding Ninth Circuit law.

Further, the balance of equities strongly favors the Board. Polymarket just wants to keep making money from its unlicensed gambling. All of its harms are self-inflicted and therefore are not irreparable as a matter of law. Polymarket's claim that having to litigate in state court will cause it irreparable harm is foreclosed by the Ninth Circuit's decision in *Express Scripts*, which rejected the argument that litigating in state court, by itself, causes irreparable harm. Being subject to a state enforcement action is

not an irreparable injury, because Polymarket can raise any defense (and indeed, it has raised its preemption defense in state court).

On the other hand, if the TRO were permitted to expire, then every day that Polymarket were permitted to offer unlicensed gambling would cause severe and irreparable injury to the State, its gaming industry, and the public. The state court expressly made that finding in granting the TRO, and Chief Judge Gordon came to the same conclusion with respect to the operations of Polymarket's competitor Kalshi.

Nevada has a sovereign interest in enforcing its gaming laws. If Polymarket were to resume its unlicensed operations pending appeal, that would severely disrupt Nevada's regulated gaming industry by giving it an unfair advantage over licensed competitors. It would harm Nevada's economy and public fisc by depriving the State of critical tax revenues. And it would harm the public, because Polymarket does not comply with Nevada's consumer-protection requirements, and its platform is open to match fixing, insider betting, and abuse. Given these documented harms that the Board and others would face, the balance of the hardships and the public interest weigh decisively against Polymarket's request for a stay.

## BACKGROUND

The Board brought this state-law civil enforcement action against Polymarket, a private company, for offering unlicensed sports betting in violation of Nevada's gaming laws. The state court issued a TRO, determining that Polymarket likely offers unlicensed gambling in violation of state law and that Polymarket's actions cause immediate and irreparable harm to the Board, Nevada's gaming industry, and the public each day that they continue. ECF No. 2-4, at 67–68. The state court found that Polymarket is not likely to succeed on the merits, because it is offering unlicensed gaming in violation of Nevada law, and its defense (that federal law preempts Nevada gaming law) fails. *Id.* at 65–67. In particular, the state court found the "reasoning" of Chief Judge Gordon's decision on the federal preemption question "persuasive." *Id.* at 66. The court also found that every day that Polymarket's unlicensed operations continue, they irreparably harm the State, its gaming industry, and the public. *Id.* at 67–68. These harms "cannot be mitigated" once incurred. *Id.* at 67. "A day means more consumers. More consumers mean more transactions. More transactions means more potential harm." *Id.* "[E]very day matters in this case

in a literal sense." *Id*. The court entered a TRO that lasted 14 days, until February 12, 2026. *Id.* at 46, 69. The parties have since agreed to extend the TRO to April 6, 2026. ECF No. 47, ¶ 10.

In the state court, Polymarket agreed to an expedited briefing schedule on the Board's preliminary-injunction motion. But the day its brief was due on the preliminary injunction motion, Polymarket removed the case to this Court—thereby preventing the state court from deciding the preliminary-injunction motion. *See* ECF No. 1. Polymarket asserts that this state-law case can only be heard in federal court—supposedly because Polymarket (a private company) can avail itself of the federal officer removal statute and because Polymarket's federal defense makes the case "arise under" federal law. *See* ECF No. 2-1, ¶¶ 24–60.

On March 2, 2026, this Court rejected both of Polymarket's asserted grounds for removal and ordered this case remanded to the state court. With respect to federal officer removal, the Court explained that the relevant question is whether Polymarket is "acting under" a federal officer, 28 U.S.C. § 1442(a)(1), when it was offering its sports and other event contracts on its market. *See* ECF No. 41, at 3. The Court concluded that Polymarket was not acting under any federal officer. *Id.* at 3–6. Polymarket had argued that it exercised delegated authority from the Commodity Futures Trading Commission (CFTC) when it self-certified that its contracts complied with the Commodity Exchange Act (CEA). *Id.* The Court rejected that argument, explaining that Polymarket's conduct simply represented the "simple compliance with the law" and does not give rise to federal officer removal. *Id.* at 5–6 (quoting *Riggs v. Airbus Helicopters, Inc.*, 939 F.3d 981 (9th Cir. 2019)).

With respect to federal question jurisdiction, the Court rejected Polymarket's argument that the Board's complaint necessarily raised a substantial federal issue. ECF No. 41, at 6–9. The Court recognized that Polymarket's claimed federal issue—whether the CEA preempts Nevada gaming law—is a federal defense, and federal defenses do not create federal-question jurisdiction. *Id.* at 9. The Court explained that a court does not need to interpret federal law to determine whether Polymarket's conduct violates Nevada's gaming laws because those laws do not incorporate federal law, and the Board's claims focus on Polymarket's failure to obtain a Nevada license and comply with Nevada-specific requirements, not any failure on Polymarket's part to obtain a federal license. *Id.* at 8.

///

The Court forwarded its remand order to the state court on March 2, 2026. *See* ECF No. 41 (docket entry). The next day, Polymarket filed its motion for a stay pending appeal. *See* ECF No. 46. On March 4, the Court recalled its remand order. *See* ECF No. 48.

## LEGAL STANDARD

The Ninth Circuit recently addressed the standard for a stay of a remand order pending appeal in *Express Scripts*. The Court held that a case should not automatically be stayed pending an appeal of a district court's order remanding the case to state court; rather, the court should evaluate whether a stay is warranted using the factors set out in *Nken v. Holder*, 566 U.S. 418 (2009). 139 F.4th at 770.

Thus, in determining whether to grant a stay of a remand order pending appeal, a court considers "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Express Scripts*, 139 F.4th at 768 (quoting *Nken*, 556 U.S. at 434). "Where the government is the opposing party, the balancing of the harm and the public interest merge." *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 983 (9th Cir. 2025).

Here, this Court has already determined that Polymarket is not likely to succeed on the merits. The Ninth Circuit has indicated that a stay pending appeal nonetheless may be appropriate if a movant shows that it has raised "serious legal questions" and that the balance of hardships "tips sharply" in its favor. *Leiva-Perez v. Holder*, 640 F.3d 962, 968, 970 (9th Cir. 2011) (internal question marks omitted); *see Express Scripts*, 139 F.4th at 772 n.8.[1]

## ARGUMENT

**I.     This Court Should Not Enter a Stay Under Rule 62(a)**

Polymarket first argues (Mot. 5–6) that this Court should enter an automatic stay of the remand order under Federal Rule of Civil Procedure 62(a). That rule provides that (with exceptions not relevant here) "execution on a judgment and proceedings to enforce it are stayed for 30 days after its entry, *unless*

---

[1] This approach appears inconsistent with *Nken* and *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), both of which require showing a likelihood of success on the merits, not merely a serious question. *See Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 & n.12 (9th Cir. 2024).

*the court orders otherwise.*" Fed. R. Civ. P. 62(a) (emphasis added). As an initial matter, Rule 62(a) is inapt, both because Kalshi seeks a stay for the duration of the appeal and not just for 30 days, and because it is not clear that Rule 62(a) even applies to remand orders. *See Arnold v. Garlock, Inc.*, 278 F.3d 426, 437 (5th Cir. 2001) (limiting Rule 62(a) to only "judgments for money"). But assuming Rule 62(a) has some relevance here, it does not set out an invariable rule—the court can "order otherwise" and not enter a stay. And in the exact context here, the Ninth Circuit has rejected the view that an automatic stay applies to remand orders and instead has held that a request for a stay should be evaluated under the *Nken* factors. *See Express Scripts*, 139 F.4th at 768.

Specifically, in *Express Scripts*, the Ninth Circuit considered whether a district court should automatically stay a remand order. 139 F.4th at 767–68. The defendants in that case had removed the case to federal court on grounds of federal officer removal. *Id.* at 766. When the federal court remanded the case, the defendants appealed the remand order and argued that the remand order should be stayed pending appeal. *Id.* at 766–67. In particular, the defendants argued that an automatic stay was warranted under *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023), where the Supreme Court held that when a party exercises its statutory right to appeal the denial of a motion to compel arbitration under the Federal Arbitration Act, the district court should automatically stay all proceedings during the appeal. *Id.* at 741.

In *Express Scripts,* the Ninth Circuit rejected the defendants' arguments for an automatic stay of a remand order. The Court held that the district court should *not* automatically stay the remand order but instead should decide whether a stay is warranted using the four-factor test set out in *Nken*. *Express Scripts*, 139 F.4th at 771–72. The Court explained that removal implicates important federalism principles that are "not at issue where parties seek to compel arbitration." *Id.* at 768. When cases are improperly removed, that "deprive[s] [the] state courts of jurisdiction over cases that should rightfully be heard in their fora, in violation of comity principles." *Id.* at 769. Requiring district courts to then automatically stay all litigation pending appeal would only exacerbate this "federal infringement on state courts' rights." *Id.*

The better course, the Court explained, is for the district court to evaluate whether to stay the remand order in each case under *Nken*. *Express Scripts*, 139 F.4th at 769. The Court further suggested that, if anything, the district court should err on the side of *denying* the stay, because state courts also are

empowered to enter stays. *Id.* (noting that "a state court could decide to stay a remanded case if, in its opinion, it thinks the defendants who removed based on the federal officer removal statute do have a strong likelihood of success on appeal"). Thus, the Court concluded that "an automatic stay pending appeal of a federal officer removal remand order would run afoul of the delicate balance of federalism." *Id.*

The Court further explained that an automatic stay is not required to vindicate a defendant's rights under the federal officer removal statute. The federal officer removal statute gives a defendant only a right to "have its federal immunity defenses adjudicated and, if necessary, a trial held in federal court," not a right to avoid litigation altogether. *Express Scripts*, 139 F.4th at 771–72 & n.7. This right can be vindicated without a stay because if the court of appeals determines that removal was warranted, the district court can recall the remand order and resume adjudicating the case post-appeal. *Id.* at 771.

Finally, the Court noted, requiring an automatic stay would "encourage gamesmanship by defendants that would frustrate principles of judicial economy." *Express Scripts*, 139 F.4th at 771–72. If an automatic stay applied, "[a]ny defendant seeking to delay . . . could craft an argument for federal officer removal then appeal a district court's remand order." *Id.* at 772. Thus, an automatic stay rule would encourage defendants to file meritless removal motions and then appeal just to delay adjudication on the merits. *Id.* For all these reasons, the Court held that a district court should not automatically stay litigation pending the appeal of a remand order, but instead should evaluate a request for a stay pending appeal under the *Nken* factors. *Id.*

Although Polymarket relies on Rule 62(a) instead of *Coinbase*, *Express Scripts*' reasoning applies equally here. Rule 62(a) expressly gives the Court discretion not to enter a stay, by providing that the Court should enter a stay unless the Court "orders otherwise." Fed. R. Civ. P. 62(a); *see Maranino v. Cabrini of Westchester*, 2022 WL 17995107, at *1 (S.D.N.Y. Dec. 29, 2022). *Express Scripts* makes clear that an automatic stay is *not* warranted in the context of an appeal of a remand order, given the important federalism principles involved, the lack of any harm from a remand, and the potential for gamesmanship from entering an automatic stay. 139 F.4th at 768–72.

Notably, Polymarket does not even cite *Express Scripts*. Instead, it cites (Mot. 6) decisions where district courts entered automatic stays under Rule 62(a) upon entering remand orders. But all of these

decisions predate *Express Scripts*, and none acknowledges (much less addresses) the significant federalism interests implicated. The cited in-circuit decisions are no longer good law after *Express Scripts*, and the cited out-of-circuit decisions have no persuasive force because they do not address the reasoning in *Express Scripts*. The Court accordingly should not enter an automatic stay under Rule 62(a), but instead should evaluate whether a stay is warranted under *Nken*. *See* 139 F.4th at 769.

## II. The *Nken* Factors Do Not Warrant a Stay Pending Appeal

This Court correctly concluded that this case should be remanded to state court. Polymarket has not identified any error in the Court's decision or otherwise shown that it has any likelihood of success on the merits of its appeal, and the balance of hardships and public interest weigh heavily against allowing it to continue its unlicensed gambling operations in Nevada pending its appeal of the remand order in this case.

### A. Polymarket has not made a strong showing of success on the merits or raised serious questions

This Court thoroughly considered, and rejected, all of Polymarket's asserted grounds for removal. *See* ECF No. 41. Polymarket thus is not likely to succeed on appeal. Notably, the most Polymarket argues is that it has raised "serious legal questions" on the merits. Mot. 6.

A "serious question[]" is one that is "substantial, difficult, and doubtful," and which "make[s] [for] a fair ground for litigation." *Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc) (internal quotation marks omitted). There must be a "fair chance of success on the merits." *Id.* (internal quotation marks omitted). A merely "plausible" or novel argument is insufficient. *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 863 (9th Cir. 2022). Polymarket has not identified any serious legal questions here. Indeed, both of Polymarket's arguments are foreclosed by binding precedent.

#### 1. Federal officer removal jurisdiction

First, Polymarket argues that it has raised a serious legal question with respect to federal officer removal jurisdiction. It has not. Polymarket's federal-officer theory is based on the fact that it operates a designated contract market (DCM) registered with the Commodity Futures Trading Commission (CFTC). Mot. 7–8. Polymarket asserts that because it is regulated by a federal agency, and the federal

agency allows it to self-certify its event contracts, Polymarket actually is acting on behalf of the federal agency when it conducts its own business operations. *Id.*

This Court correctly rejected that argument. All of Polymarket's claimed activities relevant to the Board's enforcement action are simply complying with the law, and both the Supreme Court and the Ninth Circuit have held that complying with a federal regulatory scheme, even a highly detailed one, does not bring a private party within the scope of the federal officer removal statute. *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 145–53 (2007); *Riggs*, 939 F.3d at 985.

As the Court recognized, the Board's claims focus on Polymarket's actions self-certifying its own contracts and regulating access to these contracts. ECF No. 41, at 4. The Ninth Circuit has held that the "delegation of authority 'to self-certify compliance with the relevant regulations' " is insufficient to show that the person is acting under the direction of a federal officer. *Riggs*, 939 F.3d at 988 (internal quotation marks omitted). And the Court correctly held that Polymarket's permitting access to its markets similarly does not establish acting under jurisdiction, because this again is just Polymarket's own compliance with the law. ECF No. 41, at 5–6. The Board is not suing Polymarket for its regulation of third parties, for enforcing (or not enforcing) its rules, or for its rules' compliance with the CEA. The Board is suing Polymarket because Polymarket's own contracts violate Nevada law.

Polymarket suggests (Mot. 8) that this removal question turns on a "factual dispute," but it identifies no such dispute. It does not dispute that the contracts at issue on Polymarket's markets are its own contracts. It has identified no at-issue actions it has taken performing a regulatory function with respect to third parties. The only relevant conduct is Polymarket's own conduct. And the issue before the Court is a purely legal issue, where binding law forecloses Polymarket's arguments. Indeed, the Ninth Circuit has specifically held that the "delegation of authority 'to self-certify compliance with the relevant regulations'" is insufficient to show that someone is acting under the direction of a federal officer. *Riggs*, 939 F.3d at 988 (quoting *Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1100 (9th Cir. 2018)). Polymarket repeats (Mot. 8) its argument that other self-regulatory organizations have been determined to be "exercising quasi-governmental powers" in other circumstances. *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1213 (9th Cir. 1998), *abrogated on other grounds by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374 (2016). But *Sparta Surgical* involved

governmental immunity, not federal officer removal, and the facts are completely distinguishable. There, the National Association of Securities Dealers (NASD), which operates the NASDAQ stock exchange and has the power to regulate trading on that exchange, delisted the plaintiff company's stock from the NASDAQ SmallCap market on the grounds that the listing violated the market's rules. *Sparta Surgical*, 159 F.3d at 1210–11. The plaintiff brought state and federal claims against NASD, and NASD claimed government immunity on the ground that it was "exercising quasi-governmental powers." *Id.* at 1213. The Ninth Circuit explained that NASD was entitled to governmental immunity on the plaintiff's non-federal claims because NASD was "acting in an adjudicatory, prosecutorial, arbitrative or regulatory capacity" with respect to the plaintiff's stock. *Id.* at 1214–15. The key point is that NASD was regulating third parties on behalf of the government. As the Court explained, NASD would not have been entitled to immunity if the case involved only NASD's "private business." *Id.* at 1214. Polymarket continues to have no response to this point, and it still has not identified any decision holding that a private entity can remove a state enforcement action to federal court simply because the private entity is federally regulated.

Finally, Polymarket argues (Mot. 10–11) that the federal officer removal argument raises a serious legal question because of a pending Supreme Court case, *Chevron USA, Inc. v. Plaquemines Parish*, No. 24-813 (U.S.). For federal officer removal to apply, a removing defendant must (1) demonstrate that it is a federal officer or person "acting under" a federal officer, (2) demonstrate that the plaintiff's claims are "for or relating to" an act under color of federal office, and (3) raise a colorable federal defense. *See Fidelitad*, 904 F.3d at 1099. *Chevron* addresses only (2)—and specifically, whether the removal statute requires showing a "causal nexus" to show that the suit is "for or relating to" an action taken by the defendant under color of federal office. But this case does not involve the second requirement or the causal-nexus test at all. As the Court recognized, the parties' dispute in this case centers on whether Polymarket is "acting under" a federal officer in the first place, ECF No. 41, at 3, not whether there is a nexus between its actions taken in that capacity and this suit. Polymarket identifies no basis to think the Supreme Court's decision would alter the analysis on appeal in any way, much less do so in a way that would suggest a stay pending appeal is warranted.

/ / /

/ / /

Thus, the key facts are undisputed, and Polymarket's federal officer removal arguments fail under binding Ninth Circuit precedent. It therefore has not presented any "serious questions" for appeal on this asserted ground of removal.

### a.  Federal-question jurisdiction

Second, Polymarket argues (Mot. 9) that it has raised a serious legal question with respect to federal question jurisdiction. That is incorrect. The Board filed this action in Nevada state court, seeking to enforce state gaming law and asserting only state-law causes of action. ECF No. 2-4, ¶¶ 60–80. There is no federal claim on the face of the well-pleaded complaint. If Polymarket believes federal law supplies a defense to those claims, it is free to raise that defense in state court. It may not transform a state-law enforcement action into a federal case through removal.

Polymarket repeats its argument that NRS § 465.086 incorporates federal law by requiring entities offering gaming in Nevada to obtain a Nevada gaming license except as "otherwise provided by law." Mot. 4. This Court correctly concluded that this statutory language in a Nevada statute should be understood to refer to Nevada law. See ECF No. 41 at 8; *Houston v. Moore*, 18 U.S. (5 Wheat.) 1, 42 (1820). Polymarket argues (Mot. 10) that the Board "forfeited" this argument, but that is incorrect. The Board noted in its remand motion that the relevant Nevada statute "does not directly refer to any federal law, let alone the CEA." ECF No. 7, at 17. In any event, the argument implicates the Court's subject-matter jurisdiction, so it cannot be forfeited. Polymarket notes (Mot. 10) that in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), the Supreme Court concluded that an argument was forfeited even though it "concerned jurisdiction." But that involved an argument raised by the plaintiff asserting that the court had jurisdiction. *See id.* As the D.C. Circuit has explained, forfeiture only works one way in this situation: "Although a party cannot forfeit a claim that we lack jurisdiction, it can forfeit a claim that we possess jurisdiction." *Scenic Am., Inc. v. DOT*, 836 F.3d 42, 53 n.4 (D.C. Cir. 2016).

Anyway, even if the Nevada statute were understood to incorporate federal law, that would at most provide a federal affirmative defense. *See Cunningham v. Cornell Univ.*, 604 U.S. 693, 701 (2025). It is black-letter law that an affirmative defense cannot form the basis of federal-question jurisdiction, "even if both parties concede that the federal defense is the only question truly at issue." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987). The Court declined to reach this argument given its determination

1  that the statute does not implicate federal law at all, but it is another reason why Polymarket fails to show
2  any serious legal question on appeal. Polymarket has no answer on this point.

3        In response to the Court's finding that the statute references only Nevada law, Polymarket cites
4  (Mot. 9) *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 157 (1982), for the
5  proposition that the Supremacy Clause makes federal law a part of each State's law. But *Fidelity Federal*
6  was not about how to read a state statute's reference to "law" language. On that point, the Supreme Court
7  already had held that when a statute refers to "law" generally, the statute is presumed to refer "only . . .
8  to the laws of the government" that passed the statute, *Houston*, 18 U.S. at 42—here, Nevada law. *Fidelity*
9  *Federal* was about interpreting a regulation, and the question was whether the regulation's incorporation
10 of state law precluded application of federal law; the Supreme Court said "no," because federal law
11 always applies. That decision regarding the interpretation of a federal regulation has nothing to do with
12 how a reference to "law" in a Nevada statute should be interpreted as a matter of Nevada law. Further,
13 no one disputes that federal law applies to the States; that is why Polymarket may assert a preemption
14 defense in state court. But that does not transform that preemption defense into a basis for removal or
15 otherwise suggest that Nevada must prove the absence of a federal conflict to show a state-law violation.
16 *See Caterpillar*, 482 U.S. at 393.

17       Polymarket continues (Mot. 9–10) to rely on *Georgia Gambling Recovery LLC v. Kalshi Inc.*,
18 2026 WL 279375 (M.D. Ga. Feb. 3, 2026), but as the Court recognized, the state law at issue in that case
19 is nothing like the Nevada law at issue here, *see* ECF No. 41, at 8. The Georgia law in *Georgia Gambling*
20 provided that "[g]ambling contracts" were "void," and authorized recovery of "[m]oney paid . . . upon a
21 gambling consideration" in connection with such contracts, O.C.G.A. § 13-8-3(b), and the Georgia
22 Supreme Court had stated that whether a gambling contract was void under this provision "depends on
23 whether the contract is unlawful under the law governing its validity," *Georgia Gambling*, 2026 WL
24 279375, at *3 (citing *Talley v. Mathis*, 453 S.E.2d 704 (Ga. 1995)). As a result, to succeed on its state-
25 law claim, the plaintiff had to prove that the challenged contracts were illegal under federal law. *See id.*
26 at *2–3. Polymarket can identify no similar incorporation of federal law into the elements of the Board's
27 state-law claims here.
28 / / /

### b. Polymarket would not be irreparably harmed without a stay

Polymarket argues (Mot. 11–14) that it would face irreparable harm without a stay pending appeal, whereas the Board would not be harmed. That has it exactly backwards: Polymarket has not shown any irreparable harm, whereas the Board would face substantial and irreparable harm if the Court were to grant a stay pending appeal.

Polymarket has no right to operate in violation of state law to try to make more profits. All other companies offering lawful sports betting comply with state law, either by becoming licensed or by geofencing their operations to avoid Nevada, and Polymarket can do that too. Polymarket just wants to make more money; all of its harms are self-inflicted and therefore are not irreparable. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020). Further, Polymarket cannot claim that a civil enforcement proceeding would cause it irreparable harm, because it can raise any potential defense. *John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 203 (D.D.C. 2017).

Polymarket argues that it would suffer irreparable injury absent a stay because it "would be forced to engage in parallel litigation by simultaneously briefing jurisdictional issues in the Ninth Circuit and merits issues in the Nevada state court." Mot. 11; *see id.* at 12 (suggesting that parallel litigation would impose an "unfair burden"). But it is well established that "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 735 n.20 (9th Cir. 2017) (internal quotation marks omitted). Notably, there is no risk of inconsistent decisions, because the state court and the Ninth Circuit would be addressing different issues—the state court would be considering the merits of the Board's state-law enforcement action, not the propriety of removal, whereas the reverse would be true of the Ninth Circuit.

Notably, *Express Scripts* makes clear that continuing litigation in state court during the pendency of an appeal of a remand order should be the norm, and does not impose any sort of harm. *See* 139 F.4th at 768–70. The Ninth Circuit explained that a stay of a remand order pending appeal is an "extraordinary remedy" and should be granted sparingly "when the case involves another sovereign" (here, the State of Nevada). *Id.* at 768. The Ninth Circuit further explained that although state and federal courts "may operate in slightly different ways," both provide "forums for litigation with roughly similar levels of efficiency, expense, and comprehensive discovery mechanisms." *Id.* at 770. Thus, having to continue

litigation in state court "for a brief period pending appeal" does not "cause defendants to irretrievably lose" anything. *Id.* (internal quotation marks and brackets omitted).

Polymarket cites (Mot. 11–12) *Academy of Country Music v. Continental Casualty Company*, 991 F.3d 1059 (9th Cir. 2021), where the Ninth Circuit held that, for a remand order that is reviewable under 28 U.S.C. § 1447, "the transmittal of the remand order to the state court did not deprive [the Ninth Circuit] of jurisdiction." *Id.* at 1070. Polymarket suggests that the decision shows that a stay is necessary for the appeal to be meaningful, but it reflects the opposite: The decision instead confirms that, even if a remand order is not stayed and the Court's remand order is transmitted to the state court, the Ninth Circuit still can perform appellate review. *Id.* And if the appeal is successful, the Court can issue an order recalling the remand and notifying the state court that the Court has resumed jurisdiction over the action. *See id.* That confirms that there is no harm from proceeding in state court.

Polymarket next argues (Mot. 12) that it faces a particular harm from proceeding in state court in this case because the Board has pursued "frequent and unwarranted . . . emergency, often-*ex parte* relief against Defendants." But it was Polymarket that chose to remove this case to federal court rather than file a response to the Board's preliminary injunction motion, which prevented the state court from holding a hearing on that motion. Polymarket cannot credibly try to lay the results of its litigation gamesmanship at the feet of the state court. Anyway, Polymarket's arguments about *ex parte* relief are meritless. *Ex parte* relief also is available in federal court. *See* Fed. R. Civ. P. 65(b). Further, Polymarket was able to file a preliminary response to the Board's application for a TRO in the state court, and that court took Polymarket's response into account before issuing the TRO. ECF No. 2-4 at 59, 63, 67. As for further proceedings, Polymarket is well aware of the Board's arguments and has had weeks to prepare its opposition to the Board's motion for preliminary injunction.

Finally, a stay is not required to preserve the status quo. As the Ninth Circuit has explained, the status quo is not the situation immediately before the filing of the lawsuit, but instead is "the last uncontested status which preceded the pending controversy." *Flathead*, 98 F.4th at 1191 (internal quotation marks omitted). Since the Founding, the regulation of gambling has been the prerogative of the States. *Flynt v. Bonta*, 131 F.4th 918, 932 (9th Cir. 2025); *see Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905). That includes sports betting, which Nevada has regulated for decades. *See Murphy v. NCAA*, 584

U.S. 453, 461-62 (2018). Thus, the status quo here is the Board enforcing Nevada's gaming laws against anyone who offers unlicensed gambling—including sports betting—within its borders.

The bottom line is that Polymarket just wants to be able to profit off of unlicensed gambling. The Board is statutorily charged with seeking to enjoin that illegal conduct, and "having to submit oneself to an enforcement proceeding typically does not constitute irreparable harm." *John Doe Co.*, 235 F. Supp. 3d at 203.

    **2. The balance of hardships and public interest weigh heavily against a stay pending appeal**

Polymarket asserts (Mot. 13) that staying the remand order "would not prejudice" the Board. While Polymarket currently is not operating in Nevada under the Court's TRO, that TRO is set to expire on April 6, 2026, and cannot be renewed indefinitely. *See O.L. v. City of El Monte*, 2020 WL 2477686, at *1 (C.D. Cal. Mar. 2, 2020). It likely will take months for the parties to brief and argue Polymarket's appeal in the Ninth Circuit, and then even more time for the Ninth Circuit to issue its decision. Polymarket's clear aim in seeking a stay pending appeal is to be able to resume its operations in Nevada while the appeal is pending.

But the state court has already determined that the Board suffers immediate and irreparable harm when Polymarket allows persons within Nevada to wager on sports and other events through event-based contracts in violation of Nevada law. ECF No. 2-4, at 67–68. As the court explained, "every day" matters "in a literal sense" in these cases: "A day means more consumers. More consumers mean more transactions. More transactions mean more potential harm." *Id.* at 68. Chief Judge Gordon has come to a similar conclusion with respect to Kalshi, concluding that every day Kalshi operates in violation of Nevada law imposes "substantial irreparable harms to the Board, the State of Nevada, the gaming industry in this state, and the public interest." *KalshiEX, LLC v. Hendrick*, 2025 WL 3286282, at *13 (D. Nev. Nov. 24, 2025), *appeal pending*, No. 25-7516 (9th Cir. filed Nov. 25, 2025).

Those conclusions are correct. A State "suffers a form of irreparable injury" "[a]ny time" it is "enjoined by a court from effectuating statutes enacted by representatives of its people." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 656 (9th Cir. 2025) (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 860–61 (2025)). As the state court recognized, the Board has a statutory obligation to

"consistently and equitably" enforce Nevada gaming law to "protect the health, safety, morals, good order, and general welfare of gaming consumers." ECF No. 2-4, at 67. Preventing the Board from doing so poses an affront to Nevada's sovereignty and intrudes on the democratic will of the people.

Licensed gaming is "vitally important to the economy of the State and the general welfare of the inhabitants." NRS § 463.0129(1)(a). In 2024, Nevada collected $2 billion in gaming taxes, which fund core public services. Nev. Resort Ass'n, *2025 Nevada Gaming Fact Book* 65 (2025), perma.cc/NRH9-5NGV. Unlicensed gaming threatens that revenue by evading taxes and diverting business from licensed sportsbooks that pay taxes. *See Sacco v. State*, 105 Nev. 844, 847 (1989).

Many provisions of Nevada gaming law protect the public. Only people who are at least 21 years old may gamble. NRS § 463.350(1)(a). Licensees must allow patrons to set betting limits, conspicuously display information about responsible-gaming resources, train employees to identify signs of problem gaming, and refrain from marketing to customers who have excluded themselves. Nev. Gaming Reg. 5.170. Polymarket does not follow any of those requirements.

Polymarket, as "[a]n unlicensed participant beyond the BOARD's control," obstructs the Board's ability to fulfill its statutory duties and protect the public. ECF No. 2-4, at 67. The resulting unlicensed and unregulated gambling means underage people can gamble, allows unsuitable persons to run gaming operations, and distorts the gaming industry. *Id*. These harms "cannot be mitigated" once incurred. *Id*.

Nevada has a sovereign interest in ensuring a fair and competitive gaming industry. NRS § 463.0129(1)(b)–(c); *see Sports Form, Inc. v. Leroy's Horse & Sports Place*, 108 Nev. 37, 41 (1992). If Polymarket were allowed to operate in Nevada, its failure to comply with Nevada gaming law would give it a massive and unfair competitive advantage over its competitors, which would greatly disrupt the gaming industry. That advantage would be both pecuniary, in that Polymarket would not need to spend the money its competitors need to spend on licensing fees, taxes, and compliance (including maintaining a physical location in Nevada), as well as strategic, in that Polymarket would be offering products that are not subject to the same requirements as its competitors. The Board would suffer irreparable harm if Polymarket were able to distort the playing field and disrupt the industry in this manner. *KalshiEX*, 2025 WL 3286282, at *13–14; *see Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1509 (9th Cir. 1993).

The harm only would increase the longer Polymarket is allowed to operate unfettered. Polymarket's ability to profit from unlicensed gaming will incentivize others to enter into prediction markets instead of becoming (or remaining) licensed by the State. Indeed, that already has started to happen: DraftKings and FanDuel have decided to forgo licensing in Nevada so that they can enter the prediction-markets business in other States. *See KalshiEX*, 2025 WL 3286282, at *14. Other sportsbooks could follow suit, "unleashing even more unregulated gambling." *Id.*

Polymarket suggests (Mot. 13) that the Board is not suffering irreparable harm as a result of Polymarket's activities because the Board has purportedly delayed enforcing Nevada gaming laws against Kalshi, one of Polymarket's competitors. Polymarket is wrong. The Board has actively complied with its statutory mandate to consistently and equitably enforce Nevada's gaming laws and consistently has sought to resolve its litigation against unlicensed gaming operations. The Board filed this enforcement action in state court as soon as it became aware of Polymarket's operations in Nevada. The Board likewise has vigorously enforced state gaming law against Kalshi: When Kalshi "greatly expanded" its operations, the Board obtained dissolution of a preliminary injunction, *KalshiEX*, 2025 WL 3286282, at *13, and then filed an enforcement action against Kalshi in state court, *see State of Nevada ex rel. Nevada Gaming Control Board v. KalshiEX LLC*, No. 2600000501B (Nev. 1st JD filed Feb. 17, 2026). In any event, a delay in seeking "judicial protection" rarely if ever negates a showing of irreparable injury, especially "in the context of ongoing, worsening injuries." *Arc of Cal. v. Douglas*, 757 F.3d 975, 990–91 (9th Cir. 2014)—which is the situation here.

Finally, Polymarket suggests (Mot. 14) that the *ex parte* nature of the Board's initial request for a temporary restraining order is a reason to disregard the state court's determination that the Board would suffer significant and irreparable harm if Polymarket is permitted to resume its operations. But the state court issued its order after considering Polymarket's preliminary response to the Board's renewed application for a TRO. ECF No. 2-4 at 59, 63, 67. And the state court's conclusion that the Board is irreparably harmed by Polymarket's conduct is entirely consistent with Chief Judge Gordon's conclusions regarding the effects of the unlicensed activity of Kalshi, made after a full opportunity for briefing. *KalshiEX*, 2025 WL 3286282, at *13.

* * * * *

Every day that Polymarket operates in Nevada without complying with Nevada law would cause significant and irreparable harm to the State, its residents, its gaming industry, and its broader economy. There is no justification for allowing Polymarket to avoid an enforcement action in state court while it appeals the remand order.

## CONCLUSION

The Court should deny Polymarket's motion for a stay pending appeal.

DATED this 6th day of March, 2026.

AARON D. FORD
Attorney General

By: /s/ Jessica E. Whelan
Jessica E. Whelan (Bar No. 14781)
 Chief Deputy Solicitor General - Litigation
Sabrena K. Clinton (Bar No. 6499)
 Senior Deputy Attorney General
John S. Michela (Bar No. 8189)
 Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
jwhelan@ag.nv.gov
sclinton@ag.nv.gov
jmichela@ag.nv.gov

*Attorneys for State of Nevada ex rel. Nevada Gaming Control Board*